ANTONIO MARRERO CABRERA, demandante y recurrido, *v.* CARIBBEAN REFINING CO., demandada y recurrente.

*Número:* R-63-279    *Resuelto:* 15 de marzo de 1966

*McConnell, Valdés & Kelley, González, Jr., González-Oliver & Novak,* abogados de la recurrente; *Alberto Picó* y *José A. Suro,* abogados del recurrido; *Lino J. Saldaña, Manuel Janer Mendía, Ramón R. Lugo, Eddie Gaud, Rafael Martínez Álvarez, Jr., Hernán C. Torres, Rafael Martínez Álvarez III, José A. Fernández Paoli, Hartzell, Fernández & Novas, Vicente Géigel Polanco* y *Vicente Géigel Lanuza,* abogados de los *amici curiae.*

El Juez Asociado Señor Blanco Lugo emitió la opinión del Tribunal.

La Caribbean Refining Co., se dedica a la importación de ultramar de petróleo crudo que luego refina en la planta que tiene establecida en Bayamón para destinarlo al consumo local y a la exportación. Se trata, por tanto, de una industria dedicada al comercio interestatal. La naturaleza de la operación que lleva a cabo requiere un funcionamiento continuo durante las 24 horas del día. Para ello le es indispensable distribuir el trabajo en 3 turnos de 8 horas consecutivas. Desde el 5 de junio de 1955 estableció una semana de trabajo para los empleados de turno que comenzaba a las 11:01 [1] de la noche del domingo y terminaba 168 horas consecutivas después, a las 11:00 de la noche del domingo próximo. Cada período de 24 horas consecutivas contenía tres turnos, a saber, el número 1, de 11:01 p.m. a 7:00 a.m.; el número 2, de 7:01 a.m. a 3:00 p.m.; y el número 3, de 3:01 p.m. a 11:00 p.m.

Desde el 5 de junio de 1955 hasta el 11 de enero de 1956 el sistema de turnos en vigor requería la prestación de servicios durante 5 días consecutivos y luego los empleados permanecían ociosos durante los dos días siguientes. [2] Como este sistema impedía que un gran número de empleados pudiera disfrutar de la compañía de sus familiares durante los

---

[1] Se seleccionó las once de la noche como punto de partida para la semana de trabajo para evitar las tardanzas considerando las facilidades de transportación disponibles en el área de Bayamón.

[2] Las operaciones de la refinería comenzaron en abril de 1955 bajo un sistema de trabajo idéntico con la única diferencia de que la semana comenzaba y terminaba los jueves.

fines de semana, se diseñó un nuevo programa de trabajo que consistía de seis días consecutivos de labor y 2 de descanso. En 18 de marzo de 1957 la empresa y la unión incorporaron este sistema de trabajo al convenio colectivo que entonces se firmó y que estaba vigente a la fecha en que se inició la presente reclamación.[3] Fácil es advertir que como el turno estaba diseñado para 8 días consecutivos, la prestación de servicios no comenzaba uniformemente el mismo día todas las semanas, y que el sexto día consecutivo sólo caía dentro de la semana de trabajo establecida por la empresa únicamente en dos ocasiones dentro de un período de 8 semanas.[4] Cuando

---

[3] En adición a la fijación de los salarios para las distintas labores, el convenio contenía, en su Art. V, las siguientes cláusulas sobre el pago de horas extras:

"(a) Cualquier hora trabajada en exceso de ocho (8) horas diarias dentro de un período de veinte y cuatro (24) horas consecutivas se pagará a razón de tiempo y medio (1½) del tipo regular del salario convenido.

"(b) Cualquier hora trabajada en exceso de cuarenta (40) horas durante una semana de trabajo (*según aquí se define*) (pero no durante el séptimo día consecutivo que se trabaje) se le pagará al empleado por la Compañía a razón de tiempo y medio (1½) del tipo regular del salario convenido.

"(c) Cualquier hora trabajada durante el séptimo día consecutivo se le pagará al empleado por la Compañía a razón del doble del tipo regular del salario fijado."

El Art. IV definía la semana de trabajo en la siguiente forma:

"(a)      .      .      .      .      .      .      .      .

"Para los empleados que trabajan bajo el sistema de turnos, la semana de trabajo comenzará al inicio del turno establecido regularmente que empiece el domingo en o antes de las 12:00 p.m. y que termine en la mañana del siguiente lunes. La semana de trabajo consistirá de 168 horas consecutivas que terminan el domingo siguiente a la fecha de su comienzo."

[4] La siguiente gráfica sobre el programa de trabajo facilitará comprender lo que hemos expuesto:

| Semana de trabajo: | D | L | M | M | J | V | S | Horas trabajadas |
|---|---|---|---|---|---|---|---|---|
| (1) | x | x | x | x | x | x | 0 | 48 |
| (2) | 0 | x | x | x | x | x | x | 48 |
| (3) | 0 | 0 | x | x | x | x | x | 40 |
| (4) | x | 0 | 0 | x | x | x | x | 40 |
| (5) | x | x | 0 | 0 | x | x | x | 40 |
| (6) | x | x | x | 0 | 0 | x | x | 40 |

esto sucedía la querellada pagaba las 8 horas del sexto día a tiempo y medio; en las demás semanas lo compensaba a tiempo sencillo porque, aunque se trabajaba 8 horas diarias en seis días consecutivos, los servicios se distribuían en o imputaban a dos semanas de trabajo distintas.

Brevemente expuesta, la controversia principal envuelta en este caso se reduce a determinar lo que se entiende por la *semana de trabajo* a los fines de computar las horas trabajadas en exceso de 40 a la semana en una industria cubierta por la Ley Federal de Normas Razonables de Trabajo, 29 U.S.C. secs. 201–219. Para ello precisa establecer los momentos en que comienza y termina la semana de trabajo de los empleados en dichas industrias.

Las partes proponen dos soluciones: La empresa recurrente, que adoptemos la definición que aparece en el reglamento administrativo federal, 29 C.F.R. 778.2 (c) y (d) (1964), que lee como sigue: ([5])

"(c) *La semana de trabajo*. Si durante alguna semana de trabajo un empleado está cubierto por la Ley y no está exento de

---

| (7) | x | x | x | x | 0 | 0 | x | 40 |
|-----|---|---|---|---|---|---|---|----|
| (8) | x | x | x | x | x | 0 | 0 | 40 |
| (9) | x | x | x | x | x | x | 0 | 48 |

El hecho de que se cambie de un turno a otro no altera la situación a los fines de determinar el número de horas trabajadas semanalmente.

([5]) Corresponde con las Secs. 778.103–778.105 del Boletín Interpretativo, según revisado por el Administrador Federal de Horas y Salarios en 2 de febrero de 1965, 6A WHM 94:55.

Este texto prevalece desde el 4 de febrero de 1950, en que sustituyó el Boletín Interpretativo Núm. 4 emitido en 1 de noviembre de 1938, cuyo texto—tomado de la opinión emitida en *Pappas* v. *Kerite Co.*, 8 WH Cases 756—leía:

"La norma de 40 horas de la Sección 7(a) es una limitación sobre el número de horas que pueden trabajarse dentro de una semana de trabajo sin compensación adicional a razón de tiempo y medio. Una semana de trabajo consiste de siete días consecutivos. No es necesario que coincida con la semana del calendario y puede comenzar en cualquier día o en cualquier hora del día. El comienzo de la semana de trabajo podrá alterarse cuando se intenta que el cambio sea permanente y no ha sido elaborado para evadir las disposiciones legales sobre el pago de horas extras."

Véanse los dictámenes del Administrador de diciembre de 1938 y diciembre de 1943 en 6A WHM 93:348 y 350.

sus disposiciones sobre el pago de horas extras, el patrono totalizará todas las horas trabajadas por el empleado en esa semana de trabajo (aunque haya prestado servicios en dos o más actividades no relacionadas), y pagará compensación adicional por cada hora trabajada en exceso de 40 durante la semana de trabajo. La semana de trabajo de un empleado es un período fijo que se repite regularmente de 168 horas, siete períodos consecutivos de 24 horas. No es necesario que coincida con la semana del calendario y puede comenzar en cualquier día o en cualquier hora del día. Para los fines de computar el salario adeudado bajo la Ley de Normas Razonables de Trabajo, la semana de trabajo puede establecerse para toda la empresa en conjunto o pueden establecerse semanas de trabajo diferentes para distintos empleados o grupos de empleados de la empresa. Una vez se haya establecido el inicio de la semana de trabajo de un empleado permanecerá fijo irrespectivamente de su programa de trabajo. El comienzo de la semana de trabajo podrá alterarse cuando se intenta que el cambio sea permanente y no ha sido elaborado para evadir las disposiciones legales sobre pago de horas extras."

"(d) *Cada semana de trabajo debe considerarse separadamente.* La Ley contempla cada semana de trabajo como una unidad y no permite que se prorrateen las horas trabajadas entre dos o más semanas. Así, si un empleado trabaja 30 horas durante una semana y 50 horas durante la próxima, tiene derecho a recibir compensación adicional por las horas extras trabajadas en exceso del máximo permitido en la segunda semana, aunque el promedio de horas trabajadas en ambas semanas es de 40. Esto es así aunque el empleado tenga un horario semanal fijo o preste servicios conforme a un sistema de turnos rotativos, e independientemente de que reciba su salario diariamente, semanalmente, quincenalmente, mensualmente o bajo cualquier otra base. La regla también se aplica a trabajadores por ajuste o comisión. . . ."

Los empleados recurridos, que adoptemos que semana de trabajo significa cualquier período de siete días consecutivos cuyo comienzo coincide con el inicio de la labor en el turno de trabajo, o sea, al iniciarse la prestación de servicios por el empleado en el primer día después que regresa al trabajo luego de disfrutar de los dos días de descanso, y termina in-

exorablemente 168 horas después, al transcurrir siete períodos consecutivos de 24 horas. Se invoca por analogía lo resuelto a los fines de determinar la compensabilidad doble por labor realizada durante el día de descanso en *Ponce Ramos* v. *Fajardo Sugar Co.*, 85 D.P.R. 599 (1962), y *Compañía Popular* v. *Unión de Empleados*, 69 D.P.R. 179 (1948). Resalta inmediatamente que bajo la fórmula federal la semana de trabajo es fija e inalterable; bajo la fórmula sostenida por los empleados, varía todas las semanas y comienza en un día sucesivo durante las distintas semanas. El tribunal de instancia favoreció esta última.

## I

A los fines de resolver la cuestión básica planteada es necesario determinar previamente si la recurrente, empresa que se dedica a una actividad en el comercio interestatal, está regida por el Disponiéndose del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948, 29 L.P.R.A. sec. 274, que transcribimos a continuación, especialmente a la luz de nuestra última interpretación en *Porto Rico Coal Co.* v. *Tribunal Superior*, 91 D.P.R. 89 (1964). Si no lo estuviera, estaríamos en completa libertad para adoptar la definición de semana de trabajo que estimáramos más justa y conveniente, y que podría, pero necesariamente no tendría que coincidir con la llamada fórmula federal.

"Todo patrono que emplee o permita que trabaje un empleado durante horas extras vendrá obligado a pagarle por cada hora extra un tipo de salario igual al doble del tipo convenido para las horas regulares; Disponiéndose, sin embargo, que todo patrono de una industria de Puerto Rico cubierta por las disposiciones de la Ley de Normas Razonables de Trabajo, aprobada por el Congreso de Estados Unidos de América en 25 de junio de 1938, según ha sido o fuere subsiguientemente enmendada, sólo vendrá obligado a pagar por cada hora de trabajo en exceso de la jornada legal de ocho (8) horas [diarias] o en exceso de cuarenta (40) horas a la semana un tipo de salario a razón de,

por lo menos, tiempo y medio del tipo de salario convenido para las horas regulares, salvo el caso en que por decreto de la Junta de Salario Mínimo o convenio colectivo de trabajo se haya fijado o fijare otra norma de trabajo o de compensación, o de ambas."

En *Olazagasti* v. *Eastern Sugar Associates*, 79 D.P.R. 93, 108 (1956), explicando el propósito que animó a nuestro legislador al insertar el Disponiéndose transcrito, dijimos que el mismo "demuestra de su propia faz que la Asamblea Legislativa trataba de reenactar en nuestra ley local la fórmula federal sobre horas extras para paga *semanal* [tiempo y medio para horas trabajadas en exceso de 40 a la semana] en tanto en cuanto la ley local se aplicaba a industrias sujetas a la Ley Federal de Normas Razonables de Trabajo," y añadimos que "el historial legislativo de la Ley 379 demuestra que el *Disponiéndose* fue insertado en ella para 'atemperar' el estatuto local a la Ley Federal," de forma que la intención fue no extender la responsabilidad de los patronos sujetos a la legislación federal más allá de lo dispuesto en ésta. Un examen cuidadoso demuestra que la intención legislativa no se limitaba a reenactar la fórmula local sobre horas extras para paga semanal, sino que también se consagró otra excepción al disponer paga a tiempo y medio por las horas trabajadas en exceso de ocho diarias, pues, como sabemos, la ley federal no contiene limitación alguna en cuanto a la jornada diaria de labor.

La norma establecida en *Olazagasti*, supra, ha sido consistentemente seguida en *Berríos* v. *Eastern Sugar Associates*, 79 D.P.R. 688, 697–701 (1956); *Laborde* v. *Eastern Sugar Associates*, 81 D.P.R. 478 (1959); *Ortiz Reyes* v. *Eastern Sugar Associates*, 85 D.P.R. 95, 100 (1962); *Pan American* v. *Tribunal Superior*, 86 D.P.R. 139 (1962) y *Bull Insular Line* v. *Tribunal Superior*, 86 D.P.R. 156 (1962), y extendida para cubrir no sólo a los patronos sujetos a *todas* las disposiciones de la Ley de Normas Razonables, sino también a los especificados dentro de cualquiera de las

exenciones de la Sec. 7, 29 U.S.C. sec. 207, y al caso de los empleados a que se refiere la Sec. 13, 29 U.S.C. sec. 213, porque el hecho decisivo no es que las labores particulares del empleado estén cubiertas por dicha ley, sino si la industria dentro de la cual se prestan los servicios está comprendida dentro del ámbito de la legislación federal por tratarse de actividades del comercio interestatal o en la producción de artículos para el comercio interestatal.

Ahora bien, por sus propios términos, el disponiéndose no es aplicable en las situaciones específicas en que por decreto de la Junta de Salario Mínimo o convenio colectivo se fijare (1) otra norma de trabajo; (2) otra norma de compensación; y (3) o ambas. Esto nos lleva a considerar ciertos pronunciamientos y expresiones de la opinión emitida en *Porto Rico Coal Co.* v. *Tribunal Superior*, supra. Dícese que "no es menos cierto que existen dos excepciones en que no se aplica la fórmula federal y sí se aplica la fórmula local de pagar las horas extras a doble tiempo, cuyas excepciones son: (1) cuando el salario correspondiente a la industria se haya fijado por decreto de la Junta de Salario Mínimo de Puerto Rico y (2) cuando el salario se haya acordado entre las partes en virtud de un convenio colectivo. En estas dos excepciones regiría la Ley local . . . ." De ahí que, asimilándose la fijación de salarios mínimos en la Ley Núm. 96 de 26 de junio de 1956, 29 L.P.R.A. secs. 245 y ss. (Supl. 1964, págs. 145 y ss.), con un decreto de la Junta de Salario Mínimo, se concluya que a una industria sujeta a la Ley Federal de Normas Razonables cuyo salario mínimo estuviere comprendido en la Ley de Salario Mínimo, no le sería aplicable el Disponiéndose, sino la "fórmula local."

Para una gran parte del período cubierto por la reclamación las relaciones entre la empresa y sus empleados estuvieron regidas por un convenio colectivo en el cual se fijaban salarios para las distintas clasificaciones de empleo. Además, conforme a la Sec. 6(b) de la Ley de Salario Mínimo,

29 L.P.R.A. sec. 245(e) (Supl. 1964, pág. 150), se fija un salario mínimo de un dólar en la industria de productos químicos, de *petróleo* y productos relacionados, según dicha industria se define en la Sec. 37-O, 29 L.P.R.A. sec. 246(i) (Supl. 1964, págs. 191–192).[6] Es por eso que uno de los *amici curiae* insiste en que la Caribbean Refining Co., no puede ampararse en la norma general del Disponiéndose del Art. 5, ya que conforme al lenguaje utilizado en *Porto Rico Coal* basta la mera fijación de un salario por convenio o decreto, y por interpretación, en la Ley de Salario Mínimo de 1956, para que la industria esté regida en cuanto al pago de horas extras por la "fórmula local." [7]

Todo se reduce a que reexaminemos la afirmación de que la norma de compensación a que se refiere el Disponiéndose en su parte final queda cumplida cuando meramente se fija un salario contractualmente por convenio, administrativamente por decreto o legislativamente en la Ley de Salario Mínimo de 1956, según ha sido enmendada. Nada más conveniente que emprender una corta excursión por nuestra legislación laboral desde el inicio de la década de 1940.[8]

Con el propósito de conservar normas mínimas de vida necesarias para la salud, la eficiencia y el bienestar general

---

[6] Un examen superficial de la prueba documental ofrecida revela que cuando menos durante el período anterior al 1 de enero de 1956 los reclamantes Dionisio Meléndez y William Díaz recibieron salarios inferiores a $1.00 por hora.

Véase, 29 C.F.R. § 670.1–670.3.

[7] Conviene advertir que la opinión de *Porto Rico Coal* se limitó a descartar el pago de las horas en exceso de 8 diarias a razón de tiempo y medio, y al entender que no se aplicaba la norma general del Disponiéndose por estar incluido en la excepción de fijación de salario por decreto, ordenó el pago a doble tiempo conforme al Art. 4 de la Ley Núm. 379. En forma alguna allí se resolvió que las horas en exceso de 40 a la semana tuvieren que pagarse a doble tiempo, pues no hay disposición local alguna que así lo establezca. Bajo la llamada fórmula local las horas entre 40 y 48 se compensan a tiempo sencillo, y sólo en el caso de que excedan de 48 es que se deben pagar a tiempo doble.

[8] En *Porto Rico Coal* no se planteó específicamente la cuestión en la forma en que la consideramos y analizamos en los párrafos siguientes.

de los trabajadores, se aprobó la Ley Núm. 8 de 5 de abril de 1941 (Leyes, pág. 303), que estableció una Junta de Salario Mínimo, a la cual se facultó para aprobar decretos mandatorios fijando, entre otras cosas, "el tipo mínimo de salario por períodos regulares o extraordinarios de labor, o de ambos," Sec. 8, 29 L.P.R.A. sec. 218. Regía entonces como reguladora de la jornada de trabajo la Ley Núm. 49 de 7 de agosto de 1935 (Leyes (2), pág. 539), que fue interpretada mediante opinión rendida en 18 de mayo de 1943 en *Cardona* v. *Corte*, 62 D.P.R. 61 (1943), como que obligaba al patrono a satisfacer al obrero doble compensación por la novena hora de trabajo durante cualquier día normal y compensación ordinaria por el trabajo extra realizado en adición a dicha novena hora. No es hasta el 15 de mayo de 1948 que se aprueba la Ley Núm. 379 que, en términos generales, establece la jornada de trabajo de 8 horas diarias y 48 horas semanales, y el pago de tiempo doble por horas trabajadas en adición a las regulares.([9]) En su Art. 22 mantuvo subsistentes todos los decretos mandatorios que hubiese emitido la Junta de Salario Mínimo y que contuvieran condiciones de trabajo más beneficiosas para los obreros, o sea, una jornada menor o una compensación a razón de un tipo mayor para las horas extras trabajadas. Es por eso que al enactarse la excepción de las industrias cubiertas por la Ley Federal de Normas Razonables de Trabajo se salvan los casos en que por decreto o convenio "se haya fijado o fijare otra norma de trabajo o de compensación." Ello, pues, respondía a la facultad que tenía la Junta de Salario Mínimo no sólo para fijar el salario mínimo para las distintas industrias y actividades, sino para fijar la compensación por *horas extraordinarias de labor*. Cuando esto último sucedía, y la compensación para las horas extras era superior al tipo de tiempo y medio, prevalecería el

---

([9]) Hasta entonces el pago de tiempo doble por horas trabajadas en exceso de la novena hora diaria o de 48 semanales se establecía por decreto o convenio, salvo ciertas excepciones que no es necesario especificar, por ej., los empleados en obras públicas.

decreto sobre la norma del Disponiéndose. Véase, *Laborde v. Eastern Sugar Associates*, supra. *Pero siempre presuponía que la Junta efectivamente estableciese una norma superior de compensación para las horas extras.*

■ La nueva Ley de Salario Mínimo, Núm. 96 de 26 de junio de 1956, representa una nueva política pública en cuanto a la intervención que debe tener el Estado en la formulación de las normas y condiciones de trabajo. Evidentemente consciente del crecimiento, desarrollo y fortalecimiento de las organizaciones obreras—propiciado por la Ley de Relaciones del Trabajo, Núm. 130 de 8 de mayo de 1945, que reconoce y protege los derechos de los empleados a organizarse, negociar colectivamente y llevar a cabo actividades concertadas para su propio beneficio—la Asamblea Legislativa prefiere limitar la acción pública a la fijación de salarios mínimos, por la propia Legislatura—Secs. 6 a 9, 29 L.P.R.A. secs. 245e a 245h (Supl. 1964, págs. 150–161) y por la Junta, Secs. 12 y 13, 29 L.P.R.A. secs. 245k y 245*l* (Supl. 1964, págs. 164 y 165), dejando al campo de la negociación colectiva todo lo referente a la fijación de las otras condiciones de trabajo, *Diario de Sesiones*, 1956, Vol. 8, pág. 1065, y entre ellas, las relativas a una jornada de trabajo menor y a una compensación mayor por horas extras que las que se establecen en la Ley Núm. 379. Así vemos que limitándose la ley y desde 1956 los decretos a meramente fijar un salario mínimo, es necesario que haya una acción afirmativa en el convenio bien fijando una jornada menor o bien una compensación mayor por las horas extras para que entre en juego la excepción al Disponiéndose. Abona a esta conclusión el hecho mismo de que la Ley Núm. 379 no es una de salario mínimo, sino de fijación de jornadas de trabajo. Por otro lado es inescapable que "otra norma de compensación" sólo pueda referirse al pago de horas extras pues el Art. 5 intenta fijar un norma general y al efecto comienza, "Todo patrono que emplee o permita que trabaje un empleado durante *horas extras* . . . ." *No basta*

*en ninguno de los casos en que sencillamente se haya fijado o convenido un salario específico.*

■ Resolvemos, por tanto, que en una industria sujeta a la Ley Federal de Normas Razonables, la norma de compensación a que se alude en el Disponiéndose requiere que se hubiere establecido por convenio o decreto hasta 1956, y por convenio desde entonces, un tipo mayor de tiempo y medio para las horas trabajadas en exceso de 8 diarias o 40 semanales. En tanto en cuanto es incompatible a lo aquí resuelto debe entenderse expresamente revocado el caso de *Porto Rico Coal,* supra.

Es prudente hacer un resumen de las normas que rigen las industrias cubiertas por la Ley Federal de Normas Razonables de Trabajo en cuanto se refiere a la jornada de trabajo y compensación por labor extraordinaria para aclarar una vez más cualquier idea errónea sobre estos particulares. Helo aquí.

■ (1) La jornada máxima de trabajo permitida en Puerto Rico a las industrias a las cuales se aplica le Sec. 7 (a) de la Ley Federal de Normas Razonables es de 8 horas diarias y 40 horas a la semana, y cualquier hora trabajada en exceso de 8 horas diarias o 40 a la semana se considerará como labor extraordinaria, y como tal sujeta al pago de compensación adicional.

(2) Las horas extras trabajadas en exceso de 8 horas diarias o de 40 semanales en dichas industrias deben pagarse a razón de un tipo de salario de tiempo y medio del salario convenido para las horas regulares.

■ (3) Cuando por decreto de la Junta de Salario Mínimo—situación prevaleciente hasta el 26 de junio de 1956— o por convenio colectivo se hubiere fijado o se fijare una jornada de trabajo menor de 40 horas o una compensación a un tipo mayor de tiempo y medio para las horas extras, o ambas, estas normas prevalecerán.

■ Regresando a los hechos del presente caso resulta evidente que la recurrente está regida por el Disponiéndose del Art. 5. Ello es así porque (a) en el convenio colectivo firmado en 18 de marzo de 1957 no se estableció una norma de compensación mayor de un tipo de tiempo y medio para las horas extras, según puede constatarse del Art. V que transcribimos en el escolio 3 de la presente opinión; (b) no existe decreto mandatorio alguno de la Junta de Salario Mínimo de fecha anterior al 20 de junio de 1956 que fijara una norma de compensación superior para las horas extras en la industria del petróleo y sus derivados; ([10]) y (c) de ser aplicable la Sec. 7 (a) de la Ley de Salario Mínimo de 1956 a la Caribbean Refining Company, el único hecho de la fijación legislativa de un salario mínimo no inhibe la norma general del Disponiéndose.

■ Se alude a la llamada "regla de mayor beneficio" elaborada al amparo de la Sec. 18 de la Ley Federal de Normas Razonables de Trabajo, 29 U.S.C. sec. 218. ([11]) Un examen cuidadoso de la Ley Núm. 379 revela que en sus disposiciones ésta no es más beneficiosa que la federal en cuanto a la fijación de la jornada semanal de trabajo y a la compensación por las horas extras trabajadas. Ello es así porque la jornada federal de 40 horas semanales es menor que la local de 48, y porque en el Disponiéndose del Art. 5 *como ley local* se incorporó el mismo tipo de tiempo y medio para las horas trabajadas en exceso de 40 semanales. En cuanto a industrias y actividades sujetas a la Ley de Normas Razonables la legislación nuestra es más beneficiosa en los

---

([10]) El Decreto Mandatorio Núm. 32, 29 R.&R.P.R. secs. 245n–541 y ss., en vigor desde el 25 de octubre de 1957, se limitó a fijar salarios mínimos para la industria de productos químicos, de petróleo, caucho y productos relacionados *para el comercio local.*

([11]) "Ninguna disposición de esta ley . . . excusará el incumplimiento con cualquier . . . ley estatal . . . que establezca un salario mínimo mayor que el salario mínimo que se establece en esta ley o una jornada semanal de trabajo menor que la jornada semanal máxima establecida en esta ley . . . ."

siguientes particulares: (a) las horas en exceso de 8 diarias se consideran y deben pagarse como horas extras a razón de tiempo y medio (la legislación federal nada provee en cuanto al pago de un tipo superior para las horas trabajadas en exceso de 8 diarias); (b) las horas trabajadas en exceso de 8 diarias o en exceso de 40 semanales se pagarán a razón de doble tiempo cuando así lo disponga un decreto de salario mínimo o un convenio colectivo. (12)

## II

La "semana de trabajo" no se define ni por la ley federal ni por la Ley Núm. 379. En la jurisdicción federal contamos con la interpretación administrativa que ya transcribimos; en Puerto Rico, sólo disponemos de expresiones aisladas en opiniones de este Tribunal pero relacionadas con reclamaciones por trabajo realizado durante el día de descanso. (13) En *Sierra, Com.* v. *Tribl. de Distrito,* 74 D.P.R.

---

(12) Es significativo que en los casos en que hemos hecho referencia a la legislación más favorable para el obrero siempre interviene un decreto en la fijación de salarios y la compensación por horas extras. *Peña* v. *Eastern Sugar Associates,* 75 D.P.R. 304 (1953); *Olazagasti* v. *Eastern Sugar Associates,* 79 D.P.R. 93 (1956); *Berríos* v. *Eastern Sugar Associates,* 79 D.P.R. 688 (1956); *Laborde* v. *Eastern Sugar Associates,* 81 D.P.R. 478 (1959).

(13) Una vez más reiteramos la recomendación que hicimos en *Deyá* v. *Otis Elevator Co.,* 91 D.P.R. 669 (1965), para que el Secretario del Trabajo, bajo la facultad que le confiere el Art. 17 de la Ley Núm. 379, 29 L.P.R.A. sec. 286, adopte la reglamentación necesaria para la definición de ciertos términos de dicha ley y en relación con otros problemas que corrientemente se suscitan en su administración. Con ello se contribuye a darle estabilidad a las relaciones entre patronos y empleados y confianza al inversionista en las normas que deben observar para evitar reclamaciones insospechadas en el futuro.

Aprovechamos ahora la oportunidad para sugerir la conveniencia de aprobar una disposición similar a la Sec. 10 de la Ley de Portal a Portal, 29 U.S.C. 259, que autoriza al patrono a interponer como defensa en reclamaciones de salarios su buena fe al descansar en los reglamentos, órdenes, dictámenes y decisiones escritas de los organismos gubernamentales encargados de la administración de la legislación laboral, aunque posteriormente se modifique o anule por la autoridad judicial.

89, 106–107 (1952), reconocimos que en cuanto a la semana de trabajo debe existir cierta flexibilidad y que distintas circunstancias podían justificar diferentes soluciones. Dijimos:

"El artículo 4(*d*) de la Ley núm. 379 de 1948 no define la 'semana.' Una 'semana' se ha definido, por la jurisprudencia general, en dos formas, ya sea como la semana de calendario, indicativa del transcurso de siete días de domingo a domingo— [citas]—o indicativa del transcurso de cualesquiera siete días consecutivos—[citas]—todo ello de acuerdo con determinado contexto estatutario y con la situación especial envuelta. El artículo 2 de la propia Ley núm. 379 dispone que cuarenta y ocho horas de labor constituyen una semana de trabajo. *El contenido de la definición debe depender en la realidad prevaleciente en las relaciones entre patronos y obreros en una empresa determinada y de acuerdo con la situación especial de cada industria o actividad económica.* No es necesario ni socialmente útil el que se adopte una fórmula rígida. [citas] La norma debe ser flexible y realista. Distintas clases de industrias, establecimientos y empresas pueden tener distintos sistemas en cuanto a semanas de trabajo, desde el punto de vista de la contabilidad, las nóminas, el pago de salarios, los turnos de trabajo, las horas de labor, los ingresos, la naturaleza del trabajo en sí y otros factores relevantes a la relación con sus obreros y la naturaleza del negocio o del proceso de producción. . . ." (Énfasis nuestro.)

Ya en el curso de esta opinión habíamos señalado que la incorporación del Disponiéndose del Art. 5 de la Ley Núm. 379 respondió al propósito legislativo de "atemperar" la ley local al estatuto federal, de forma que en cuanto al pago de horas extras la responsabilidad de los patronos cubiertos por la Ley Federal de Normas Razonables no se extendiera más allá de lo dispuesto en ésta. Sólo así se lograba colocar a estas industrias en posición de competir, sin estar en desventaja, con empresas establecidas en Estados Unidos dedicadas a las mismas actividades. Cualquier norma más onerosa significaba un certero desaliento para atraerlas al suelo puertorriqueño dentro del entonces inci-

piente programa de industrialización. Si bien podría aducirse
que se les estaba ·concediendo un trato preferente no es
menos cierto que en última instancia las fuentes adicionales
de empleo que se creaban, unidas a los salarios mayores y a
la jornada de trabajo menor que prevalecían en estas indus-
trias, compensaban adecuadamente a la fuerza obrera del
país, a la cual se le abrió un horizonte preñado de oportuni-
dades, que de otra forma no hubiese tenido disponible ni
disfrutado. La visión de los legisladores en 1948 ha sido
ampliamente confirmada por el progreso económico del país,
al cual ha contribuido en no pequeña medida la instalación en
Puerto Rico de industrias cubiertas por la Ley Federal de
Normas Razonables.

Consonante con ese propósito no vemos cómo pueda adop-
tarse una definición de semana de trabajo para estas indus-
trias que difiera del concepto arraigado en la industria
interestatal, y que desde los comienzos de la interpretación de
la ley federal, mereció la sanción administrativa(14) y judi-
cial.(15) En verdad es inseparable del trabajo extra (*over-
time*) y se halla tan identificado con e indisolublemente unido
al sistema que pretender formular un concepto distinto
destruiría en gran parte el fin que se propuso con la aproba-
ción del Disponiéndose. Basta leer con detenimiento el texto
de la Sec. 7(a) de la ley federal para comprender lo
expresado:

"Excepto lo dispuesto en contrario en esta sección, ningún
patrono empleará sus obreros dedicados al comercio o a la

---

(14) Véase el escolio 5 anterior .y Leiter, *The Principle of Overtime*,
2 Lab. L.J. 24 (1951).

En cuanto al sistema de turnos rotativos para las industrias de opera-
ción continua la División de Horas y Salarios Federal aprobó un sistema
igual al que se utiliza por la Caribbean Refining Company. Véase, 6A
WHM 94:501.

(15) *Barclay* v. *Magnolia Petroleum Co.*, 203 S.W.2d 626 (Texas 1947);
*Harned* v. *Atlas Powder Co.*, 192 S.W.2d 378 (Ky. 1946); *Sloat* v. *Davidson
Ore Mining Co.*, 71 F.Supp. 1010 (Mich. 1942); *Pappas* v. *Kerite Co.*,
supra.

producción de artículos para el comercio *por una semana de trabajo* (workweek) que exceda de cuarenta horas, a menos que dichos empleados reciban compensación por las horas extras a un tipo no menor de tiempo y medio del salario regular. . . ."

Para determinar las cuarenta horas la unidad de medida es la *semana de trabajo*. Ecker, *When Does Overtime Start*, 53 Dick. L. Rev. 201, 205 (1949). Y al adoptar la fórmula de tiempo y medio en exceso de 40 horas semanales trasplantamos igualmente la unidad de medida que se conocía para determinar si en efecto se había realizado labor extra. A un resultado parecido llegamos en *Bull Insular Line, Inc.* v. *Tribunal Superior*, 86 D.P.R. 156, 163 (1962), al decir que "Ningún argumento nos ha convencido de que nuestra legislatura intentara atemperar la ley local al estatuto federal, *solamente en parte*, en lo que respecta al pago de salarios por horas extras, y excluyera, en su propósito de atemperar un estatuto con el otro, el trabajo por piezas u otra unidad de obra." Y ya en *Peña* v. *Eastern Sugar Associates*, 75 D.P.R. 304, 322 (1953), habíamos dicho que ". . . el artículo 5 adopta la norma federal de *una semana de trabajo* de 40 horas para las industrias sujetas a la Ley Federal." (16) Además, es significativo que en el convenio colectivo firmado por las partes se aceptó la semana de trabajo diseñada y adoptada por la empresa desde el comienzo de sus operaciones.

■   Habiendo concluido que el Disponiéndose del Art. 5 incorporó también el concepto de semana de trabajo de la ley federal, es innecesario que resolvamos si la definición propuesta por la parte recurrida—calcada de opiniones en que solamente hemos considerado reclamaciones por el día de

---

(16) *Quiñones Rosa* v. *Fajardo Development Co.*, 90 D.P.R. 684 (1964), es distinguible pues se trataba allí de una industria sujeta a la Ley Federal de Normas Razonables a la cual se aplicaban las disposiciones de un decreto local sobre horas extraordinarias, supuesto de excepción que reconoce el mismo Disponiéndose. Por tanto estábamos en libertad de adoptar la interpretación que creyéramos más adecuada para nuestra fórmula local.

descanso—([17]) es la procedente. No obstante precisa hacer ciertos comentarios.

El error de enfoque de quienes sostienen que la recurrente debe pagar siempre horas extras en trabajos durante el sexto día consecutivo de labor—particular posición que no ha merecido la aprobación administrativa o judicial en el ámbito federal, de donde es oriundo el sistema de turnos rotativos para una jornada máxima de trabajo de 40 horas semanales (véanse los escolios 14 y 15)—consiste en confundir la semana de trabajo—que es fija e inalterable tanto para la empresa como para los empleados—con el programa de trabajo que en esencia es uno de turnos rotativos.([18]) Ello los lleva a la posición insostenible de hablar de una semana de 8 días, en su empeño de que el comienzo de la semana de trabajo coincida siempre con el momento en que se inicia la labor. Todo cuanto ocurre es que determinados turnos caen dentro de dos distintas semanas de trabajo. Es conveniente reiterar que el sistema de turnos establecido en la industria fue adoptado a petición de los empleados para proporcionar a todos la oportunidad de disfrutar de algunos fines de semana en compañía de sus familiares, cosa que no podría lograrse cuando la empresa funcionaba con turnos fijos.([19])

---

([17]) No está demás advertir que a los fines del día de descanso el criterio básico es el de "días," mientras que para los fines del Disponiéndose del Art. 5 predomina el de "horas," cuarenta horas a la semana.

([18]) El reglamento administrativo federal, 29 C.F.R. 778.2(d) (1964) admite expresamente la coincidencia de una semana de trabajo fija con un sistema de turnos rotativos.

([19]) Copiamos de la declaración del Vice-Presidente de la recurrente:
"P. ¿Y qué pasó en enero once del cincuenta y seis?
R. El sistema de turnos se cambió.
P. ¿Por qué se efectuó el cambio?
R. El motivo principal era darle turnos rotativos a los empleados para que tuvieran diferentes días libres." (T.E. pág. 40)

.    .    .    .    .    .    .    .

"P. ¿Puede usted decirnos, Sr. Cays, por qué se hizo el cambio en enero once de mil novecientos cincuenta y seis?
R. El cambio del sistema de turnos surgió de un . . . como resultado del requerimiento de nuestros empleados.

Fácil es observar que bajo el sistema de turnos fijos que prevaleció hasta enero de 1956 la compañía no venía obligada a pagar horas extras y que con el nuevo sistema implantado, cuando menos, tenía que pagar a cada empleado 16 horas extras cada ocho semanas.

Como se ha expuesto la solución a que hemos llegado descansa en nuestra interpretación del alcance del propósito legislativo al aprobar el Disponiéndose del Art. 5. Al hacer una clara distinción en el caso de las industrias cubiertas por la Ley Federal de Normas Razonables de Trabajo se evidenció una política pública para cuya formulación indudablemente se consideró no sólo el factor de un salario adecuado para el empleado puertorriqueño, sino otros no menos importantes que se reflejan en la salud económica del país. Al abordar estos problemas no podemos ciegamente tratar de leer nuestras preferencias personales en el estatuto ni dar exclusivamente énfasis a un criterio, sino que es necesario situarlos en el cuadro total de circunstancias para poder determinar la verdadera intención legislativa.

## III

Finalmente sostienen los querellantes que en el turno Núm. 1—11:01 p.m. a 7:00 a.m.—trabajaban durante los siete días calendario, y por tanto tienen derecho a que se les compensen a doble tiempo las horas trabajadas durante el séptimo día calendario. Para ello, ingeniosamente, fraccionan el primer turno: la primera hora, de 11:01 p.m. a 12:00 p.m.

P. ¿Qué clase de requerimiento es ese, Sr. Cays?

R. Con los cuatro turnos que teníamos uno de esos grupos tenía sábados y domingos o los 'week-ends' libres todo el tiempo. Según ese sistema de turnos uno de esos grupos tenía los sábados y domingos libres siempre. Los otros grupos trabajaban y nunca tenían la oportunidad de tener los 'week-ends' o los sábados y domingos libres, así es que [en] ese requerimiento no podíamos ver ninguna objeción." (T.E. págs. 41–42)

"R. Actually our employees worked the schedule themselves." (T.E. pág. 93)

constituye un día de trabajo, y las restantes siete horas, de 12:01 a.m. a 7:00 a.m., constituyen un día separado de trabajo. También el tribunal a quo favoreció esta posición.

En esta área impera exclusivamente la interpretación local por tratarse de un estatuto nuestro que concede al empleado beneficios adicionales. En *Ponce Ramos v. Fajardo Sugar Co.*, 85 D.P.R. 599 (1962), establecimos una definición del concepto "semana de trabajo" a los fines de fijar "en qué momento exacto comienza el período de veinticuatro horas consecutivas de descanso a que se refieren las Leyes 289 de 1946 y 379 de 1948, o dicho de otra manera, en qué momento exacto termina el sexto día consecutivo de trabajo que menciona la Ley 289." A este último respecto señalamos que es necesario partir del comienzo de la labor en el primer período de trabajo después del descanso del obrero y que este sexto período no empieza, como cuestión de derecho, antes de las 120 horas ni termina después de las 144 horas de comenzada la jornada del primer período de trabajo.

En el caso de los obreros que trabajaban el turno Núm. 1, la labor terminaba a las 7:00 a.m. de determinado día, y no se reintegraban a sus labores para comenzar el turno Núm. 2, hasta las 7:01 a.m. *dos días después*. Fácil es comprender que entre ambos turnos transcurría un período continuo de más de 24 horas consecutivas.

De lo expuesto se deduce que la querellada recurrente no adeuda a los querellantes recurridos suma alguna por horas extras. *Se revocará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en 18 de octubre de 1963, y se desestimará la querella.*

El Juez Asociado Señor Belaval disintió en parte en opinión separada en la cual concurren el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

El Juez Asociado Señor Santana Becerra disintió en parte en opinión separada en la cual concurren el Juez Presidente

Señor Negrón Fernández y los Jueces Asociados Señores Belaval y Hernández Matos.

—O—

Opinión disidente del Juez Asociado Señor Belaval con la cual están conformes el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Hernández Matos y Santana Becerra

San Juan, Puerto Rico, a 15 de marzo de 1966

La Sala de San Juan del Tribunal Superior de Puerto Rico, declaró probados, como los hechos de este caso, los siguientes: La querellada recurrente, una refinería de petróleo instalada en la ciudad de Bayamón, comenzó a trabajar en el año 1955 en una industria dedicada al comercio interestatal, la cual, por la naturaleza de su proceso industrial, está obligada a trabajar continuamente durante los siete días de la semana, veinticuatro horas cada día.

Cuando empezó a trabajar la querellada recurrente estableció una semana de trabajo que comenzaba a las once de la noche del domingo correspondiente y terminaba ciento sesenta y ocho horas consecutivas después (24 x 7 = 168) o sea, a las once de la noche del próximo domingo. Dentro de esa semana de trabajo, la querellada recurrente estableció un sistema de turnos diarios que se extendían, el primero desde las once de la noche anterior hasta las siete de la mañana del día siguiente (8 horas); el segundo, desde las siete de la mañana hasta las tres de la tarde del mismo día (8 horas), y el tercero, desde las tres de la tarde hasta las once de la noche del mismo día (8 horas).

Del 5 de junio de 1955 al 11 de enero de 1956, la querellada recurrente puso en vigor un programa de trabajo continuo, de acuerdo con los turnos indicados y durante una semana de trabajo de cuarenta horas, sus empleados trabajan cinco días consecutivos de ocho horas (5 x 8 = 40)

y descansaban dos días consecutivos. Del 11 de enero de 1956 hasta el 18 de marzo de 1957, se varió el programa de trabajo continuo, trabajando los obreros, de jueves a jueves seis días consecutivos de ocho horas (6 x 8 = 48) y descansando dos días consecutivos. Desde el 18 de marzo de 1957, en adelante, la querellada recurrente y la Unión que representa a los querellantes recurridos, suscribieron un convenio colectivo adoptando el horario acordado el 11 de enero de 1956.

Como conclusiones de derecho, la ilustrada Sala sentenciadora añadió: De acuerdo con las disposiciones de la Ley de Normas Razonables de Trabajo federal y la Sec. 778.2 del Reglamento de dicha ley, la semana de trabajo del patrono es un período fijo y regular de 168 horas, o sea, siete períodos consecutivos de veinticuatro horas cada uno. La semana de trabajo del patrono no tiene que coincidir con la semana calendario, pero, tanto el día en que comienza como la hora en que empieza debe fijarse permanentemente, independiente del turno de trabajo del empleado, aunque se puede cambiar el día en que comienza la semana de trabajo del patrono si el cambio no se hace con el propósito de evadir el pago de horas extras. De acuerdo, asimismo, con dicha Sec. 778.2, cada semana de trabajo del obrero de 40 horas tiene vida propia y se considerará como una semana independiente de la que le sigue y no es permitido coger más de una semana para determinar mediante promedio, el número de horas trabajadas. Por ejemplo: un empleado u obrero que trabaje 30 horas en una semana y 50 horas en la semana siguiente, recibirá compensación adicional por las 10 horas trabajadas en exceso de 40 en la segunda semana, aunque el promedio de las dos semanas sea de 40 horas. Si bien la Ley de Normas Razonables de Trabajo federal permite que un obrero trabaje en un día 24 horas consecutivas sin pagar horas extras, siempre que dichas 24 horas diarias estén dentro del límite de 40 horas de la semana de trabajo del obrero, también reconoce,

por ser más beneficiosa al obrero el límite de 8 horas diarias que pueda establecer una ley estatal, como lo establece la Ley Núm. 379 para establecer una jornada de trabajo en Puerto Rico de 15 de mayo de 1948. Las dos leyes pueden armonizarse permitiendo que el obrero trabaje cinco días de ocho horas, o sea, un total de 40 horas a la semana.

En virtud de la Ley Núm. 289 de 9 de abril de 1946, se le concedió a todos los trabajadores, no cubiertos por las disposiciones sobre cierre al público del Art. 553 del Código Penal de Puerto Rico, un día de descanso después de cada seis días de trabajo, y si el patrono interesa que el empleado trabaje durante el día de descanso, deberá satisfacer adicionalmente dichas horas a un tipo doble del convenido para las horas regulares. De acuerdo con lo resuelto por este Tribunal en el caso de *Compañía Popular* v. *Unión de Empleados*, 69 D.P.R. 179 (Snyder) (1949) cita precisa a las págs. 195–198, la semana regular de trabajo empieza el primer día después que el empleado disfruta de su día regular de descanso. Si la semana de trabajo empieza el día inmediatamente después al día de descanso, la semana de trabajo en una industria cubierta por la ley federal termina cuando el obrero ha trabajado 40 horas, o sea, si dichas 40 horas semanales son trabajadas en períodos de ocho horas cada día, las trabajadas después del quinto día, son horas extras y el patrono quedará obligado a pagarlas a razón de tiempo y medio de acuerdo con el *disponiéndose* del Art. 5 de la Ley Núm. 379 de 1948.

La semana establecida por la querellada está de acuerdo en algunos aspectos con la semana de trabajo dispuesta por la Ley Núm. 379 de 15 de mayo de 1948, pero, al combinar el sistema de turnos de seis días consecutivos de trabajo con dos días de descanso, en una semana fija de siete días, de domingo a domingo, el resultado inevitable de tal programa de trabajo es una violación al plan de salud laboral que se propone la Ley Núm. 289 de 9 de abril de 1946 creando

el día de descanso. Por otro lado, solamente dos veces cada ocho semanas los seis días consecutivos de trabajo caen dentro de la semana de trabajo. En su aplicación práctica, y en cuanto a las limitaciones impuestas por la Ley Núm. 379 de 15 de mayo de 1948, la semana de trabajo creada por la querellada recurrente es de seis días de ocho horas (48 horas) y no de cinco días de ocho horas (40 horas) cuya semana de 40 horas es la autorizada por la Ley de Normas Razonables de Trabajo y el *disponiéndose* del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948.

En virtud de dichas conclusiones, la ilustrada Sala sentenciadora le ordenó a la querellada recurrente radicar un proyecto de sentencia compensando las horas trabajadas durante el sexto día, a contar del día inmediatamente después del día de descanso, a razón de tiempo y medio, y las horas trabajadas por los querellantes en el día de descanso, o sea, el séptimo día, a razón de doble tiempo.

Las conclusiones de derecho de la ilustrada Sala de San Juan resultan enteramente correctas de acuerdo con las disposiciones de la Ley Núm. 289 de 9 de abril de 1946, la Ley Núm. 379 de 15 de mayo de 1948 y nuestra jurisprudencia laboral, según veremos más adelante.

Ha quedado sometida a nuestro estudio la proposición que por tratarse de una industria cubierta por la Ley de Normas Razonables de Trabajo federal, la cuestión debe ser resuelta, en parte, de acuerdo con las disposiciones del reglamento administrativo federal—29 Code of Federal Regulations Sec. 788.2(c) y (d) (1964), revisado hasta el 1ro. de enero de 1965, que contiene la siguiente definición de lo que constituye una "semana de trabajo":

"(c) *La semana de trabajo.* Si durante alguna semana de trabajo un empleado está cubierto por la Ley y no está exceptuado de sus disposiciones sobre el pago de horas extras, el patrono totalizará todas las horas trabajadas por el empleado en esa semana de trabajo, aunque haya prestado servicios en dos o más actividades independientes, y pagará compensación adicional por

cada hora trabajada en exceso de 40 horas durante la semana de trabajo. La semana de trabajo de un empleado es un período fijo, regularmente recurrente de 168 horas, (o sea) siete períodos consecutivos de 24 horas. No es necesario que coincida con la semana de calendario y puede comenzar en cualquier día o en cualquier hora del día. A los fines de computar el salario adeudado bajo la Ley de Normas Razonables de Trabajo [federal] la semana de trabajo puede establecerse para toda la empresa en conjunto o establecerse semanas de trabajo diferentes para distintos empleados o grupos de empleados dentro del establecimiento fabril. Una vez se haya determinado el comienzo de la semana de trabajo de un empleado, permanecerá fijo sin tomarse en cuenta el horario cubierto por su trabajo. El comienzo de la semana de trabajo podrá alterarse cuando se intente un cambio permanente y no un cambio diseñado para evadir las disposiciones legales correspondientes al pago de horas extras."

"(d) Cada semana de trabajo es independiente de la otra. La ley considera cada semana de trabajo como una unidad y no autoriza que se promedien las horas trabajadas entre dos o más semanas. Siendo esto así, un empleado que trabaje 30 horas durante una semana y 50 horas durante la próxima, debe recibir compensación extra por las horas trabajadas en exceso del máximo aplicable a la segunda semana, aunque el promedio de horas trabajadas en ambas semanas sea de 40 horas. Esto no varía aunque el empleado trabaje sujeto a un horario regular o rotativo e independiente del pago diario, semanal, quincenal, o bajo cualquier otro término de tiempo, que reciba. La regla también se aplica a trabajadores por piezas y empleados a comisión. Para eso será necesario determinar las horas trabajadas y la retribución ganada por los trabajadores por piezas y los empleados a comisión a base de una semana."

Lo primero que debemos resolver es, si dicho reglamento, que deriva su autoridad de la Ley de Normas Razonables de Trabajo (federal), rige en Puerto Rico.

La primera vez que tuvimos que pasar sobre el conflicto o la coexistencia de la Ley de Normas Razonables de Trabajo federal y las leyes locales—*Chabrán* v. *Bull Insular Line*, 69 D.P.R. 269 (Snyder) (1948) cita precisa a las págs. 294–295—dejamos claramente establecida la regla de inter-

pretación, que al aprobar la Sec. 18 de la Ley de Normas
Razonables de Trabajo, el Congreso de los Estados Unidos
"hizo constar claramente que no estaba apropiándose exclu-
sivamente el campo de las normas en relación con horas y
salarios en el comercio interestatal. Le concedió a los estados
libertad de acción para establecer normas mayores que las
comprendidas en la Ley Federal. La Ley sobre Normas
Razonables de Trabajo suplanta la legislación local solamente
en caso de que ésta provea normas menores que la Ley
Federal. Los informes de comités son consistentes con esta
interpretación de la Ley. Dichos informes aparecen citados
en parte en *C.C.H. Labor Law Service*, párrafo 26,800, como
sigue: 'La sección 16 de la enmienda del Comité dispone que
ninguna disposición de la ley será justificación para no cum-
plir con cualquier otra ley federal o estatal u ordenanza muni-
cipal, que establezca un salario mínimo mayor o un día máxi-
mo de trabajo o semana máxima de trabajo menores que los
establecidos bajo la ley, y ninguna disposición de la ley en
relación con el empleo de menores será justificación para no
cumplir con cualquier ordenanza federal, estatal o municipal
que establezca una norma mayor que la establecida por la Ley.
H.R. Rep. *No. 2182*, pág. 15, abril 21, 1938, Congreso 75,
Tercera Sesión. La Sección 18 que trata de la relación de la
ley con otras leyes sigue la disposición correspondiente de la
enmienda de la Cámara, con la adición de una disposición al
efecto de que ninguna disposición de la ley se interpretará
como que es una justificación para reducir los salarios o
aumentar las horas. *Conference Committee Rep. No. 33*, pág.
2738, junio 11, 1938, Congreso 75, Tercera Sesión . . . .' El
silencio que guarda la sección 18 en cuanto a las leyes esta-
tales que proveen días máximos de trabajo no quiere decir
que el Congreso tuvo la intención de suplantar tal legislación
local. Por el contrario, según indica el Informe de la Cámara,
tales leyes continuaron en vigor. La sección 18 no contiene re-
ferencia específica a ellas precisamente porque la Ley Federal

no contiene disposición alguna en relación con un día máximo de trabajo. El Congreso creyó que era innecesario incluir una cláusula de salvedad para la legislación estatal sobre una materia que no estaba comprendida en la Ley Federal."

La regla establecida guarda una saludable correspondencia con la buena política judicial de la Corte Suprema de Estados Unidos y la Corte Suprema de Puerto Rico, en el sentido, que aun cuando la legislación federal "cubra el mismo campo" que la legislación puertorriqueña, es posible la coexistencia de ambos estatutos: *Puerto Rico* v. *Shell Co.*, 302 U.S. 253, 82 L.Ed. 235 (Sutherland) (1937) cita precisa a las págs. 261–264 U.S., 242–244 L.Ed., en ausencia de una prohibición expresa del Congreso en la Ley Federal concernida en cuanto a cualquier otra legislación estatal o territorial.

Sin este pequeño antecedente legislativo y doctrinal, no podría explicarse la redacción del famoso *disponiéndose* del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948, objeto de tan abundante interpretación por parte nuestra, que dispone: "Todo patrono que emplee o permita que trabaje un empleado durante horas extras vendrá obligado a pagarle por cada hora extra un tipo de salario igual al doble del tipo convenido para las horas regulares; *Disponiéndose, sin embargo,* que todo patrono de una industria de Puerto Rico cubierta por las disposiciones de la Ley de Normas Razonables de Trabajo (Fair Labor Standards Act), aprobada por el Congreso de Estados Unidos de América en 25 de junio de 1938, según ha sido o fuera subsiguientemente enmendada, sólo vendrá obligado a pagar por cada hora de trabajo en exceso de la jornada legal de ocho (8) horas o en exceso de cuarenta (40) horas a la semana un tipo de salario a razón de, por lo menos, tiempo y medio del tipo de salario convenido para las horas regulares, salvo en caso en que por decreto de la Junta de Salario Mínimo o convenio colectivo de trabajo se haya fijado o fijare otra norma de trabajo o de

compensación, o de ambas. Para determinar el tipo de salario convenido para horas regulares de trabajo, se dividirá el salario diario, semanal, mensual o en otra forma estipulado, por el número de horas regulares que se trabaje durante ese mismo período de acuerdo con las disposiciones de esta Ley." De acuerdo con el Art. 3 de la misma Ley; "Son horas regulares de trabajo ocho horas durante cualquier período de veinticuatro horas consecutivas, cuarenta y ocho horas durante cualquier semana y doscientos ocho horas durante cualquier mes; *Disponiéndose, sin embargo,* que el Comisionado de Trabajo hará publicar en periódicos de general circulación en la isla todos los años un aviso expresando el número exacto de horas regulares de trabajo durante cada mes del año, conforme al número de días y horas laborables según el calendario y la legislación vigente, sobre días de fiesta; . . ."

La doctrina del caso de *Chabrán,* en cuanto a que, debe aplicarse siempre la ley que mayor beneficio represente para el empleado u obrero en aquellos contratos de trabajo, en los cuales puedan resultar aplicables disposiciones distintas de la Ley de Normas Razonables de Trabajo y de nuestras leyes locales, fue seguida en el caso de *Peña* v. *Eastern Sugar Associates,* 75 D.P.R. 304 (Snyder) (1953) cita precisa a las págs. 321–322, en el cual resolvimos: "Como hemos visto, la regla Federal es que cuando se invalida un contrato tipo *Belo,* el 'tipo sencillo' por hora se determina dividiendo el salario semanal por el número total de horas de hecho trabajadas durante esa semana específica. Pero el artículo 7 y la última oración del artículo 5 de la Ley Núm. 379 cambian esta regla, en beneficio del empleado, disponiendo que bajo estas circunstancias el divisor es el número de horas que constituyen la semana regular de trabajo. La demandada no difiere. Afirma, sin embargo, que 48 horas son la semana regular de trabajo provista por los artículos 2 y 3 de la Ley núm. 379. En su consecuencia arguye que el impacto de la Ley núm. 379 exige el uso de 48 horas como el divisor en un

contrato ineficaz de tipo *Belo*. Convendríamos en seguida con esta contención de la demandada de que 48 horas, como la semana regular de trabajo establecida por los artículos 2 y 3 de la Ley núm. 379, sería el divisor si el demandante hubiera sido empleado en una industria local. La dificultad estriba en que el *Disponiéndose* en el artículo 5 fija una regla diferente para las industrias sujetas a la Ley Federal. Con posibles excepciones que aquí no son relevantes, el artículo 5 adopta la norma federal de una semana de trabajo de 40 horas para las industrias sujetas a la Ley Federal. Por consiguiente, como proposición general, el artículo 5 y la Ley Federal, leídas conjuntamente, hacen de *40* horas la semana regular de trabajo para la fase industrial del negocio azucarero durante la zafra. Y el párrafo B(2)(b) del Decreto Mandatorio Núm. 3 y la Ley Federal logran el mismo resultado para el tiempo muerto . . . . Esto contrasta con las otras disposiciones de la Ley núm. 379 que hacen de *48* horas la semana regular de trabajo para la industria local. De ahí surge que, a virtud del mandato del artículo 7 y de la última oración del artículo 5 de la Ley núm. 379, el divisor aquí— la semana regular de trabajo—es 40 horas y no 48. En vista de lo anterior, convenimos con el demandante y así lo resolvemos que el tipo sencillo de paga por hora para cada semana en que se adeuda tiempo extra, debe determinarse dividiendo la garantía semanal por 40 horas."

El caso de *Chabrán* fue seguido además en la decisión de *Olazagasti* v. *Eastern Sugar Associates*, 79 D.P.R. 93 (Marrero) (1956) cita precisa a las págs. 103–112. Lo que se planteó como punto saliente en la decisión de Olazagasti fue si la exención de elaboración (*processing exemption*) concedida por la Sec. 207(c) de la Ley de Normas Razonables de Trabajo federal (29 U.S.C. 207(c)) a los patronos dedicados a la conversión de caña de azúcar en azúcar fue validamente dejada sin efecto por la Ley Núm. 379 de 15 de mayo de 1948 y la Ley Núm. 289 de 9 de abril de 1946, referentes las dos

últimas a la jornada de trabajo en Puerto Rico y al día de descanso. El querellante era un mecánico cuyos deberes comprendían reparar y mantener en condiciones de trabajo el molino de la central azucarera de la querellada. Como tal estaba incluido en la exención establecida por la Sec. 207 (c) de la Ley de Normas Razonables de Trabajo federal: *Maneja* v. *Waialua Agri. Co.*, 349 U.S. 254, 99 L.Ed. 1040 (Clark) (1955) cita precisa a las págs. 270–271 U.S., 1056 L.Ed.

Copiando literalmente del texto de la opinión rendida en el caso de *Olazagasti*, diría: "El Tribunal sentenciador no resolvió de manera taxativa que la exención concedida por la Ley Federal fuera dejada sin efecto por la Ley 379, supra. Lo que sí resolvió dicho tribunal fue que ambas disposiciones legales coexistían en diferentes planos de acción y que tal cosa ocurre en virtud de otro precepto de la misma Ley Federal, que lee así: 'Ninguna de las disposiciones contenidas en las secciones 201 a 219 de este título [Ley de Normas Razonables de Trabajo federal] o en cualquiera de las órdenes que a virtud de las mismas se apruebe excusará el incumplimiento de cualquier Ley Federal o Estatal o de cualquier ordenanza municipal que establezca un salario mínimo superior al salario mínimo establecido en tales secciones o una semana máxima de trabajo inferior a la semana máxima de trabajo establecida en tales secciones . . . . Ninguna de las disposiciones contenidas en las secciones 201 a 219 de este título justificará a ningún patrono a reducir un salario pagado por él que sea en exceso del salario mínimo aplicable bajo las secciones 201 a 219 de este título ni justificará a ningún patrono a aumentar las horas de trabajo mantenidas por él que sean menores que las horas máximas aplicables bajo tales secciones . . .' Podemos decir, sin temor a equivocarnos, que al aprobar la referida disposición el Congreso de Estados Unidos hizo patente su intención de impedir que amparándose en la Ley Federal de Normas de

Trabajo pudieran rebajarse normas de trabajo más altas existentes en los diferentes estados o territorios de la unión. En el caso que nos ocupa la norma establecida por el Congreso Federal consistió en eximir al querellante de las ventajas del estatuto federal. Eso no significa, sin embargo, que él quedara forzosamente privado de protección legal. En *Chabrán* v. *Bull Insular Line*, 69 D.P.R. 269, los hechos fueron distintos a los del presente caso, pero el principio allí establecido es aplicable a éste. En él dijimos a la pág. 291:

. . . 'El Congreso no se apropió exclusivamente el campo de las normas a fijarse en relación con horas y salarios de empleados que trabajan en el comercio interestatal. Pudo haber prohibido legislación local sobre cualquier aspecto de la materia. Véase *Latoni* v. *Corte*, 67 D.P.R. 140. Pero en vez de prohibir las leyes locales, el Congreso afirmativamente dispuso, quizá por exceso de precaución, en la sección 18 de la Ley sobre Normas Razonables de Trabajo, que los Estados podían proveer un salario mínimo mayor o una semana de trabajo mejor que los establecidos por la Ley.' Sin embargo, subsiste la cuestión de si nuestra Asamblea Legislativa al adoptar el art. 5 de la Ley 379 como cuestión de hecho dispuso el pago de horas extras a razón de tiempo y medio después de las 40 horas durante la época de zafra para aquellos empleados que, como el querellante, de lo contrario estarían exentos durante la época de zafra, a virtud de la sec. 7(c) de la Ley Federal, de las disposiciones sobre horas extras. Conforme indicamos en el escolio 10 que aparece a la pág. 322, del caso de *Peña*, una manera de convenir con la querellada es que intercalemos en el *Disponiéndose* del art. 5 las palabras: 'Cuando la Ley Federal requiera el pago de horas extras.' Esto significaría, desde luego, que no estaríamos siguiendo el lenguaje literal del estatuto. Mas si estamos convencidos de que no fue el propósito legislativo que ese contexto se leyera literalmente, nuestro deber es, doquiera que el contexto mismo se preste razonablemente a semejante inter-

pretación, interpretarlo en armonía con la intención legislativa [citas]." Continúa la opinión:

"El *Disponiéndose* del art. 5 de la Ley 379 demuestra de su própia faz que la Asamblea Legislativa trataba de reenactar en nuestra ley local la fórmula federal sobre horas extras para paga semanal, en tanto en cuanto la ley local se aplicaba a industrias sujetas a la Ley Federal de Normas Razonables de Trabajo. Este criterio nuestro queda fortalecido por la disposición al afecto de que *sólo* se pagará tiempo y medio, mientras que a tenor de otros artículos de la ley las industrias locales deben pagar tiempo doble después que el obrero trabaja ocho horas por día. El uso de la palabra 'sólo' hace que parezca improbable que fuera la intención legislativa extender la responsabilidad del patrono más allá de lo dispuesto en la Ley Federal; sin embargo, ese sería el efecto de interpretar el *Disponiéndose* en el sentido de que excluye la exención sobre la época de zafra a que hace referencia la sec. 7(c) de la Ley Federal. En adición a ello, el historial legislativo de la ley 379 demuestra que el *Disponiéndose* fue insertado en ella para *atemperar* el estatuto local a la Ley Federal. No tenemos a la vista la totalidad de ese historial legislativo, mas en una certificación que figura en autos aparece que después de anunciarse por el Presidente del Senado que el P. del S. 25 (que luego se convirtió en la Ley 379 de 1948) había sido aprobado por unanimidad en tercera lectura, y de disponerse su remisión a la Cámara de Representantes, el Senador Pagán, explicando el voto afirmativo que acababa de emitir, se expresó del modo siguiente: 'Votaré la ley con la enmienda que propone el señor Géigel Polanco, pero no estoy de acuerdo con la explicación de que se modifica la ley para atemperarla a la Ley Federal. Es un hecho incontrovertible el poder legislativo que tiene nuestra Legislatura para establecer el tipo original que se establece en el proyecto. Según se establece por la Legislatura, no es incompatible, en forma alguna, con la Ley Federal. Tampoco es un mito el que tenemos poder

y autoridad plena para hacer eso . . . .' En ese contexto la palabra 'atemperar' únicamente podía significar que el *Disponiéndose* del art. 5 de la Ley 379 preceptuaba sustancialmente la misma paga por horas extras durante la semana regular que la Ley Federal, incluyendo la exención durante la zafra contenida en el art. 7 (c)."

Continúa la opinión: "Esta intención legislativa no fue cumplida a cabalidad. La fraseología de la sec. 7 y la última oración del art. 5 de nuestra ley exigen que se utilicen 40 horas como la semana regular de trabajo—más bien que las horas de hecho trabajadas, tal como lo dispone la Ley Federal —al calcular la paga por horas extras que debe recibir un obrero bajo un contrato Belo frustrado. Como resultado de esto el obrero recibe más paga por horas extras bajo la Ley 379 de la que recibiría bajo la Ley Federal. *Peña* v. *Eastern Sugar Associates*, supra. Es menester admitir que la disposición contenida en la Ley 379, relativa a un método más beneficioso para el obrero al calcularse la paga por horas extras bajo un contrato Belo frustrado que el que figura en la Ley Federal de Normas Razonables de Trabajo, debilita el argumento de que fue la intención legislativa en el *Disponiéndose* del art. 5 reiterar no solo la fórmula federal de tiempo y medio después de 40 horas a la semana, sino también la exención federal del pago de tales horas extras en épocas de zafra contenida en el art. 7 (c) de la Ley Federal. No obstante, creemos que puede aducirse un argumento bastante convincente—(1) del contexto del *Disponiéndose;* (2) del uso de la palabra *sólo;* y (3) de su historial legislativo—para la proposición de que el *Disponiéndose*, tomado aisladamente puede interpretarse como que conserva, más bien que en efecto elimina, la exención relativa a la paga por horas extras durante la época de zafra contenida en la Ley Federal, en tanto en cuanto concierne a la semana regular de trabajo. Empero, es innecesario que para llegar al resultado que aquí llegamos descansemos únicamente en el *Disponiéndose* del

art. 5. El art. 22 de la Ley 379 dispone que 'quedarán subsistentes en todos sus términos' la Ley de Salario Mínimo y los Decretos Mandatorios que se hayan promulgado a tenor de la misma. Al interpretar el art. 22 resolvimos que con una excepción, el mismo preserva las disposiciones de todos los decretos existentes, independientemente de si contienen disposiciones superiores o inferiores a las contenidas en la Ley núm. 379 [citas]". Continúa la opinión:

"El párrafo B-2(*b*) del Decreto Mandatorio núm. 3 dispone que: 'Ningún patrono empleará a trabajador alguno en la fase industrial de la industria del azúcar durante el llamado "tiempo muerto" por más de cuarenta (40) horas en cualquier semana de trabajo, a menos que dicho trabajador reciba compensación por su trabajo en exceso de dichas cuarenta (40) horas a razón de tiempo y medio el tipo mínimo de salario aplicable de acuerdo con la escala establecida en el apartado B-1 de este Decreto.' Al aprobarse este Decreto en febrero de 1943, el art. 7(*c*) de la Ley Federal, conforme hemos visto, eximía ciertos empleados como el querellante de las disposiciones sobre paga por horas extras de la Ley Federal durante la época de zafra. Por tanto, es obvio que al limitarse la disposición sobre paga extra a tiempo y medio después de 40 horas en el párrafo B-2(*b*) al tiempo muerto, el Decreto Mandatorio núm. 3 en efecto adoptaba como cuestión de ley local, la exención para épocas de cosechas contenidas en la Ley Federal."

Hemos acotado en la mayor extensión compatible con la naturaleza de esta clase de trabajo el aspecto doctrinal del caso de *Olazagasti*, porque sin duda ha sido una de las decisiones mejor resueltas y peor entendidas de nuestra jurisprudencia laboral. En el caso de *Olazagasti*, tomando como radical la Sec. 18 de la Ley de Normas Razonables de Trabajo federal, se estableció el principio de lo que podría llamarse la regla de mayor beneficio, en el sentido, que, de confligir una disposición de la Ley de Normas Razonables de Trabajo fe-

deral con una norma de nuestra Ley local, prevalecería aquélla que resultara de mayor beneficio para el obrero.

Es necesario, ante todo, recordar que la Ley de Normas Razonables de Trabajo federal es un estatuto adoptado para la protección del obrero. La exposición de motivos de dicha ley es clara: 2 (a) "Por la presente, el Congreso encuentra, que la existencia en las industrias que se dedican al comercio o a la producción de objetos de comercio, de condiciones obreras que no permiten mantener ciertas condiciones mínimas de vida, necesarias a la salud, la eficiencia y el bienestar general de los obreros, (1) hace que el comercio y las vías y establecimientos comerciales sean usados para ampliar y perpetuar tales condiciones de vida entre los obreros de los distintos estados, (2) se convierte en una carga para el comercio y la libre circulación de los objetos de comercio, (3) crea un estado de competencia injusto, (4) se resuelve en disputas obreras que dificultan y obstruyen el comercio y la libre circulación de los objetos de comercio (5) e interfiere con la más ordenada y justa distribución de los objetos de comercio. Por la presente se declara que es el fin público de esta Ley, regular haciendo uso del poder del Congreso, el comercio entre los distintos estados y corregir, y tan pronto como sea posible eliminar, las condiciones antes señaladas en tales industrias, sin reducir en forma substancial el empleo y sin afectar las posibilidades del obrero a obtener sus salarios."

Como se ve, el Congreso de los Estados Unidos, al regular las normas razonables de trabajo de las industrias y negocios comprendidos dentro del comercio interestal, nunca tuvo la intención de establecer normas laborales uniformes, que al aplicarse a todos los estados y territorios dejaran sin efecto las legislaciones promulgadas por dichos estados y territorios, sino, establecer ciertas normas federales básicas, dejando a las legislaturas de los estados y territorios en libertad para adoptar las normas adicionales que les permitieran sus respec-

tivas economías. No es la primera vez que las desigualdades socio-económicas entre los Estados de la Unión, obliga al Congreso de los Estados Unidos a emplear este método legislativo.

La sabiduría de permitir la coexistencia de unas normas básicas federales con normas adicionales de mayor beneficio de carácter estatal o territorial tiene su mejor ilustración en el caso de Puerto Rico, caso especialísimo dentro de las estructuras del Derecho público de los Estados Unidos de América. La fórmula de la inventiva puertorriqueña ha sido, adoptar como una especialidad dentro de su legislación local general las normas básicas federales en cuanto a la extensión de la semana regular de trabajo (40 horas), el tipo de compensación para horas extras (tiempo y medio), para ser aplicadas solamente a las industrias y negocios comprendidos dentro del comercio interestatal que no estuvieren en otra forma regulados por algún Decreto Mandatorio de la Junta de Salario Mínimo de Puerto Rico o un convenio colectivo.

En el caso de *Olazagasti* no tuvimos siquiera que aplicar la regla de mayor beneficio provista por la Sec. 18 de la Ley de Normas Razonables de Trabajo federal, porque, de acuerdo con la Sec. 7(c) de dicha ley, la tarea desempeñada por *Olazagasti*, durante el período de zafra, estaba exenta de la aplicación de la Ley de Normas Razonables de Trabajo federal. Esto le dejaba el campo abierto a nuestra ley laboral; en primer lugar, al apartado B-2(b) del Decreto Mandatorio Núm. 3 de 27 de febrero de 1943 de nuestra Junta de Salario Mínimo, en el sentido, que no se aplicarían sus determinaciones al tiempo trabajado durante el período de zafra; en segundo lugar, al *disponiéndose* del Art. 5 de nuestra Ley Núm. 379, en el sentido, que dicho *disponiéndose* lo que perseguía era equiparar nuestra Ley local a la fórmula federal sobre semana regular de trabajo y compensación por hora extra en aquellas industrias o negocios comprendidos dentro del comercio interestatal que no estuvieran cubiertos por un

decreto mandatorio nuestro o un convenio colectivo, y en tercer lugar al Art. 22 de nuestra Ley Núm. 379, en el sentido, que dicho Art. 22 lo que se proponía era preservar en toda su vigencia los decretos mandatorios anteriores a nuestra Ley Núm. 379 de 15 de mayo de 1948, y tomando en consideración únicamente el cuadro de determinación administrativa e intención legislativa que presentaba el párrafo B-2 (b) del Decreto Mandatorio Núm. 3 y los Arts. 5 y 22 de la Ley Núm. 379 llegamos a la conclusión que habiéndose propuesto el Decreto Mandatorio Núm. 3 seguir la exención durante el período de cosecha establecido por la Sec. 7 (c) de la Ley de Normas Razonables de Trabajo federal, y siendo la intención del Art. 22 de la Ley Núm. 379 conservar en toda su virtualidad los decretos mandatorios anteriores a la Ley Núm. 379 y los posteriores a ella, no tenían derecho a recibir compensación por horas extras, de acuerdo con el *disponiéndose* del Art. 5 de la Ley Núm. 379, aquellos obreros o empleados que las hubiesen trabajado durante el período de zafra. Se observará que al referirnos a los decretos mandatorios, hemos incluido tanto los anteriores como los posteriores a la Ley Núm. 379 pues estableciendo la excepción del *disponiéndose* del Art. 5 como salvedad a la aplicación general, el caso del decreto de la Junta de Salario Mínimo en el cual se *haya fijado*—pretérito perfecto del modo subjuntivo—o fijare—futuro imperfecto del subjuntivo—, o sea de acción prospectiva o proyectada, pues según reza la gramática de la Real Academia Española, el futuro imperfecto enuncia el hecho como no acabado, y siempre como contingente referido ya al presente, ya al futuro, autoriza la inclusión tanto de los decretos anteriores como de los decretos posteriores a la Ley Núm. 379. Debe tenerse además en cuenta que cualquier *exclusión* de un grupo de trabajo o industria establecida por la Ley de Normas Razonables de Trabajo federal no podría dejar sin efecto cualquier *inclusión* establecida por la legislación laboral de cualquier estado o territorio, por-

que siendo la inclusión más favorable al obrero que la exclusión, regiría la regla de mayor beneficio de la Sec. 18 de la propia Ley de Normas Razonables de Trabajo federal, y es por ello, que alabar debemos la sabiduría de la decisión del caso de *Olazagasti* de haber buscado la solución no en la simple exclusión federal, sino además en las más abarcadora aunque no por ello menos eficaz, de la no inclusión de la ley estatal o territorial.

El caso de *Berríos* v. *Eastern Sugar Associates*, 79 D.P.R. 688 (Marrero) (1956) cita precisa a las págs. 690–691, 695–701, el caso de un marino expresamente exento por la Sec. 218 de la Ley de Normas Razonables de Trabajo federal de las disposiciones sobre salario mínimo y semana de trabajo y paga extra de la misma ley, se resuelve siguiendo el mismo procedimiento del caso de *Olazagasti*: Se declara la exclusión del marino de las disposiciones de la Ley de Normas Razonables de Trabajo federal (pág. 697) y se estudia el caso bajo nuestra legislación local, o sea, combinando las disposiciones del párrafo B-2 (a) del Decreto Mandatorio Núm. 3 con el *disponiéndose* del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948 fijando la jornada de trabajo en Puerto Rico, en virtud de la cual, concluimos que cuarenta horas constituían la semana regular de trabajo del querellante; que durante el "tiempo muerto" las horas trabajadas por Berríos en exceso de cuarenta a la semana debían pagárseles a razón de tiempo y medio y que durante el "tiempo de zafra" las horas en exceso de cuarenta a la semana, debían serle satisfechas a tiempo sencillo (págs. 700–701).

El caso de *Laborde* v. *Eastern Sugar Associates*, 81 D.P.R. 478 (Belaval) (1959) cita precisa a las págs. 482–483, el caso de un operador de líneas telefónicas de una central azucarera que se alegaba estar comprendido dentro de la exención dispuesta por la Sec. 7 (c) de la Ley de Normas Razonables de Trabajo federal y como tal fuera de los beneficios del día de descanso semanal establecido por nuestra Ley Núm.

289 de 9 de abril de 1946 y de la jornada de trabajo establecida por nuestra Ley Núm. 379 de 15 de mayo de 1948, reafirma el principio del caso de *Olazagasti*, en el sentido, que en todo posible conflicto entre la Ley de Normas Razonables del Trabajo federal y nuestras leyes locales, debe prevalecer la ley que resulte mas beneficiosa al obrero. Dice así la decisión de *Laborde*: "En cuanto a si es aplicable a este caso la exención de elaboración (*processing*) dispuesta por la sec. 7(c) de la Ley de Normas Razonables de Trabajo, un estudio comparativo que hemos hecho de las disposiciones de la Ley de Normas Razonables del Trabajo y de las disposiciones de nuestras distintas leyes locales sobre el contrato de trabajo, nos ha convencido de que nuestras leyes locales resultan más beneficiosas que el estatuto federal. Siendo esto así, de acuerdo con la sec. 18 de la propia Ley de Normas Razonables del Trabajo, lo que debemos aplicar son nuestras leyes locales, en este caso, la Ley Núm. 49 de 1935, el Decreto Mandatorio Núm. 3 de la Junta de Salario Mínimo de Puerto Rico armonizado con las disposiciones de la Ley Núm. 289 de 1946 y la Ley Núm. 379 de 1948: *Olazagasti* v. *Eastern Sugar Associates*, 79 D.P.R. 93 (Marrero) (1956) cita precisa a las págs. 103–114. La Legislatura de Puerto Rico no ha creído prudente establecer la total exención para la fase industrial de nuestra industria azucarera que contiene la Ley Federal, disponiendo progresivamente, [por el contrario] una tarea diaria y semanal menos agotadora para los negocios exemptuados por la Ley federal. Hay abundante razones climatológicas, sociales, humanas que justifican la diferenciación si tal justificación fuera necesaria."

Tal vez sea aconsejable recordar aquí la exposición de motivos de nuestra Ley Núm. 379 de 15 de mayo de 1948, al establecer la norma del mayor beneficio en favor del obrero, bastante parecida en ánimo reparativo a la exposición de motivos de la Ley de Normas Razonables de Trabajo federal. Dice así la exposición de motivos de nuestra Ley Núm. 379:

"Consagra esta Ley el principio de la limitación de la jornada de trabajo: una de las grandes reivindicaciones obreras. Se trata de una medida de efectiva protección de la salud, la seguridad y la vida del trabajador. Las jornadas excesivas de labor producen fatiga, aumentan la frecuencia de los accidentes del trabajo y quebrantan el vigor del organismo exponiéndole a dolencias y enfermedades. Además, privan al trabajador del tiempo necesario para el solaz y cultivo de su espíritu y sus relaciones sociales y ciudadanas . . . . Al mecanizarse el trabajo y racionalizarse la organización industrial, la producción ha aumentado considerablemente, pero también el esfuerzo del obrero, compelido ahora a rendir su servicio con mecanismo y bajo técnicas que requieren destreza suma y atención constante. Nada más natural que el trabajador alcance el beneficio del monocultivo y la racionalización en la forma de una jornada más humana de labor. Es la política de esta Ley limitar a un máximo de ocho horas la jornada legal de trabajo en Puerto Rico y proveer el pago de un tipo doble de salario para las horas trabajadas en exceso de la jornada legal . . . . Se declara por la presente que la política de esta Ley es, mediante el ejercicio de la facultad de la Asamblea Legislativa de Puerto Rico para decretar leyes para la protección de la vida, la salud y la seguridad de empleados y obreros, corregir y tan rápidamente como sea posible eliminar las condiciones de explotación del trabajador a base de jornadas excesivas, aumentar los empleos sustancialmente y proveer una mejor compensación al empleado en aquellos casos en que el patrono prolonga la jornada."

Las decisiones en los casos de *Chabrán, Olazagasti, Berríos* y *Laborde* crearon un estado de derecho que podría sintetizarse así: Habiendo la Legislatura de Puerto Rico adoptado como parte de su estatuto laboral las únicas normas básicas federales originalmente aplicables a Puerto Rico, por haber sido hasta el momento de emitirse dichas decisiones expresamente excluido nuestro país de la aplicación del salario mínimo

federal, y resultando más beneficiosas para el obrero o empleado las otras condiciones del contrato de trabajo dispuestas por nuestras leyes obreras, es indudable que a toda industria o negocio dedicados al comercio interestatal o a la producción de objetos de comercio interestatal, le son aplicables nuestras leyes locales en todo lo referente al contrato de trabajo, y solamente en aquellas condiciones marginales en que comparadas ambas legislaciones resultaran más beneficiosas al obrero o empleados las disposiciones de la Ley de Normas Razonables de Trabajo federal, regiría ésta para tal situación en particular.

No obstante tenemos que reconocer que frente a este estado de derecho, nuestra jurisprudencia quizás por un poco de despreocupación en cuanto al uso de las radicales más adecuadas a la cuestión o por haber variado de criterio algunos de los jueces que suscribieron con sus votos dichas opiniones se ha ido concretando otra tesis contraria en cuanto a la aplicación de la ley federal con exclusión de la Ley de Puerto Rico. El asunto es lo suficiente grave, sobre todo en los actuales momentos, como para merecer un análisis exhaustivo de la cuestión.

El resultado contrario se ha logrado extractando de la opinión de *Olazagasti* (79:108) la siguiente aseveración: "El *Disponiéndose* del art. 5 de la Ley 379 demuestra de su propia faz que la Asamblea Legislativa de Puerto Rico trataba de reenactar en nuestra ley local la fórmula federal sobre horas extras para paga semanal, en tanto en cuanto la ley local se aplicaba a industrias sujetas a la Ley Federal de Normas Razonables de Trabajo. Este criterio nuestro queda fortalecido por la disposición al efecto de que *sólo* se pagará tiempo y medio, mientras que a tenor de otros artículos de la ley las industrias locales deben pagar tiempo doble después que el obrero trabaja ocho horas por día. El uso de la palabra '*sólo*' hace que parezca improbable que fuera la intención legislativa extender la responsabilidad del patrono más allá de lo

dispuesto en la Ley Federal; sin embargo, ese sería el efecto de interpretar el *Disponiéndose* en el sentido de que excluye la exención sobre la época de zafra a que hace referencia la sec. 7(c) de la Ley Federal. En adición a ello, el historial legislativo de la Ley 379 demuestra que el *Disponiéndose* fue insertado en ella para 'atemperar' el estatuto local a la Ley Federal . . . ."

Considero necesario una pequeña incursión en la semántica para dejar debidamente aclaradas las dos palabras que parecen haber sido la clave de la nueva interpretación, las palabras "reenactar" y "atemperar". Es indudable que la primera pertenece a la terminología particular del proceso legislativo, tomada del idioma inglés y significa volver a promulgar una ley. Esto nos hace sospechar que en la forma metafórica en que se usa en el caso de *Olazagasti*, significa simplemente "adoptar", según se empleó en el caso de *Peña* v. *Eastern Sugar Associates*, 75 D.P.R. 304 (Snyder) (1953) cita precisa a las págs. 321 *in fine* y 322. Así el primer período de la aseveración acotada está supuesto a expresar, por simple sustitución que: "El *disponiéndose* del art. 5 de la Ley 379 demuestra de su propia faz que la Asamblea Legislativa de Puerto Rico trataba de *adoptar* en nuestra Ley local la fórmula federal." No le damos significación especial dentro de la terminología legal porque no teniendo la Legislatura de Puerto Rico facultad de promulgar de nuevo una ley del Congreso de los Estados Unidos, su uso semántico queda dominado por la acepción figurada. La segunda, por el contrario, es palabra del idioma español, y parece usada en las dos únicas acepciones que tiene la palabra: atemperar como "moderar", "templar", primera acepción o como "acomodar una cosa a otra", segunda acepción, en este último caso una legislación federal a una legislación territorial.

El caso de *Ortiz Reyes* v. *Eastern Sugar*, 85 D.P.R. 95 (Per Curiam) (1962) cita precisa a las págs. 99–100, es el caso de cuatro marinos que trabajaban a bordo de los remol-

cadores de la Eastern Sugar Associates transportando caña
da azúcar desde la Isla de Vieques a Punta Santiago en
Humacao. Los querellantes alegaban que como tales marinos
no estaban cubiertos por la Ley de Normas Razonables de
Trabajo federal, y no estando cubiertos por dicha ley, y
aunque las labores de los marinos estaban incluidas en la
definición de la industria de la transportación marítima con-
tenida en la división R. de la Sec. 37 de la Ley Núm. 96
de 26 de junio de 1956 (Ley de Salario Mínimo), no estaban
incluidas en ningún decreto mandatorio, y por lo tanto, no
les era aplicable a su caso el *disponiéndose* del Art. 5 de la
Ley Núm. 379 de 15 de mayo de 1948 que es el que autoriza
el pago a tiempo y medio de las horas en exceso de ocho
diarias, según lo había pagado la Eastern Sugar, sino el
Art. 4 (a) de la última ley que es el que clasifica como horas
extras las trabajadas en exceso de 8 diarias y aquellas dis-
posiciones del Art. 5 que proveen la norma general de que las
horas extras se pagarán a tipo doble.

Resolviendo la cuestión de derecho planteada concluyó
este Tribunal: "La dificultad con que se enfrenta esta po-
sición de los apelantes es que según se deduce de las opiniones
emitidas en *Olazagasti* v. *Eastern Sugar Associates*, 79 D.P.R.
93 (1956) y *Berríos* v. *Eastern Sugar Associates*, 79 D.P.R.
688 (1956) el criterio para la aplicación del 'disponiéndose'
del artículo 5 de la Ley 379 no es si la labor particular que
realiza el obrero está cubierta por la Ley Federal de Normas
Razonables del Trabajo, sino si la industria dentro de la
cual presta estos servicios está cubierta o no. Y en el presente
caso, considérese como parte de la fase industrial de la in-
dustria azucarera o como parte de la industria de transporta-
ción marítima, las labores realizadas por los querellantes están
comprendidas dentro del ámbito de la legislación federal por
tratarse de actividades de comercio interestatal o en la pro-
ducción de artículos para el comercio interestatal. Sección
1 de la Ley Federal de Normas Razonables del Trabajo, 29

U.S.C.A. sec. 201; *Berríos* v. *Eastern Sugar Associates*, supra, a la pág. 695. Todo cuanto resulta es que las labores que desempeñan los querellantes están cubiertas por la ley federal pero que las disposiciones de dicha ley sobre salario mínimo y jornada de labor, secciones 6 y 7 (29 U.S.C.A. secs. 206 y 207) no les son aplicables a virtud de la exención establecida por el párrafo 14 de la sección 13 aludida. Conviene recordar aquí que en *Olazagasti*, supra, indicamos que la intención de la Asamblea Legislativa de Puerto Rico al aprobar el 'Disponiéndose' del Art. 5 de la Ley 379 fue que la Ley Federal de Normas Razonables rigiera en Puerto Rico con todas sus disposiciones, incluyendo todas las exenciones provistas en la misma, con la excepción de imponerles a los patronos de industrias cubiertas por la citada ley federal, la obligación de pagarles a sus empleados a tiempo y medio las horas trabajadas en exceso de ocho diarias." Demás está decir que el lenguaje cuidadoso y bien meditado que empleamos en *Olazagasti* no da derecho a una generalización tan gruesa de las intenciones legislativas.

El caso de la *Bull Insular Line* v. *Tribunal Superior*, 86 D.P.R. 156 (Pérez Pimentel) (1962) cita precisa a la pág. 163 es el caso de unos estibadores que trabajaban en la carga de azúcar a bordo de barcos consignados o pertenecientes a la Bull Insular Line, una industria cubierta por la Ley de Normas Razonables de Trabajo federal, durante el período de tiempo comprendido entre julio 1947 y noviembre de 1956, bajo convenios colectivos negociados durante el curso del empleo. Los querellantes trabajaron horas en exceso de ocho horas diarias y por tales horas extras recibieron compensación a tiempo y medio y no a doble tiempo.

Basándose en el *disponiéndose* del Art. 5 de la Ley Núm. 379 aplicable a las industrias o negocios en Puerto Rico cubiertas por la Ley de Normas Razonables de Trabajo federal, el Tribunal resolvió: "En *Olazagasti* v. *Eastern Sugar Associates*, 79 D.P.R. 93 (1956), dijimos que el historial legisla-

tivo de la Ley 379 demostraba que el *Disponiéndose* del artículo 5 fue insertado en dicha ley para atemperar el estatuto local a la Ley Federal. En esa forma se colocaba a las industrias en Puerto Rico dedicadas al comercio interestatal en posición de igualdad competitiva con aquellas industrias de Estados Unidos también cubiertas por la Ley Federal de Normas Razonables de Trabajo, y a las cuales sólo se les exige el pago de tiempo y medio por horas extras trabajadas. Ningún argumento nos ha convencido de que nuestra legislatura intentara atemperar la ley local al estatuto Federal, solamente en parte, en lo que respecta al pago de salarios por horas extras, y excluyera, en su propósito de atemperar un estatuto con el otro, el trabajo por piezas u otra unidad de obra. Por el contrario resolvemos que el *Disponiéndose* del art. 5 de la Ley 379 es aplicable a las industrias en Puerto Rico cubiertas por la Ley Federal de Normas Razonables de Trabajo lo mismo cuando en el contrato de trabajo se conviene un salario diario, semanal o mensual, que cuando se conviene uno por piezas u otra unidad de obra." Otra vez tenemos que tomar excepción en cuanto a que el lenguaje cuidadoso y bien meditado de nuestras anteriores decisiones, entre ellas la de *Olazagasti*, no autorizan una interpretación tan extensa de la doctrina establecida por nuestra jurisprudencia laboral.

El caso de *Pan American* v. *Tribunal Superior*, 86 D.P.R. 139 (Blanco Lugo) (1962) cita precisa a las págs. 150–155 trata de varios empleados de una empresa aérea solicitando compensación a tiempo doble por las horas trabajadas en exceso de ocho horas dentro de los períodos diarios de veinticuatro horas, de las horas trabajadas en exceso de cuarenta y ocho horas semanales, las horas trabajadas en el día semanal de descanso, durante el período de tiempo comprendido entre los años 1948 y 1958, de acuerdo con las disposiciones de la Ley Núm. 379 de 15 de mayo de 1948, 29 L.P.R.A. secs. 271 *et seq.*, fijando la jornada legal de trabajo en Puerto Rico

y de la Ley Núm. 96 de 26 de junio de 1956, 29 L.P.R.A. (Supl. 1961) secs. 245 *et seq.*, relativa a la fijación de salarios mínimos. En los convenios colectivos firmados se provee una jornada de trabajo de ocho horas diarias durante cinco días consecutivos a la semana. En cuanto al pago de horas extras y siendo considerada como horas extras las trabajadas en exceso de ocho horas diarias o cuarenta semanales se dispone en los convenios, que las mismas serán pagadas a tiempo y medio del tipo regular por hora, aunque las horas en exceso de doce diarias o de ocho durante el sexto día de trabajo, o durante el séptimo día, se compensaran a tipo doble. Por haber aceptado los querellantes que fueron compensados de acuerdo con los términos del contrato, lo único sujeto a litigación es "si las horas trabajadas en exceso de ocho horas diarias hasta doce o en exceso de cuarenta a la semana hasta cuarenta y ocho, deben compensarse a tiempo y medio como alega la Pan American o a tiempo doble según sostienen los empleados".

La cuestión litigiosa estaba circunscrita a determinar si a la reclamación de los empleados le era aplicable el *Railway Labor Act* o nuestra Ley Núm. 379 de 15 de mayo de 1948. Al descartar la aplicabilidad de la *Railway Labor Act* y pasar sobre la aplicabilidad del Art. 5 de nuestra Ley Núm. 379 de 15 de mayo de 1948, se resolvió por este Tribunal: "Según expresamos en *Olazagasti* v. *Eastern Sugar Associates*, 79 D.P.R. 93, 108 (1956). 'El *Disponiéndose* del art. 5 de la Ley 379 demuestra de su propia faz que la Asamblea Legislativa trataba de reenactar en nuestra ley local la fórmula federal sobre horas extras para paga semanal, en tanto en cuanto la ley local se aplicaba a industrias sujetas a la Ley Federal de Normas Razonables de Trabajo' y que 'fue insertado en ella para "atemperar" el estatuto local a la Ley Federal'. En otras palabras, la Ley Federal de Normas Razonables rige en Puerto Rico con todas sus disposiciones, excepto que nuestra Asamblea Legislativa le impuso a los

patronos cubiertos por dicha ley o comprendidos dentro de las exenciones de la sección 13, 29 U.S.C.A. sec. 213, la obligación de pagar a sus empleados las horas en exceso de ocho diarias y 40 semanales, cuando menos, a razón de tiempo y medio, o, a un tipo mayor, si así lo disponía un convenio colectivo concertado por las partes o un decreto de la Junta de Salario Mínimo aplicable a la industria en cuestión. *Olazagasti* v. *Eastern Sugar Associates*, supra; *Berríos* v. *Eastern Sugar Associates*, 79 D.P.R. 688 (1956); *Ortiz Reyes* v. *Eastern Sugar Associates*, 85 D.P.R. 95 (1962); *Bull Insular Line, Inc.* v. *Tribunal Superior*, 86 D.P.R., resuelto en el día de hoy. De lo expuesto se deduce que para los fines de la Ley 379, la querellada, como porteador aéreo que se dedica al comercio interestatal y extranjero, es una industria sujeta a las disposiciones de la Ley Federal de Normas Razonables de Trabajo. Ello es así aun cuando los porteadores aéreos sujetos a la *Railway Labor Act* han sido expresamente exentos de las disposiciones de la sección 7 de la misma (29 U.S.C.A. sec. 207) que establece una jornada máxima de labor de 40 horas semanales mediante la sección 13(b) (3) 29 U.S.C.A. sec. 213(b)(3). En *Ortiz Reyes* v. *Eastern Sugar Associates*, supra, manifestamos que el criterio para la aplicación del 'Disponiéndose' del artículo 5 de la Ley 379 no es si la labor particular que realiza el obrero está cubierta por la mencionada ley federal, sino si la industria dentro de la cual presta servicios está cubierta o no. Y como hemos indicado anteriormente, el hecho de que la industria esté exenta de las disposiciones de la sección 7, no la excluye del 'Disponiéndose' provisto por la Ley 379 . . . .

"En resumen, la Railway Labor Act federal no inhibe la aplicación a los porteadores aéreos de la legislación local sobre la jornada de trabajo, pero en virtud del 'Disponiéndose' de la misma Ley 379, dicha industria—en ausencia de un convenio colectivo o un decreto de la Junta de Salario Mínimo que establezca condiciones superiores—sólo viene

obligada a satisfacer las horas trabajadas en exceso de 8 diarias y de 40 semanales a razón de tiempo y medio."

El caso de *Porto Rico Coal Co.* v. *Tribunal Superior*, 91 D.P.R. 89 (Belaval) (1964) cita precisa a la pág. 91 es el caso de unos marinos que trabajan desde el 26 de junio de 1956 al 31 de agosto de 1961 en el servicio de transporte, carga, remolque, traslación o conducción de los barcos que operan las dos compañías. Dichos marinos están exentos de las disposiciones de la Ley de Normas Razonables del Trabajo federal, y en cuanto al disponiéndose del Art. 5 de nuestra Ley Núm. 379 de 15 de mayo de 1948 el mismo no aplica, según los obreros por tratarse de una industria cubierta, en cuanto a su salario mínimo por la Sec. 37-R de la Ley Núm. 96 de 26 de junio de 1956 (pág. 721)—29 L.P.R.A. sec. 246i Supl. Acum. 1963 (pág. 194)—y la Sec. 6(f) adicionada a dicha Ley Núm. 96 por el Art. 1 de la Ley Núm. 103 de 25 de junio de 1958 (pág. 257)—29 L.P.R.A. sec. 245(e) Supl. Acum. 1963 (pág. 156).

Resolviendo la objeción de las compañías, en el sentido, que el disponiéndose del Art. 5 exceptúa solamente los casos en que por decreto mandatorio de la Junta de Salario Mínimo o por convenio, se fijare otra norma para compensar horas extras y la Sec. 6(b) de la Ley de Salario Mínimo no es un decreto ni es un convenio, este Tribunal resolvió: "Es indudable que la exención de la industria por la Ley de Normas Razonables de Trabajo, no juega ningún papel en este caso. Según hemos visto, la única consecuencia de una exención federal es dejarle el campo abierto en su totalidad a la legislación local, por resultar más beneficiosa la inclusión local que la exclusión federal. En cualquier forma que deba ser aplicado el *disponiéndose* del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948, en una situación como la que presenta este caso, realiza la función de una ley local. Entonces, el pago por cada hora de trabajo en exceso de la jornada legal de ocho (8) horas [al día] o en exceso de cuarenta

(40) horas a la semana será a un tipo de salario a razón de, por lo menos, tiempo y medio del salario convenido para las horas regulares, 'salvo el caso en que por decreto de la Junta de Salario Mínimo o convenio colectivo de trabajo se *haya fijado* o *fijare* otra norma de trabajo (horas) o de compensación (salarios) o de ambas (horas y salarios)'. Obsérvese que lo regulado por el decreto de la Junta o el convenio colectivo pueden ser exclusivamente las horas de trabajo o puede ser el salario o pueden ser ambos. En realidad de Derecho lo único que tenemos que resolver en este caso es si por haberse declarado el salario por la Asamblea Legislativa de Puerto Rico, varía la situación cubierta por la última salvedad del *disponiéndose* del Art. 5. Tratándose de una norma establecida por la misma autoridad que crea la Junta de Salario Mínimo, la misma resulta tan obligatoria como un decreto de dicha Junta y de acuerdo con el propio texto del Art. 5 que permite regular o el trabajo (horas) o la compensación (salarios) el caso no resulta inusitado ni la interpretación forzada. En este caso, las horas de trabajo son las establecidas por el disponiéndose del Art. 5 que es nuestra Ley local para las industrias cubiertas por la Ley Federal de Normas Razonables de Trabajo y el salario mínimo el establecido por la Asamblea Legislativa de Puerto Rico, en la Sec. 6(b) adicionada a la Ley de Salario Mínimo de Puerto Rico por la Ley Núm. 103 de 25 de junio de 1958, o sea, a razón de un dólar por cada hora de trabajo, debiendo pagarse las horas extras en la misma forma que si se tratara de una industria cubierta por decreto, o sea, a razón de doble tiempo."

Es conveniente a los fines de este estudio, exponer algunas de las disposiciones de la Ley de Normas Razonables de Trabajo de 1938 federal, usando para dicha exposición el método histórico-evolutivo. Prescindiremos de la exposición de motivos por haberla incluido ya en esta opinión.

De acuerdo con la Sec. 3(b) de la Ley Pública Núm. 718 del 25 de junio de 1938 del Congreso de los Estados Unidos, mejor conocida como Ley de Normas Razonables de Trabajo de 1938—52 U.S. Statutes at Large, 1060–1069; 83–8 Congressional Record 9159, 9163, 9165, 9179, 9246, 9257— la palabra "comercio" significa negocio, comercio, transportación, transmisión o comunicación entre los distintos estados o desde cualquier estado a cualquier sitio fuera de éste; de acuerdo con la Sec. 3(c) de la misma ley, la palabra "estado" comprende cualquier estado de los Estados Unidos o el Distrito de Columbia o cualquier territorio o posesión de los Estados Unidos; de acuerdo con la Sec. 3(h), la palabra "industria" significa un oficio, negocio, industria o cualquier ramal de los mismos, o un grupo de industrias en las cuales los individuos estén lucrativamente empleados; de acuerdo con la Sec. 3(i) de la misma ley, las palabras "objetos de comercio" significan, además de cualquier equipo marino o embarcaciones, mercancías, artículos de consumo, mercaderías o artículos de comercio o comprendidos dentro del comercio por su carácter, o cualquiera parte o ingredientes de ellos; de acuerdo con la Sec. 3(j), la palabra "producidos" significa además manufacturado, extraído de una mina, hecho a mano o de cualquiera otra manera, construido dentro del Estado, y para los fines que persigue este estatuto, un empleado se considerará como dedicado a la producción de objetos de comercio, si dicho empleado se utiliza en la producción, manufactura, extracción de minerales, trabajo a mano, transportación o si en cualquier otra forma ha trabajado directamente sobre dichos objetos o en cualquier proceso o tarea necesarias a la producción de estos objetos y dentro de cualquier estado.

La Sec. 5(a) de la misma ley establece que el Administrador—se refiere al Administrador de la División de Horas y Salarios del Departamento del Trabajo de los Estados Unidos—tan pronto como le sea posible, deberá nombrar un

comité para cada industria dedicada al comercio o a la producción de objetos de comercio y (b) en dicho comité debe incluirse un número de personas sin interés económico en la industria bajo estudio, en representación del interés público, un número igual de personas en representación de los empleados de la industria y otro número igual en representación de los patronos de la industria y al nombrar las personas que han de representar a cada grupo, el Administrador tendrá en cuenta la región geográfica de la industria, debiendo constituir el *quorum* de dicho comité las dos terceras partes, aunque para decidir sólo se requiera el voto de una mayoría de todos sus miembros, y es ante dicho comité que el Administrador deberá someter la información disponible que tenga relacionada con la industria bajo estudio, trayendo asimismo ante el mismo cualquier testigo que el Administrador considere esencial al estudio de la industria referida al Comité, sin que esto limite la facultad de los comités para citar otros testigos o pedir del Administrador cualquier información adicional que pueda ayudar al Comité en sus deliberaciones.

La Sec. 6 de la misma ley es la que establece el aumento periódico del *mínimo* de salario inicial hasta cuarenta centavos la hora y la Sec. 7 la que establece la reducción progresiva de la semana de trabajo hasta cuarenta horas. La Sec. 8 (a) dispone que con vista a darle efectividad al propósito público de la ley, y tan rápidamente como dentro de lo económico sea posible hacerlo sin reducir los empleos, deberá llegarse a un salario *mínimo* general de cuarenta centavos la hora en cada industria dedicada al comercio o a la producción de objetos de comercio, y el Administrador, de tiempo en tiempo, podrá convocar al comité de la industria correspondiente y dicho comité deberá, de tiempo en tiempo, recomendar el tipo de salario *mínimo* o los tipos de salarios mínimos a ser pagados bajo la Sec. 6 por los patronos dedicados al comercio o a la producción de objetos de comercio en dicha industria o cualquier

clase de industria parecida a la misma; el inciso (b) de la Sec. 8 establece que al convocar al comité de la industria correspondiente, el Administrador le referirá para su determinación el tipo de salario mínimo o los tipos de salarios mínimos a ser fijados para dicha industria, pero, el comité deberá investigar las condiciones de la industria, y para dicho fin, el Comité o cualquier Subcomité debidamente autorizado para ello, podrá oir testigos y recibir la prueba que sea necesaria para habilitar a dicho Comité a cumplir con sus obligaciones y funciones bajo la ley, recomendándole al Administrador el tipo de salario *mínimo* más alto, tomadas en cuenta, las condiciones económicas y la competencia y que no se reduzcan sustancialmente los empleos dentro de la industria; el inciso (c) de la Sec. 8 dispone: El Comité de la industria correspondiente recomendará aquellas clasificaciones razonables dentro de cualquier industria que determine sean necesarias al propósito de fijar para cada clasificación dentro de dicha industria el más alto tipo de salario mínimo que no exceda de 40 centavos la hora, (1) ni reduzca sustancialmente los empleos dentro de dicha clasificación y (2) no le dé ninguna ventaja en la competencia a ningún grupo en la industria y recomendará para cada clasificación en la industria el más alto tipo de salario *mínimo* que el Comité considere no reduzca sustancialmente los empleos en dicha clasificación. Al determinar si dichas clasificaciones deben ser hechas en cualquier industria, al hacer dichas clasificaciones y al determinar el tipo de salario *mínimo* para tales clasificaciones, ninguna clasificación se hará y ningún tipo de salario mínimo se fijará sólo bajo el criterio de la locación regional, pero el Comité de la industria correspondiente y el Administrador considerarán, entre otros factores a tomarse en cuenta, los siguientes: (1) la competencia a que esté sujeta la industria según pueda ésta quedar afectada por la transportación, los gastos de vida y los costos de producción; (2) los salarios establecidos para trabajos de igual o parecido

carácter por convenios colectivos acordados entre patronos y empleados por medio de representantes de su propia selección y (3) los salarios pagados por trabajo de igual o parecido carácter por patronos que voluntariamente hayan establecido ciertas pautas de salario mínimo aceptables en la industria y ninguna clasificación, de acuerdo con esta sección, debe distinguir en cuanto al salario a pagarse, por razón de edad o sexo.

La Sec. 18 de la misma ley establece que ninguna disposición de esta ley o cualquier orden bajo la misma excusará el incumplimiento de cualquier ley federal o estatal u ordenanza municipal estableciendo un salario mínimo mayor que el establecido bajo esta ley o una semana de trabajo máxima menor que la establecida bajo esta ley y ninguna disposición de esta ley relativa al empleo de niños justificará el incumplimiento de cualquier ley federal o estatal u ordenanza municipal estableciendo una norma más beneficiosa que la norma establecida por esta ley. Ninguna disposición de esta ley justificará la reducción por el patrono de salarios pagados por él que sean más altos que el salario *mínimo* autorizado por esta ley o justificará a cualquier patrono aumentar las horas de trabajo mantenidas por él que sean menos que las horas máximas establecidas por esta ley.

Por la Resolución conjunta de 26 de junio de 1940 del Congreso de los Estados Unidos, 54 U.S. Statutes at Large 615–616 se enmendó la Sec. 5 de la Ley de Normas Razonables de 1938 para añadir al final de dicha sección por el inciso (e) lo siguiente: Ningún comité de industria nombrado de acuerdo con el inciso (a) de esta sección tendrá ninguna autoridad para recomendar el tipo *mínimo* o los tipos *mínimos* de salarios a pagarse bajo la Sec. 6 a cualquier empleado de Puerto Rico o en las Islas Vírgenes. Sin tomar en cuenta cualquiera otra disposición de esta ley, el Administrador podrá nombrar un comité de la industria especial que recomiende el tipo *mínimo* o los tipos *mínimos* de salarios a ser

pagados bajo la Sec. 6 a todos los empleados en Puerto Rico o en las Islas Vírgenes, o en Puerto Rico y las Islas Vírgenes dedicados al comercio o a la producción de objetos de comercio, o el Administrador nombrará comités de la industria correspondiente separados que recomienden el tipo *mínimo* o los tipos *mínimos* de salarios a ser pagados bajo la Sec. 6 a empleados allí dedicados al comercio o a la producción de objetos de comercio en dichas industrias en particular. Un comité de la industria correspondiente nombrado bajo este inciso estará compuesto de residentes de dicha isla o islas donde los empleados, respecto a los cuales dicho comité fue nombrado, estén contratados y residentes de los Estados Unidos, fuera de Puerto Rico, y las Islas Vírgenes. Al determinar el tipo *mínimo* o los tipos *mínimos* de salarios a ser pagados, y al determinar las correspondientes clasificaciones dentro de una industria, dichos comités de la industria y el Administrador estarán regidos por las disposiciones de la Sec. 8 y ningún comité recomendará y el Administrador no aprobará un salario mínimo que pudiera darle ventaja en la competencia a cualquier industria en Puerto Rico y las Islas Vírgenes sobre cualquier industria en los Estados Unidos, fuera de Puerto Rico y las Islas Vírgenes. Por el inciso (d) se dispone que: Ningún decreto expedido por el Administrador siguiendo las recomendaciones de un comité de la industria hechas con anterioridad a la promulgación de esta resolución conjunta de acuerdo con la Sec. 8 de la Ley de Normas Razonables de Trabajo de 1938, será aplicable después de dicha promulgación a ningún empleado dedicado al comercio o a la producción de objetos de comercio en Puerto Rico o en las Islas Vírgenes.

Por la misma resolución conjunta se enmendó la Sec. 6 (a) de la Ley de Normas Razonables de Trabajo de 1938, referente al salario mínimo, para añadirle a dicha Sec. 6 (a) lo siguiente: Si dicho empleado es un trabajador en su propio domicilio en Puerto Rico o en las Islas Vírgenes (se le

pagará) *no menos* que el tipo *mínimo* para trabajo por pieza prescrito por reglamento o decreto de salario; o, de no estar en efectividad ningún tipo mínimo para trabajo por pieza, (se le pagará) cualquier tipo implantado por el patrono que pueda rendirle a la proporción más adecuada o al grupo de los empleados comprendidos dentro de tal reglamento u orden, no menos del tipo *mínimo* de salario por hora. Dicho tipo *mínimo* de trabajo por pieza o del tipo salario por pieza implantado por el patrono debe ser proporcionado a y pagado en sustitución del tipo de salario *mínimo* por hora que resulte aplicable bajo esta sección. El Administrador o su representante autorizado, tendrán facultad para dictar los reglamentos o decretos que sean necesarios o propios para poner en vigor cualquiera de las disposiciones de este apartado, incluyendo la autoridad para, sin limitar los contenidos generales de la anterior exposición, definir cualquier tarea u ocupación que sea llevada a cabo por dichos trabajadores por pieza a domicilio en Puerto Rico y las Islas Vírgenes, establecer tipos *mínimos* de trabajo por piezas para cualquier tarea u ocupación de esta forma conocida, prescribir el método y el procedimiento para determinar y promulgar los tipos *mínimos* de trabajo por piezas, prescribir las normas que deben ser seguidas por los patronos, estimando la proporción más adecuada o el grupo de empleados que deben recibir no menos de la compensación mínima por hora, definir el término "trabajador a domicilio" y prescribir las condiciones bajo las cuales dichos patronos, agentes, contratistas y subcontratistas deben procurar los objetos de comercio que producen los trabajadores a domicilio.

Por virtud de la Ley Pública Núm. 393 de 26 de octubre de 1949, mejor conocida como enmiendas del 1949 a la Ley de Normas Razonables de Trabajo—2 U.S. Code Congressional Service 1617–1628 First Session 1949, 63 United States Statutes at Large 910–920—se enmienda la Sec. 2(b) de la Ley de Normas Razonables de Trabajo del 1938 para que lea

así: Por la presente se declara que la política pública de esta Ley, a través del ejercicio por el Congreso de su poder para reglamentar el comercio entre los varios estados y con las naciones extranjeras, es, corregir y tan rápidamente como resulte práctico eliminar, las condiciones antes referidas en dichas industrias sin entorpecer sustancialmente los empleos o la capacidad para ganar dinero; se enmienda la Sec. 3(b) de la misma ley para que lea así: la palabra "comercio" significa negocio, comercio, transportación, transmisión o comunicación entre los varios estados o entre cualquier estado y algun sitio fuera de él, la Sec. 3(j) se enmienda para que lea así: la palabra "producidos" significa además manufacturado, extraído de una mina, hecho a mano o en cualquier otra manera trabajado dentro de cualquier estado, y para los fines que persigue este estatuto, un empleado se considerará como dedicado a la producción de objetos de comercio si dicho empleado se ha utilizado en la producción, manufactura, extracción de minerales, trabajo a mano, transportación o en cualquier otra manera ha trabajado sobre dichos objetos, o en cualquier proceso estrechamente relacionado u ocupación que resulte directamente esencial a la producción de tales objetos en cualquier estado.

Por la misma Ley Pública Núm. 393 de 26 de octubre de 1949, se enmienda la Sec. 5(a) de la Ley de Normas Razonables de Trabajo de 1938 para que disponga así: El Administrador, tan pronto como resulte práctico, podrá nombrar un comité de la industria correspondiente que recomiende el tipo o tipos de salarios *mínimos* que deben ser pagados bajo la Sec. 6 a empleados en Puerto Rico o en las Islas Vírgenes o en Puerto Rico y las Islas Vírgenes, dedicados al comercio o a la producción de objetos de comercio o el Administrador podrá nombrar comités separados de la industria correspondiente para recomendar el tipo o tipos de salarios mínimos a ser pagados bajo la Sec. 6 a empleados dedicados allí al comercio o a la producción de artículos de comercio en ciertas

industrias. Un comité de la industria nombrado bajo este inciso se integrará por residentes de dicha isla o islas donde los empleados, con respecto a los cuales dicho comité fue nombrado, trabajan y de personas que residen en los Estados Unidos fuera de Puerto Rico e Islas Vírgenes. Al determinar el tipo o tipos de salarios *mínimos* a pagarse y al determinar las clasificaciones industriales correspondientes, los comités para la industria y el administrador estarán sujetos a las disposiciones de la Sec. 8; se enmiendan, asimismo, las Secs. 6(a) y 6(c) de la Ley de Normas Razonables de Trabajo, la primera, en el sentido que el salario *mínimo* establecido por el estatuto será no menos de 75 centavos la hora y la segunda, en el sentido, que dicho salario mínimo será dejado sin efecto en el caso de cualquier empleado en Puerto Rico o en las Islas Vírgenes, dedicado al comercio o a la producción de objetos de comercio solamente hasta tanto y mientras que, como tal empleado, sea cubierto por un decreto de salario como hasta ahora o de aquí en adelante se autorice por el Administrador de acuerdo con las recomendaciones de un comité especial de la industria correspondiente nombrado de acuerdo con la Sec. 5. *Disponiéndose* que el decreto de salario en vigor antes de la fecha de entrar en efecto esta Ley cubriendo cualquier industria en Puerto Rico o en las Islas Vírgenes se aplicará a todo empleado de dicha industria cubierta por el inciso (a) de esta sección hasta que sea dejado sin efecto por un decreto de salario puesto en vigor desde ahora en adelante siguiendo las recomendaciones de un comité especial de la industria nombrado de acuerdo con la Sec. 5.

La Sec. 7(a) de la Ley de Normas Razonables de Trabajo fue enmendada por la Ley Pública Núm. 393 de 26 de octubre de 1949 para establecer lo siguiente: Excepto cuando otra cosa se disponga en esta sección, ningún patrono empleará a cualquier empleado que se dedique al comercio o a la producción de objetos de comercio por una jornada de

trabajo de más de cuarenta horas a la semana, a menos que dicho empleado reciba compensación por su trabajo en exceso de dichas horas a un tipo de vez y media el tipo regular de salario por el cual trabaja y el inciso (e) de la Sec. 7 quedó enmendado por la misma Ley Pública Núm. 393 para disponer que: Ningún patrono se le considerará como que ha violado el sub-apartado (a) por haberle dado trabajo a cualquier empleado suyo en exceso de cuarenta horas a la semana si dicho empleado trabaja de acuerdo con los términos de un contrato individual suscrito de buena fe o de acuerdo con el pacto que resulte de un convenio colectivo concertado por los representantes de dichos empleados, si las obligaciones de dicho empleado necesitare de horas de trabajo irregulares y el contrato o el pacto (1) especifica un tipo regular de paga de no menos del tipo *mínimo* por hora provisto en la Sec. 6(a) y compensación de no menos de vez y media del tipo regular de paga por todas las horas trabajadas en exceso de cuarenta en cualquier semana de trabajo y (2) provea una garantía semanal de paga de no más de sesenta horas de acuerdo con los tipos por esta sección autorizados.

La Sec. 8(a) de la Ley de Normas Razonables de Trabajo del 1938 queda enmendada por la Ley Pública Núm. 393 de 26 de octubre de 1949 de la siguiente manera: Es la política de esta Ley respecto a industrias en Puerto Rico y las Islas Vírgenes dedicadas al comercio o a la producción de objetos para el comercio llegar, tan pronto como sea económicamente posible sin reducir sustancialmente los empleos, al objetivo de salario *mínimo* dispuesto en el párrafo (1) de la Sec. 6(a) en cada una de las industrias, para cuyo efecto el Administrador reunirá, de tiempo en tiempo, un comité o comités para la industria correspondiente nombrados de acuerdo con la Sec. 5 y cualquiera de estos comités recomendará, de tiempo en tiempo, el salario o los salarios *mínimos* a pagarse bajo la Sec. 6 por los patronos en Puerto Rico o las Islas Vírgenes o en Puerto Rico y las Islas Vírgenes, dedicadas al

comercio o a la producción de objetos para el comercio en cualquiera de estas industrias o clasificaciones dentro de ellas; el inciso (b) de la Sec. 8 queda enmendado de la manera siguiente: Al reunirse cualquiera de estos comités para la industria corespondiente, el Administrador referirá a éste el asunto del salario o salarios *mínimos* a ser fijados para esa industria, y dicho comité investigará las condiciones en la industria y el comité, o cualquier sub-comité autorizado por éste oirá aquellos testigos y recibirá aquella prueba que pueda ser necesaria o pertinente y que les permita llevar a cabo sus deberes y funciones bajo esta ley, debiendo el comité recomendar al Administrador el salario *mínimo* más alto determinado para tal industria, teniendo en cuenta, aquellas condiciones económicas o competitivas que no reduzcan sustancialmente el empleado de la industria y que no dé a industria alguna en Puerto Rico o en las Islas Vírgenes una ventaja competitiva sobre cualquier industria en los Estados Unidos fuera de Puerto Rico y las Islas Vírgenes; el inciso (c) de la Sec. 8 queda enmendado para disponer lo siguiente: El comité para la industria correspondiente recomendará aquellas clasificaciones razonables dentro de cualquier industria según lo considere necesario para el propósito de fijar para cada clasificación dentro de tal industria el salario *mínimo* más alto siempre que no exceda lo dispuesto en el párrafo (1) de la Sec. 6(a) y que no reduzca sustancialmente el empleo comprendido en la clasificación y no dé una ventaja en la competencia a cualquier grupo en la industria y recomendará para cada clasificación en la industria el salario *mínimo* más alto que el comité considere no reducirá sustancialmente los empleos comprendidos en la clasificación, y al determinar si tales clasificaciones deben hacerse en cualquier industria, tanto las clasificaciones mismas como el salario *mínimo* para las clasificaciones, no se harán solamente tomando en cuenta la región a cubrirse sino que el comité para la industria y el administrador considerarán,

entre otros factores relevantes, los siguientes: (1) los costos de transportación, vida y producción que afectan la capacidad para competir de dicha industria, (2) los salarios establecidos para trabajos de un carácter similar o parecido por los convenios colectivos negociados entre patronos y empleados por representantes de la propia elección de ambas partes y (3) los salarios pagados por trabajos de igual o parecida clase mantenidos voluntariamente por los patronos como tipos razonables de salario *mínimo* para determinada industria y en ninguna clasificación bajo esta sección se harán distinciones por razón de edad o sexo; el inciso (d) de la sección anteriormente citada queda enmendado para disponer que el Comité para la industria correspondiente presentará al Administrador un informe con sus recomendaciones respecto a aquellas cuestiones que le fueron sometidas y a la presentación de dicho informe y después de dar debida noticia a las personas interesadas y darles una oportunidad de ser oídas, el Administrador mediante una orden aprobará y llevará a efecto las recomendaciones contenidas en tal informe si él encuentra que las recomendaciones fueron hechas de acuerdo con la Ley, están sostenidas por la prueba admitida en la vista y tomando en consideración los mismos factores relevantes que se requiere sean considerados por el Comité para la industria correspondiente para llevar a cabo los propósitos de esta sección, pues, de otra manera el Administrador desaprobará las recomendaciones y referirá otra vez el asunto al Comité para la industria o a otro Comité para la industria nombrado por el Administrador para nueva consideración y recomendaciones; el inciso (e) de la misma sección queda así enmendado: Los decretos emitidos bajo esta sección contendrán una definición de las industrias, las clasificaciones a las cuales serán aplicables y contendrán aquellas disposiciones y condiciones que el Administrador encuentre sean necesarias para cumplir los propósitos de tales decretos, evitar el incumplimiento de los mismos y mantener en vigen-

cia los salarios *mínimos* establecidos en ellos. Ninguno de estos decretos será efectivo hasta tanto sea debidamente notificada su promulgación al publicarse en el *Federal Register* y por aquellos otros medios de divulgación que de acuerdo con el criterio del Administrador den a las personas interesadas, en general, noticia de su adopción; el inciso (f) de la misma sección queda enmendada para que lea: De cualquier vista a celebrarse de acuerdo con esta sección se dará debida notificación mediante su publicación en el *Federal Register* y aquellos otros medios de divulgación que el Administrador razonablemente crea que darán notificación, en general, a las personas interesadas.

Por la Ley Pública Núm. 381 de 12 de agosto de 1955, —2 U.S. Congressional and Administrative News 3082–3086 First Session 1955, 69 United States Statutes at Large 711–712—se enmiendan las siguientes secciones de la Ley de Normas Razonables de Trabajo de 1938: Para tener efecto el 1ro. de julio de 1956, al inciso (a) de la Sec. 8 se le añade la siguiente oración: Los tipos de salarios *mínimos* establecidos de acuerdo con esta sección serán revisados por dicho comité por lo menos una vez cada año fiscal; al inciso (a) de la Sec. 5 se le eliminan las palabras "y del Administrador" de la última oración; del inciso (b) de la Sec. 8 se elimina la segunda oración y se sustituye por lo siguiente: "El comité para la industria correspondiente investigará las condiciones prevalecientes en la industria y el propio comité o cualquier subcomité del mismo podrá después de la debida notificación escuchar aquellos testigos o recibir aquella prueba que sea necesaria o adecuada para permitirles llevar a cabo sus deberes y funciones bajo esta Ley; del inciso (c) de la Sec. 8 se eliminan las palabras "y el Administrador" de la parte anterior inmediata a la enumeración de los factores relevantes; el inciso (d) de la Sec. 8. se enmienda para que lea así: El Comité para la industria correspondiente presentará ante el Secretario del Trabajo un informe con sus reco-

mendaciones con respecto a aquellas cuestiones que le fueron sometidas y a la presentación de dicho informe, el Secretario podrá publicar dichas recomendaciones en el *Federal Register* y podrá disponer por decreto que las recomendaciones incluidas en dicho informe entrarán en vigor después de quince días, a contar de la fecha de publicación; el inciso (e) de la Sec. 8 se enmienda eliminando la última oración que antes disponía: Ninguno de estos decretos será efectivo hasta tanto sea debidamente notificada su promulgación al publicarse en el *Federal Register* y por aquellos otros medios de divulgación que de acuerdo con el criterio del Administrador den a las personas interesadas, en general, noticia de su adopción.

Tal vez sea conveniente añadir la Ley Pública Núm. 85–231 de 30 de agosto de 1957—2 U.S. Code Congressional and Administrative News 1756–1760 First Session 1957; 71 United States Statutes at Large 514—que al reformular el área de aplicación de la Ley de Normas Razonables de Trabajo de 1938 enmienda la Sec. 13 de dicha ley para añadirle al final de dicha sección un nuevo inciso (1) que especifica: Las disposiciones de las Secs. 6, 7, 11 y 12 no serán aplicables a ningún empleado cuyos servicios durante la semana de trabajo sean prestados en un sitio de tiempo dentro de una nación extranjera o dentro de un territorio bajo la jurisdicción de los Estados Unidos que no sean: un estado de la Unión, el Distrito de Columbia, Alaska, Hawaii, Puerto Rico, las Islas Vírgenes; . . . Samoa, Guam, la Isla de Wake y la Zona del Canal.

La Ley Pública Núm. 85–750 de 25 de agosto de 1958 para enmendar la Ley de Normas Razonables de Trabajo de 1938 en relación a la *frecuencia* con que deben revisarse los tipos de salarios *mínimos* para Puerto Rico e Islas Vírgenes —2 U.S. Code Congressional and Administrative News 3887–3888 Second Session 1958; 72 United States Statutes at Large 844—dispone que la Sec. 8 de la Ley de Normas Razonables de Trabajo de 1938 se enmienda, eliminando la

última oración del inciso (a) e insertando en su lugar lo siguiente: Los tipos de salarios *mínimos* establecidos de acuerdo con esta sección, que no sean iguales al tipo *mínimo* de salario dispuesto por el párrafo (1) de la Sec. 6(a), serán revisados por dicho comité una vez cada dos años, empezando con el período bienal que comience el 1ro. de julio de 1958, excepto que el Secretario, a su discreción, podrá autorizar otra revisión adicional durante cualquier período bienal.

La Ley Pública Núm. 87–30 de 5 de mayo de 1961 para enmendar la Ley de Normas Razonables de Trabajo de 1938 en relación con la inclusión de empleados de grandes empresas dedicadas al comercio al detal o servicios y otros empleados dedicados al comercio o a la producción de objetos de comercio, subir el salario básico federal a $1.25 por hora y otros fines,—2 U.S. Code Congressional and Administrative News 1620–1715 First Session 1961, 75 U.S. Statutes at Large 67–69—enmienda el apartado (c) de la Sec. 6 de la Ley de Normas Razonables de Trabajo federal para que lea como sigue: (c) El salario o los salarios dispuestos en los apartados (a) y (b) de esta sección serán dejados sin efecto en el caso de cualquier empleado en Puerto Rico o las Islas Vírgenes solamente mientras y hasta donde tal empleado esté cubierto por una orden de salario hasta este momento emitida o que se emita en el futuro por el Secretario de acuerdo con las recomendaciones de un comité especial para la industria correspondiente nombrado de acuerdo con la Sec. 5. Disponiéndose que (1) los siguientes salarios se aplicarán a cualquier empleado a quien, el salario o los salarios dispuestos por el sub-apartado (a) de otra manera le fueren aplicables:

(A) El salario o los salarios aplicables bajo la orden de salario más reciente emitida por el Secretario, con *anterioridad* a la fecha de efectividad de las enmiendas de 1961 a la Ley de Normas Razonables, aumentados en un 15 por ciento, a menos que tal salario o salarios sean dejados sin efecto por

el salario o los salarios dispuestos en una orden de salarios emitida por el Secretario de acuerdo con las recomendaciones de un comité de revisión nombrado a tal fin. Tal salario o salarios serán efectivos sesenta días después de la fecha de efectividad de las enmiendas de 1961 a la Ley de Normas Razonables de Trabajo o un año desde la fecha de efectividad de la orden de salarios más reciente aplicable a tal empleado hasta entonces emitida por el Secretario de acuerdo a las recomendaciones de un Comité especial para la industria nombrado bajo la Sec. 5, cualquiera que sea la más reciente.

(B) Comenzando dos años *después* de la fecha de efectividad aplicable bajo el párrafo (a), no menos que el salario o los salarios dispuestos por el párrafo (A) aumentados en una cantidad igual al 10 por ciento del salario o los salarios aplicables bajo la orden de salarios más reciente emitida por el Secretario antes de la fecha de efectividad de las enmiendas de 1961 a la Ley de Normas Razonables de Trabajo, a menos que tal salario o salarios sean dejados sin efecto por el salario o los salarios dispuestos en una orden de salarios emitida por el Secretario de acuerdo a las recomendaciones de un comité de revisión nombrado bajo el párrafo (C).

(C) Cualquier patrono o grupo de patronos que empleen una mayoría de los empleados de una industria en Puerto Rico o las Islas Vírgenes pueden solicitar por escrito al Secretario el nombramiento de un Comité de revisión para que recomiende el salario o los salarios mínimos a ser pagados a tales empleados en vez del salario o los salarios dispuestos por los párrafos (A) o (B). Cualquiera de tales solicitudes respecto a cualquier salario o salarios dispuestos bajo el párrafo (A) deberá ser presentada dentro de los sesenta días siguientes a la promulgación de la enmiendas de 1961 a la Ley de Normas Razonables de Trabajo y cualquier solicitud respecto a cualquier salario o salarios dispuestos bajo el párrafo (B) deberá ser radicada no más tarde de ciento veinte y no menos de sesenta días antes de la fecha de

efectividad del salario o los salarios aplicables bajo el párrafo (B). El Secretario considerará con prontitud tal solicitud y podrá nombrar un comité de revisión si él tiene una justa razón para creer, a base de información financiera de otra clase contenida en la solicitud, que el cumplimiento con cualquier salario o salarios dispuestos por el párrafo (A) o (B) reducirá sustancialmente el empleo de tal industria. La decisión del Secretario sobre cualquiera de tales solicitudes será final. Cualquier orden de salario emitida de acuerdo a las recomendaciones de un comité de revisión nombrado bajo este párrafo empezará a regir en la fecha de efectividad aplicable dispuesta en los párrafos (A) o (B).

(D) En caso de que una orden de salarios no haya sido emitida de acuerdo con la recomendación de un Comité de revisión antes de la fecha de efectividad aplicable bajo el párrafo (A) o (B) el aumento porcentual aplicable dispuesto por cualesquiera de estos párrafos tendrá efecto en la fecha de efectividad prescrita allí, excepto respecto a los empleados de un patrono que hubiese radicado una solicitud bajo el párrafo (C) y que radicare con el Secretario una garantía con fianza o fianzas satisfactorias al Secretario de una cantidad suficiente pagadera a sus empleados para compensar a tales empleados por la diferencia entre los salarios realmente recibidos y los salarios a los que ellos tienen derecho bajo este apartado. El Secretario tendrá el poder de hacer cumplir esta garantía y cualesquiera sumas obtenidas por él se depositarán en una cuenta especial y se pagará mediante orden del Secretario, directamente al empleado o empleados afectados. Cualquier cantidad no pagada a un empleado debido a imposibilidad de hacerlo así dentro de un período de tres años ingresará en el Tesoro de los Estados Unidos como recibos misceláneos.

(2) En el caso de cualquier empleado al cual de otra manera le sería aplicable el sub-apartado (b), el Secretario deberá nombrar dentro de los sesenta días después de apro-

badas las enmiendas de 1961 de la Ley de Normas Razonables de Trabajo, un Comité especial para la industria correspondiente de acuerdo con la Sec. 5 para que recomiende el tipo de salario mínimo o salarios mínimos más altos de acuerdo con las normas establecidas por la Sec. 8, que no sea en exceso del tipo aplicable provisto por el sub-apartado (b), aplicable a tal empleado en vez del tipo o los tipos dispuestos por el sub-apartado (b). El tipo de salario o salarios recomendados por el Comité especial para la industria correspondiente serán efectivos, en cuanto a dicho empleado, a la fecha de efectividad de la orden de salarios emitida de acuerdo con tal recomendación pero no antes de sesenta días después de la fecha de efectividad de las enmiendas del 1961 a la Ley de Normas Razonables de Trabajo.

(3) Las disposiciones de la Sec. 5 y de la Sec. 8, relativas a Comités especiales para la industria, serán aplicables a comités de revisión nombrados bajo este apartado. El nombramiento de un Comité de Revisión será además de, y no en vez de, cualquier Comité especial para la industria que deba ser nombrado de acuerdo con las disposiciones del sub-apartado (a) de la Sec. 8, excepto que ningún comité especial para la industria llevará a cabo vista alguna dentro de un año después que el salario o los salarios mínimos para esa industria hayan sido recomendados al Secretario por un Comité de revisión para ser pagados en vez del salario o salarios dispuestos bajo el párrafo (A) o (B). El tipo o tipos de salario mínimo dispuestos por este apartado, serán efectivos mientras y hasta donde tal tipo o tipos de salario mínimo no hayan sido dejados sin efecto por una orden de salarios fijando un tipo o tipos de salario mínimo más alto pero no en exceso del tipo aplicable en el apartado (a) o en el apartado (b) emitida en el futuro por el Secretario de acuerdo a las recomendaciones de un Comité especial para la industria.

El clima de opinión ambiguo que prevalecía en cuanto a la posible inconstitucionalidad de las leyes regulando el contrato de trabajo por ser contrarias a la libertad de contratación, garantizada por la Constitución de los Estados Unidos, no le permitió a la mayoría de las primeras leyes norteamericanas y puertorriqueñas que trataban de regular el contrato de trabajo cumplir a cabalidad con sus motivos altruistas. Cuando se resuelve por la Corte Suprema de los Estados Unidos el caso de *West Coast Hotel Company* v. *Parrish*, 300 U.S. 379, 81 L.Ed. 703 (Hughes) (1937) cita precisa a las págs. 391–400 U.S., 708–713 L.Ed., reconociendo el derecho del Estado a reglamentar el contrato de trabajo para proteger la salud, la seguridad, la moral y el bienestar del trabajador, se abrió la puerta ancha que trajo la Ley de Normas Razonables de Trabajo de 1938 del Congreso de los Estados Unidos y la Ley Núm. 8 de 5 de abril de 1941 creando una Junta de Salario Mínimo de la Legislatura de Puerto Rico.

El cuadro de concordancias entre ambos estatutos demostraría que las Secs. 3, 4 y 6 de la Ley Núm. 8 de Puerto Rico, referentes a la organización, funcionamiento y facultades de nuestros comités de salario mínimo, son bastante similares a los comités para la industria correspondiente de la Sec. 5 de la Ley de Normas Razonables de Trabajo federal. Las determinaciones en cuanto al salario mínimo general, la semana de trabajo, el tipo de la hora extra que habrían de regir en el futuro, las encomienda la Legislatura de Puerto Rico a la labor cuasi legislativa que realizaría la Junta de Salario Mínimo de Puerto Rico.

Ahora bien, en cuanto a los salarios devengados con anterioridad a los decretos de la Junta de Salario Mínimo fue necesario recurrir a aquellas leyes nuestras, que en alguna forma habían intentado, antes del caso de *West Coast Hotel Company*, reglamentar el contrato de trabajo. Se encontró una Ley Núm. 45 de 9 de junio de 1919 que hacía

ilegal por parte de cualquier patrono que empleare mujeres, niñas inclusive, en ocupaciones industriales comerciales y de servicio público, pagarles un salario menor del especificado en esta sección, a saber: menores de 18 años a razón de cuatro (4) dólares semanales y mayores de esa edad a razón de seis (6) dólares semanales, no siendo las disposiciones anteriores aplicables a la agricultura ni a las industrias agrícolas; se encontraron las disposiciones del Art. 553 del Código Penal de Puerto Rico—según enmendado hasta ese momento por la Ley Núm. 57 de 13 de marzo de 1913, la Ley Núm. 131 de 9 de agosto de 1913, la Ley Núm. 26 de 23 de noviembre de 1917, la Ley Núm. 18 de 20 de mayo de 1925 y la Ley Núm. 54 de 25 de abril de 1930—conocidas como la Ley del Cierre y que representaban el primer esfuerzo para crear un día de descanso para nuestros empleados, menos cuando eran domingo de nochebuena o víspera de reyes y los días de fiesta legales desde las doce del día en adelante y en cuanto a los días laborables para que se cerraran los establecimientos a las seis de la tarde, menos los sábados que se podían cerrar a las 9 de la noche; se encontró además una Ley Núm. 80 de 5 de mayo de 1931, para reglamentar "las horas extras del día o de la noche, que a juicio del Comisionado del Trabajo fueren necesarias para permitir a los patronos o dueños, la terminación de trabajos urgentes o necesarios que debían efectuarse dentro del tiempo determinado en talleres, fábricas, factorías o cualquier establecimiento industrial o comercial en Puerto Rico" y que por primera vez establece una compensación por horas extras por cualquier tiempo extra que fuere trabajado por las operarias, operarios o empleados de dichos establecimientos *industriales*, una vez autorizados sus patronos o dueños de acuerdo con las disposiciones de esta ley, cuyo tiempo extra será pagado a razón de un tipo doble de salario por hora, la cual se enmienda por la Ley Núm. 24 de 15 de abril de 1935 para incluir las denominaciones "empleado" y "comer-

cial", ya que la Ley Núm. 80 de 1931 sólo hablaba de "obreros", "talleres", "fábricas", "factorías" o "establecimiento industrial".

La ley, en torno a la cual habrían de madurar los frutos de la violencia, resultó ser la Ley Núm. 49 de 7 de agosto de 1935 para regular las *horas de trabajo* de las personas empleadas en los establecimientos comerciales, industriales y en otros negocios lucrativos y para otros fines, que disponía: "A ninguna persona se le empleará o se le permitirá que trabaje en ningún establecimiento comercial, industrial, agrícola o en cualquier otro negocio lucrativo, más de ocho (8) horas durante cualquier día natural, excepto cuando ocurriere cualquier evento extraordinario, o cualquiera emergencia causada por fuego, hambre o inundación, por peligro a la vida, a la propiedad, a la seguridad o salud pública, o en cualquiera otra circunstancia especial, siempre que el Gobernador de Puerto Rico, por recomendación del Comisionado del Trabajo declarare subsiguientemente que las disposiciones de esta Ley no deberán aplicarse a estos casos excepcionados y que por lo tanto las infracciones cometidas han sido excusables; *Disponiéndose,* que la limitación de ocho (8) horas establecida por esta sección y en todos los trabajos normales fuera de las excepciones ya anotadas, puede ser ampliada a un período que no excederá de nueve (9) horas durante cualquier día natural, a condición de que a toda persona de ese modo empleada a salario, jornal o en otra forma, por más de ocho (8) horas durante cualquier día natural, se le pagará por el trabajo que haga durante tal período extra, a un tipo que sea doble del salario que se le está pagando por hora de trabajo precedentes."

La jurisprudencia de este Tribunal sobre la Ley Núm. 49 de 7 de agosto de 1935 no dejó satisfechos a los legisladores, ni a los obreros, y mucho menos, a una nueva generación de jueces de nuestras cortes de primera instancia que habían seguido de cerca el terrible debate sobre el contrato de trabajo

de los tribunales norteamericanos. Este Tribunal llegó a la conclusión que por ser la Ley Núm. 49 de 1935, una ley de horas y nada más, la retribución del trabajo extra sólo podía tener un tipo doble después de la novena y el resto de las horas después de la novena debían pagarse a tipo sencillo, usando como divisor para el tipo por hora extra, no las ocho horas legales, sino todas las horas realmente trabajadas. O sea, *sub silentio*, seguía funcionando la vieja teoría de la libertad de contratación frente a la reglamentación de las horas de trabajo por el Estado. No hay tiempo ni espacio suficiente para una exposición ordenada de este primer período de nuestra jurisprudencia sobre la Ley Núm. 49 de 1935. Sólo acotaremos como los más característicos de este primer período de nuestra jurisprudencia laboral, propiamente dicha, los casos de *Cardona* v. *Corte*, 62 D.P.R. 61 (Snyder) (1943) y *Avellanet* v. *Porto Rican Express Co.*, 64 D.P.R. 693 (Snyder) (1945).

Esta insatisfacción con los frutos de la violencia trajo nuestra actual Ley Núm. 379 de 15 de mayo de 1948 para establecer la jornada de trabajo en Puerto Rico, proveer un tipo doble de salario por las horas trabajadas en exceso de la jornada legal, fijar períodos de descanso, reglamentar ciertos aspectos del contrato de trabajo, imponer ciertos deberes a los patronos, señalar penalidades por la violación de las disposiciones de esta Ley y derogar la Ley Núm. 49 de 7 de agosto de 1935.

Como se observará la ley puertorriqueña del 1948, no fija un salario mínimo por hora como la Ley de Normas Razonables de Trabajo federal, dejando dicha función a la Junta de Salario Mínimo de Puerto Rico, después del correspondiente estudio económico de la industria, y en cuanto al salario regular lo deja abierto a la contratación colectiva o individual, pero, sigue el mismo plan legislativo federal, en cuanto a la declaración de la semana de trabajo y del tipo de salario para hora extra, conservando en ambos casos la individualidad

histórica de nuestra legislación en cuanto a "día natural", "semana de cuarenta y ocho horas" y "doble compensación". En síntesis, la nueva ley dispone:

En cuanto a horas se establece que ocho horas de labor constituyen la jornada legal de trabajo por día en Puerto Rico, cuarenta y ocho horas de labor constituyen una semana de trabajo y doscientas ocho horas constituyen un mes de trabajo, siendo horas regulares de trabajo ocho horas durante cualquier período de veinticuatro horas consecutivas, cuarenta y ocho horas durante cualquier semana y doscientas ocho horas durante cualquier mes, siendo obligación del Comisionado del Trabajo hacer publicar en periódicos de general circulación en la isla todos los años un aviso expresando el número exacto de horas regulares de trabajo durante cada mes del año, conforme al número de días y horas laborables, según el *calendario* y la legislación vigente sobre días de fiesta.

En cuanto a horas extras, se considerarán como tales: (a) Las horas que un empleado trabaje para su patrono en exceso de ocho horas durante cualquier período de veinticuatro horas consecutivas; (b) las horas que un empleado trabaje para su patrono en exceso de cuarenta y ocho horas durante cualquier semana; (c) las horas que un empleado trabaje para su patrono durante los días u horas en que el establecimiento en que presta servicio deba permanecer cerrado al público por disposición legal; (d) las horas que un empleado trabaje para su patrono durante el día de descanso que se haya fijado o se fijare por ley para el caso de industrias o negocios que no estén sujetos al cierre de su establecimiento; (e) las horas que el empleado trabaje para su patrono en exceso del máximo de horas de labor al día que la Junta de Salario Mínimo haya fijado o fijare para la ocupación, negocio o industria cubierta por el decreto; (f) las horas que el empleado trabaje para su patrono en exceso del máximo de horas fijado en un convenio colectivo de trabajo.

En cuanto al tipo de salario por hora extra será igual al doble del tipo de salario convenido para las horas regulares, *"Disponiéndose, sin embargo,* que todo patrono de una industria de Puerto Rico cubierta por las disposiciones de la Ley de Normas Razonables de Trabajo (*Fair Labor Standards Act*), aprobada por el Congreso de Estados Unidos de América en 25 de junio de 1938, según ha sido o fuere subsiguientemente enmendada, sólo vendrá obligado a pagar por cada hora de trabajo en exceso de la jornada legal de ocho (8) horas o en exceso de cuarenta (40) horas a la semana un tipo de salario a razón de, por lo menos, tiempo y medio del tipo de salario convenido para las horas regulares, salvo el caso en que por decreto de la Junta de Salario Mínimo o convenio colectivo de trabajo se haya fijado o fijare otra norma de trabajo o de compensación o de ambas. Para determinar el tipo de salario convenido para horas regulares de trabajo se dividirá el salario diario, semanal, mensual o en otra forma estipulado, por el número de horas regulares que se trabaje durante ese mismo período de acuerdo con las disposiciones de esta Ley."

En cuanto a lo que se entiende cubierto por el pago del salario, si el empleado trabaja por un salario semanal, el salario estipulado cubrirá únicamente el pago de las horas regulares de trabajo durante cada semana; lo mismo, si el empleado trabaja por un salario mensual, el salario estipulado cubrirá únicamente el pago de las horas regulares de trabajo durante cada mes; si el contrato es a base de trabajo por pieza, o por cualquiera otra unidad de obra, el empleado tendrá derecho a recibir doble compensación por piezas o unidades hechas durante horas extras.

Con estas dos leyes, la Asamblea Legislativa de Puerto Rico y este Tribunal lograron, aplicando el principio de la coexistencia de estatutos federales e insulares, elaborado durante las relaciones político-jurídicas de Puerto Rico y Estados Unidos, llegar hasta el 1956 sin ningún tropiezo. Como

cuestión de realidad de acuerdo con el inciso (e) de la Sec. 5 de la Ley de Normas Razonables de Trabajo federal según traída al estatuto original por la Resolución Conjunta de 26 de junio de 1940, en el sentido, que ningún Comité de la industria correspondiente organizado para fijar salarios en los Estados Unidos tendría autoridad para extender dichos tipos mínimos de salarios a cualquier empleado en Puerto Rico o en las Islas Vírgenes y autorizando al Administrador de Horas y Salarios federal a nombrar un comité de la industria correspondiente especial para recomendar los tipos mínimos de salarios y de acuerdo con el *Disponiéndose* del Art. 5 de la Ley para establecer la jornada de Trabajo en Puerto Rico, en el sentido, que todo patrono de una industria de Puerto Rico que pudiera estar comprendida entre las disposiciones de la Ley de Normas Razonables de Trabajo federal sólo vendría obligado a pagar por cada hora de trabajo en exceso de la jornada legal de ocho (8) horas o en exceso de cuarenta (40) horas a la semana, un tipo de salario a razón de, por lo menos, tiempo y medio del tipo de salario convenido para las horas regulares, evitó todo conflicto entre ambos estatutos que nos obligara a pasar sobre el propósito del Congreso de Estado Unidos de establecer una preeminencia Congresional sobre cualquiera legislación de la Asamblea Legislativa de Puerto Rico. No debe olvidarse que la Ley de Normas Razonables de Trabajo federal fuera de la fijación de un tipo de salario mínimo básico, de la declaración de lo que constituye una semana de trabajo máxima y un tipo de compensación por horas de trabajo mínima, no existe en dicha ley ningún propósito de dejar sin efecto las legislaciones estatales sobre el contrato de trabajo.

Sin embargo, sin medir el interés de los gobiernos de Estados Unidos y Puerto Rico, en cuanto a sostener, en un medio socio-económico más razonable, aquellas condiciones de trabajo que mejor ayuden a la moral, al bienestar y a la salubridad de los núcleos obreros concernidos, sin reducir

sustancialmente los empleos, ciertos grupos de presión, sospechando que el plan de industrialización del Gobierno de Puerto Rico con sus incentivos de exención contributiva, edificios industriales y ayuda al capital de operación, pueden crearle una competencia desleal a las industrias norteamericanas que operan en el continente, tratan de que se haga aplicable a Puerto Rico el mínimo legislativo federal establecido para las industrias que operan en los Estados Unidos.

El fruto de esta violencia son las leyes del Congreso de los Estados Unidos—Ley Pública Núm. 381 de 12 de agosto de 1955, Ley Pública Núm. 85–231 de 30 agosto de 1957, Ley Pública Núm. 85–750 de 25 de agosto de 1958 y la Ley Pública Núm. 87–30 de 5 de mayo de 1961 anteriormente acotadas—buscando ya equiparar los tipos básicos de salarios mínimos de Estados Unidos y Puerto Rico, sin tomar en consideración las condiciones particulares de nuestra economía y abriendo a riesgo la reducción sustancial de los empleos que tal medida acarrearía. La respuesta de la Legislatura de Puerto Rico, tratando de consolidar, el estado de derecho más beneficioso a nuestra economía, creado por la Sec. 5 de la Ley de Normas Razonables de Trabajo federal y el Art. 5 de la Ley para establecer la jornada de Trabajo en Puerto Rico, está en la Ley Núm. 96 de 26 de junio de 1956, la Ley Núm. 103 de 25 de junio de 1958 y la Ley Núm. 81 de 14 de junio de 1960.

. La declaración de principios de la Ley Núm. 96 de 26 de junio de 1956, se encuentra dispersa en distintas partes del estatuto y conveniente resultará, detallar los principios que mejor demuestran el propósito legislativo: La Sec. 1 de la Ley dispone (a): La Asamblea Legislativa de Puerto Rico declara que la existencia de salarios, horas de labor y otras condiciones de trabajo inadecuadas en las industrias es perjudicial a la salud, eficiencia y bienestar general de los trabajadores; es perjudicial al mejor y más completo desarrollo de la economía; constituye un medio de competen-

cia desleal en la producción y el intercambio; crea desasosiego y motiva conflictos entre obreros y patronos que entorpecen el desarrollo de la economía puertorriqueña y representa un estado de manifiesta injusticia social; (b) : Se declara que la política del Estado Libre Asociado es eliminar tan rápidamente como sea posible las condiciones de trabajo inadecuadas en las industrias; promover normas de vida, salud y seguridad para los trabajadores; acelerar el desarrollo de la agricultura, la industria y los negocios en Puerto Rico; eliminar la competencia desleal y lograr el más alto nivel posible de jornales consistente con dicho desarrollo sin reducir sustancialmente el empleo ni menoscabar la oportunidad de obtener los mejores salarios; (c) : Se declara, además, que es la política de esta ley mantener la flexibilidad necesaria en la fijación de salarios mínimos para asegurar a los trabajadores el salario más alto que las condiciones económicas de la industria permitan, y que los salarios mínimos en cada negocio, industria u ocupación sean revisados por lo menos una vez cada dos años hasta lograr, tan rápidamente como sea económicamente posible un salario mínimo de $1.00 la hora en todas las industrias; (d) : Se declara también que es la política de esta ley que el *nivel de salarios mínimos* para trabajadores en industrias que produzcan o exporten sus productos *para ser vendidos en los Estados Unidos* en competencia con industrias allí situadas, debe igualarse o aproximarse, hasta donde sea posible, al de los salarios mínimos dispuestos por ley para los trabajadores en las respectivas industrias competidoras; (e) : Se declara, además, que es la política de la Asamblea Legislativa de Puerto Rico estimular la contratación colectiva entre obreros y patronos que sirva de eficaz instrumento social para elevar progresivamente el nivel de los salarios mínimos, reducir la jornada de trabajo y asegurar aquellas otras condiciones de empleo necesarias a la salud y bienestar de los trabajadores; (f) : Se declara también, que es la política de la Asamblea Legislativa de

Puerto Rico que la Junta de Salario Mínimo, en descargo de las obligaciones que se le impongan por esta Ley, establezca tan rápidamente como ello sea posible, salarios mínimos iguales para los obreros que desempeñen una labor de idéntica naturaleza en empresas que operen exclusivamente en el comercio local y en empresas que exporten sus productos para ser vendidos fuera de Puerto Rico; (g): Se declara, asimismo, que es la política de la Asamblea Legislativa de Puerto Rico que los procedimientos que autorizan esta ley para la fijación y revisión de salarios mínimos sean conducidos en forma cuasi legislativa.

La Sec. 2 crea en el Departamento del Trabajo una Junta de Salario Mínimo integrada por tres personas en simpatía reconocida con los propósitos de esta ley, quienes serán nombradas por el Gobernador de Puerto Rico, con el Consejo y consentimiento del Senado de Puerto Rico, por el término de cuatro años. El Gobernador designará una de dichas personas Presidente de la Junta, quien bajo la supervisión del Secretario de Trabajo, será el Jefe ejecutivo y administrativo de la Junta y los asuntos de naturaleza puramente administrativa serán despachados por él. Dos miembros de la Junta constituirán quorum, y en caso de ausencia o enfermedad, el Presidente podrá designar a cualquiera de los otros dos miembros de la Junta para que le sustituya en sus funciones. La Junta tendrá facultades para aprobar reglamentos y ejercerá todos los demás poderes necesarios para llevar a cabo los fines de esta ley.

Las Secs. 3 y 4 establecen como deberes y poderes de la Junta los siguientes: (1) estudiar las condiciones de trabajo que prevalecen en las distintas industrias en Puerto Rico (2) solicitar de todos los departamentos, agencias, corporaciones, autoridades, oficinas y subdivisiones políticas del Estado Libre Asociado, toda información oficial, ejemplar de libro, folleto o publicación, copia certificada de documentos, estadísticas, recopilación de datos y constancias que se les solici-

ten para uso oficial de la Junta; (3) el Presidente, o cualquiera de los miembros de la Junta, podrá expedir citaciones requiriendo la comparencia de testigos y la presentación de datos o información que la Junta o el Presidente estime necesarios, incluyendo nóminas, listas de pago, estados de activo y pasivo, estados de ganancias y pérdidas y libros de contabilidad; (4) el Presidente o cualquier miembro de la Junta podrá tomar juramento y recibir testimonios, datos o información; (5) si una citación expedida por el Presidente, o cualquier otro miembro de la Junta, no fuese debidamente cumplida, la Junta podrá comparecer ante cualquier Sala del Tribunal Superior de Puerto Rico y pedir que el Tribunal ordene el cumplimiento de la citación, teniendo el Tribunal Superior facultad para castigar por desacato la desobediencia de esas órdenes; (6) cualquier persona natural podrá ser procesada y condenada por perjurio que cometiere al prestar testimonio ante la Junta, su Presidente o ante un Comité de Salario Mínimo.

La Sec. 6 es el primer intento de la Asamblea Legislativa de Puerto Rico después del 1919, de fijar legislativamente un salario mínimo por hora, a partir del 26 de junio de 1956 para las industrias cubiertas por dicha sección y la Sec. 7 decreta un aumento de salario mínimo en un 25% y "(a) por todo trabajo o servicio no cubierto por las disposiciones de la Sec. 6 de esta ley, todo patrono pagará un salario que no será menor de un 25% más alto que el salario mínimo que venía obligado a pagar el 1ro. de enero de 1956 por disposición de orden de salario federal, pero, si después del 1ro. de enero de 1955 se le hubiere fijado a dicho trabajo o servicio un aumento en el salario mínimo por disposición de orden de salario federal, que no alcanzó a un 25% de dicho salario mínimo, se pagará un salario no menor de 25% más alto que el salario mínimo que regía inmediatamente antes de dicho aumento. En ningún caso el salario mínimo así aumentado excederá de $1.00 la hora para cualquier trabajo o servicio

y (b) por todo trabajo o servicio cubierto por decreto mandatorio, todo patrono pagará un salario que no será menor de un 25% más alto que el salario mínimo que venía obligado a pagar el 1ro. de enero de 1956, pero, si después del 1ro. de enero de 1955 se le hubiere fijado a dicho trabajo o servicio un aumento en el salario mínimo que no alcanzó a un 25% de dicho salario mínimo, se pagará un salario no menor del 25% más alto que el salario mínimo que regía inmediatamente antes de dicho aumento. En ningún caso el salario mínimo así aumentado excederá de $1.00 la hora para cualquier trabajo o servicio". De acuerdo con el apartado (d) de la Sec. 7, no estarán sujetas al aumento de 25% provisto en esta sección las siguientes industrias y actividades: (1) la agricultura en todas sus ramas; (2) el despalillado de tabaco; (3) los trabajos a mano de la industria de la aguja a domicilio; (4) cualquier trabajo o servicio que por orden de salario federal hubiere tenido un aumento en salario de 25% o más después de enero 1ro. de 1955; (5) cualquier trabajo o servicio que por decreto mandatorio hubiere tenido un aumento en salario de 25% o más después de enero 1ro. de 1955; (6) la industria de transportación de carga y pasajeros por ferrocarril.

En cuanto a los aumentos que se proveen en los incisos (a) y (b) de la Sec. 7 comenzarán a regir sesenta días después de la aprobación de la Ley y el apartado (e) de la misma Sec. 7 dispone que: "La industria que considere que no puede pagar el aumento que le fuere aplicable deberá someter a la Junta de Salario Mínimo de Puerto Rico no más tarde de treinta (30) días después de estar en vigor esta ley, una petición, bajo juramento, exponiendo detalladamente la situación financiera de la industria y las razones de orden económico por las cuales considere que no puede pagarlo, debiendo dicha petición ser considerada por la Junta si la misma fuere radicada en tiempo y estuviere suscrita por patronos que conjuntamente empleen en Puerto Rico

no menos de una tercera parte del total de los trabajadores utilizados determinando si la industria debe pagar el 25% de aumento, un aumento menor o mayor de 25% o si no debe pagar aumento alguno y fijando el salario mínimo que los patronos de dicha industria pagarán a sus empleados de acuerdo con la referida orden y determinación de la Junta.

En cuanto al salario mínimo para las nuevas industrias manufactureras, dispone la Sec. 8 que (a) todo patrono en una industria manufacturera que se estableciere en Puerto Rico después del 1ro. de julio de 1956 para la producción de artículos que en dicha fecha no se estaban produciendo en Puerto Rico en escala comercial, pagará a sus empleados un salario que no será menor de $0.50 la hora; (b) todo patrono en una industria manufacturera que se estableciere en Puerto Rico, después del 1ro. de julio de 1957, para la producción de artículos que en dicha fecha no se estaban produciendo en Puerto Rico en escala comercial, pagará a sus empleados un salario que no será menor de $0.60 la hora; las disposiciones de los apartados (a) y (b) que anteceden no se aplicarán a los patronos en una industria manufacturera que se estableciere en Puerto Rico para la producción de artículos en los cuales se utilizaren principalmente como materia prima productos agrícolas cultivados en Puerto Rico o los desperdicios o productos secundarios de otros procesos industriales de dichos productos agrícolas, disponiendo además, la Sec. 8 que nada de lo anteriormente expuesto, se entenderá como que limita la facultad de la Junta para fijar salarios mínimos que no excedan de $1.00 la hora, a cualquier industria que al comenzar sus operaciones hubiere estado comprendida dentro de las disposiciones de esta sección.

La Sec. 10 autoriza la fijación o la revisión de salarios mínimos mediante comités de salarios mínimos nombrados por el Presidente de la Junta, compuestos dichos comités por un número igual de personas representativas de interés

público, de los patronos y los empleados de que se trate y en caso de que el comité así designado estuviera compuesto por un número par de miembros, el Presidente de la Junta designará, además, un miembro adicional representativo del interés público para formar parte del comité, quien podrá participar en las audiencias como cualquier otro miembro del comité pero en las deliberaciones, decisiones y votaciones del comité el miembro adicional solamente estará presente e intervendrá cuando el comité no pudiera recomendar un proyecto de decreto debido a un empate en la votación y se solicite su presencia e intervención por no menos de la mitad de los miembros que componen el comité y (b) en caso de industrias cubiertas por la Ley de Normas Razonables de Trabajo de 1938, según enmendada, el Presidente podrá designar como miembro de un comité de salario mínimo a personas residentes de cualquier estado de los Estados Unidos o del Distrito de Columbia, y cuando el Presidente de la Junta de Salario Mínimo de Puerto Rico decida nombrar dichos miembros, designará un número de personas representativas del interés público, de los patronos y de los empleados de la industria de que se trate, igual al número de miembros que por cada representación se designen de Puerto Rico y para romper el empate se designará un miembro adicional representativo del interés público para formar parte de dicho comité con las mismas funciones y facultades que tiene el miembro adicional representativo del interés público creado por el apartado (a).

La Sec. 11 establece que cuando la Junta de Salario Mínimo determine que deben establecerse procedimientos para fijar o revisar salarios mínimos a una industria expedirá una convocatoria para una audiencia pública ante el Comité de Salario Mínimo correspondiente, y en el ejercicio de sus funciones cuasi legislativas, el comité conducirá la audiencia en forma de consulta pública (tal como lo haría un comité o comisión legislativa), de manera que todas las personas

interesadas puedan participar en la formulación de un decreto sometiendo datos, información, observaciones o argumentos pertinentes que a discreción del comité puedan ser presentados por escrito u oralmente.

La Sec. 12 le impone al Comité de Salario Mínimo correspondiente remitir a la Junta de Salario Mínimo el legajo completo de la audiencia, acompañado de un informe conteniendo sus conclusiones de hecho y un proyecto de decreto recomendando el tipo o los tipos mínimos de salario que deban pagarse en la industria objeto de investigación, ninguno de los cuales será mayor de $1.00 por hora; la Sec. 13 provee la publicación del proyecto de decreto recomendado por el comité para la radicación de objeciones y sugestiones por las personas interesadas y la facultad de la Junta de Salario Mínimo para aceptar o rechazar el proyecto de decreto recomendado, pudiéndolo devolver al comité, si llegare a la conclusión que el decreto no es aceptable, para una reconsideración del mismo, o procediendo a nombrar un nuevo comité para una nueva determinación de salarios, disponiéndose en la misma Sec. 13 que el decreto que aprobare la Junta de Salario Mínimo tendrá fuerza de ley y empezará a regir quince (15) días después de la publicación por la Junta en un periódico de circulación general en Puerto Rico de un aviso en que se informe al público de su aprobación y cuando se trate de una industria cubierta por la Ley Federal de Normas Razonables de Trabajo de 1938, según enmendada, el Presidente de la Junta enviará copia del decreto aprobado al Secretario del Trabajo de los Estados Unidos.

Sólo nos queda por puntualizar las disposiciones de la Sec. 15 que establece las siguientes normas sobre salarios mínimos (a) : "Los salarios mínimos para cada industria se fijarán teniendo en cuenta los propósitos y fines de esta ley y deberán ser los salarios mínimos más altos que razonablemente pueda pagar la industria de que se trate sin reducir sustancialmente el empleo en dicha industria y to-

mando en consideración el coste de la vida y las necesidades de los empleados, así como las condiciones económicas y de competencia de la industria en cuestión y (b) cuando se trate de industrias manufactureras cubiertas por la Ley Federal de Normas Razonables de Trabajo de 1938, enmendada, y que están en competencia sustancial con industrias de los Estados Unidos de la unión, se tomarán también en consideración los salarios prevalecientes en éstas y la situación de competencia existente entre industrias de Puerto Rico e industrias similares de los Estados Unidos y las disposiciones de la Sec. 17 que establece: La Junta revisará los salarios mínimos fijados en esta ley o por decretos u órdenes de la Junta, con respecto a cada industria, por lo menos una vez cada dos años, pero en ningún caso, el salario mínimo que fijare la Junta podrá ser mayor de $1.00 la hora ni menor que el salario mínimo correspondiente fijado por esta ley. La Sec. 29 de la ley contiene un sistema completo de revisión judicial en favor de cualquier persona perjudicada por un decreto mandatario u orden dictada en virtud de las Secs. 7 y 20 de esta ley en aquellos casos en que el Comité de Salario Mínimo de la industria correspondiente actuara sin facultad o en exceso de sus poderes.

El cuadro de concordancias entre la Ley de Normas Razonables de Trabajo de 1938 del Congreso de los Estados Unidos de América y la Ley Núm. 96 de 26 de junio de 1956, anterior e inmediatamente acotada, es todavía más cerrado que cualquier anterior cuadro de concordancia entre la primera ley federal y la Ley Núm. 8 de 5 de abril de 1941 creando nuestra primera Junta de Salario Mínimo, según enmendada por la Ley Núm. 44 de 23 de abril de 1942 ó la Ley Núm. 379 de 15 de mayo de 1948 estableciendo la jornada de trabajo en Puerto Rico. Compárese la Sec. 2 de la Ley de Normas Razonables de Trabajo con la Sec. 1 de la Ley Núm. 96 de 26 de junio de 1956, en cuanto a la exposición de motivos o declaración de princi-

pios; las definiciones de las palabras "persona" y "patrono" de la Sec. 3 de la ley federal con la definición de "patrono" de la Sec. 26 de la ley insular; la definición de "agricultura" de la Sec. 3(f) de la ley federal con la definición de agricultura de la Sec. 36 de la ley insular; la definición de "industria" de la Sec. 3(h) de la ley federal con la definición de "industria" de la Sec. 36 de la ley insular; la definición de "objetos de comercio (*goods*)" de la Sec. 3(i) de la ley federal con la definición de "industria manufacturera" de la Sec. 36 de la ley insular; la definición de "salario" de la Sec. 3(n) de la ley federal con la definición de "salario" de la Sec. 36 de la ley insular; la creación del puesto de "administrador" de la Sec. 4 de la ley federal con la creación de la Junta de Salario Mínimo de la Sec. 2 de la ley insular; la creación de los comités especiales para las industrias de Puerto Rico e Islas Vírgenes de la Sec. 5 de la ley federal con la creación de los comités de salario mínimo para las industrias de Puerto Rico cubiertas por la Ley de Normas Razonables de Trabajo de 1938 de la Sec. 10(b) de la ley insular; la fijación del salario mínimo de la Sec. 6 de la ley federal con la fijación del salario mínimo por hora de la Sec. 6 de la ley insular; la fijación de las horas máximas de trabajo de la Sec. 7 de la ley federal con la fijación de las horas regulares de trabajo del Art. 3 de la Ley Núm. 379 de 15 de mayo de 1948 de Puerto Rico; la disposición sobre las órdenes de salario para Puerto Rico e Islas Vírgenes de la Sec. 8 de la ley federal con la disposición sobre comités especiales de salario mínimo de la Sec. 10(b) de la ley insular; el poder para citar testigos de la Sec. 9 de la ley federal con el poder de investigación de la Sec. 4(a) de la ley insular; las disposiciones sobre revisión por las cortes de la Sec. 10 de la ley federal con las disposiciones sobre revisión judicial de la Sec. 29 de la ley insular las diligencias sobre investigaciones, inspección, obtención de prueba documental y reglamentos de trabajo a domicilio de la Sec. 11 de la ley

federal con los deberes de los patronos provistos de la Sec. 5 de la ley insular; las exenciones de los ejecutivos, administradores y profesionales de la Sec. 13(a) de la ley federal con la correspondiente exención establecida bajo la palabra "empleado" por el Art. 19 de la Ley Núm. 379 de 1948; la reglamentación sobre aprendices, estudiantes e inhabilitados de la Sec. 14 de la ley federal con las disposiciones similares de las Secs. 22 y 23 de la ley insular; los discrímenes prohibidos por la Sec. 15 de la ley federal con los discrímenes patronales prohibidos por la Sec. 24 de la ley insular; las penalidades impuestas por la Sec. 16 de la ley federal con las penalidades impuestas por las Secs. 25 y 27 de la ley insular; el procedimiento de *injunction* provisto por la Sec. 17 de la ley federal con las disposiciones sobre *injunction* y otros procedimientos provistos por la Sec. 28 de la ley local, la aplicabilidad de otras leyes más beneficiosas establecida por la Sec. 18 de la ley federal con la cláusula de salvedad de idéntico propósito de la Sec. 40(c) de la ley local; la separabilidad de cláusulas autorizadas por la Sec. 19 de la ley federal con las disposiciones sobre cláusulas separables de la Sec. 42 de la ley insular.

Como se ve, del examen conjunto de ambos estatutos lo que resulta es una situación de coexistencia de estatutos sobre la misma materia y la aplicación de uno de los estatutos con preferencia al otro depende de cual de los dos resulte más beneficioso para el obrero, de acuerdo con el estado de derecho creado por el caso de *People of Puerto Rico* v. *Shell*, 302 U.S. 253, 82 L.Ed. 235, cita precisa a las págs. 261–264 U.S.; 242–244 L.Ed., la Sec. 18 de la Ley de Normas Razonables de Trabajo de 1938 del Congreso de los Estados Unidos y nuestra propia jurisprudencia, según se ha expuesto en esta misma opinión. Nada hay en la historia legislativa de la Ley Núm. 96 de 26 de junio de 1956 de Puerto Rico—que milite en contra de esta conclusión.

En el debate parlamentario que se produce en torno a la Ley Núm. 96, es fácil descubrir, que el ideal legislativo que conduce a la aprobación de la Ley Núm. 96 de 26 de junio de 1956, es (1) conservar la especialidad del caso de Puerto Rico en la imposición federal de un salario mínimo uniforme para todas las áreas americanas, estableciéndose por nuestra propia legislatura aquellos tipos de salarios mínimos que protejan nuestra economía y al mismo tiempo reduzcan hasta el mínimo cualquier desventaja en la competencia que pueda producir la diferencia en los tipos de salarios mínimos; (2) conservar la regla de mayor beneficio para el obrero en todas las demás condiciones de trabajo, que no sea la del salario mínimo, para las industrias cubiertas por la Ley de Normas Razonables de Trabajo federal, por la autoridad derivada de la Sec. 18 de dicha Ley de Normas Razonables de Trabajo.

En cuanto al primer punto, quedó dilucidado durante el premioso debate que para algunas industrias se adoptaron por mandato legislativo nuestro, como *ley local*, las determinaciones hechas por los comités de salarios federales en la investigación y fijación de mínimos para industrias cubiertas por la Ley de Normas Razonables de Trabajo federal establecidas en Puerto Rico y en otras industrias podrían adoptarse como *ley local* las determinaciones hechas por los Comités de Salarios Mínimos de nuestra propia Junta de Salario Mínimo para otras industrias también cubiertas por la Ley de Normas Razonables de Trabajo federal establecidas en Puerto Rico, amparados por la inalterable política de la Ley de Normas Razonables de Trabajo federal de no tomar acción, en sentido contrario, cuando la imposición federal pudiera reducir los empleos o aumentar cualquier desventaja en el libre tránsito de los objetos de comercio entre Puerto Rico y Estados Unidos. Como es sabido, Puerto Rico es un país de poca materia prima y el doble costo del flete podría ocasionar una desventaja en la competencia.

Durante la discusión parlamentaria, se hizo constar claramente por el portavoz del partido de Gobierno Lic. Víctor Gutiérrez Franqui, el interés del estado puertorriqueño en mantener la preeminencia y la aplicabilidad de la *ley local* en toda cuestión de salario, siguiendo el método adoptado en la redacción del *disponiéndose* del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948. Véamos: Del tomo III, Vol. 8, del *Diario de Sesiones* de la Asamblea Legislativa de Puerto Rico, correspondiente a la Sesión Ordinaria del 1956, tomamos los siguientes extractos:

"Sr. Gutiérrez Franqui: Como verá el compañero por el informe, este inciso, que estamos enmendando, de la sección 6, según se explica en el informe, lo que hace es convertir en *ley de Puerto Rico* las determinaciones hechas por comités de salarios federales en la investigación y fijación de mínimos a industrias en el comercio interestatal cubiertas por la Ley de Normas Razonables de Trabajo, aprobadas estas determinaciones con posterioridad a la última enmienda que el Congreso de Estados Unidos hizo, a fines del año pasado, a la Ley de Normas Razonables de Trabajo. Y los tipos que aparecen aquí consignados, en esta sección [Sección 6 de la Ley número 96 de 26 de junio de 1956] son exactamente los mismos que fijó recientemente, o sea, en investigaciones hechas hace dos y tres meses, estos comités federales. La razón de la enmienda, surge de que, con posterioridad al estudio y a las determinaciones iniciales que hizo la Comisión Conjunta sobre estas inclusiones, se reunieron nuevos comités federales, hicieron nuevas clasificaciones y subdivisiones de industrias [de las] que existían antes, creando estas nuevas divisiones con estos nuevos tipos de salarios, y la enmienda que ofrecemos es adicionar, para poner al día esta sección, adicionar lo que se ha hecho con posterioridad al día en que se redactó este proyecto de ley.

"Sr. Susoni: Los comités, ¿ellos tienen autoridad para revisar estos salarios en la misma forma que los demás tipos que se establecen por esta ley?

"Sr. Gutiérrez Franqui : Eso es así." Pág. 1098 (Énfasis nuestro.)

Respondiendo a una petición de uno de los partidos de la minoría—Partido Estadista Republicano—, para que se le entregara los documentos que pudiera tener la Comisión Conjunta del Senado y la Cámara de Representantes de Puerto Rico, sobre los cuales hubieran trabajado los comités federales de salario, informó el portavoz del partido de gobierno.

"Sr. Gutiérrez Franqui: En primer lugar, queremos decir que, hasta donde nosotros sabemos, la Comisión Conjunta no tiene en su poder todo el expediente, lo que puede llamarse todo el expediente de estos comités federales de industria, que incluyen la transcripción del récord de los testimonios ofrecidos ante el comité, ante los comités federales y, según explicamos cuando propusimos esta enmienda, la Comisión Conjunta, al hacer sus recomendaciones sobre este particular, no dijimos que hubiera hecho un estudio de los expedientes completos, sino que aclaramos que estas enmiendas, como el resto de la sección de la ley donde están incluídas, es una mera repetición de los tipos mínimos de salarios fijados por comités [federales] de salarios recientes, o sea, que trabajaron después de la enmienda que en agosto del año pasado se hizo por el Congreso de los Estados Unidos a la Ley Federal de Normas Razonables del Trabajo y que la Comisión Conjunta no hizo ningún estudio para hacer determinaciones en cuanto a estos tipos sino que meramente tomó los tipos que fijaron estos comités industriales para convertirlos en *ley local,* entendiendo la Comisión que este estudio había sido objeto de investigación reciente y que no estaba justificado hacer una revisión por la Comisión misma dentro de los dos o tres meses siguientes al trabajo de estos comités industriales. Y que la Comisión Conjunta aceptó estos tipos, según fijados, con el propósito de convertirlos en *ley local;* o sea, con el propósito de que rigieran en Puerto Rico, independientemente de lo que pudiera resultar de la validez o no validez de la actuación de estos comités. . . ." (Pág. 1148 (*in fine*), 1149.) (Énfasis nuestro.)

Frente a una enmienda para eliminar la disposición en el proyecto bajo discusión que establecía: "Cuando se trate de industrias manufactureras cubiertas por la Ley Federal

de Normas Razonables del Trabajo de 1938, enmendada, y que están en competencia substancial con industrias de los Estados de la Unión, se tomarán también en consideración los salarios prevalecientes en éstas y la situación de competencia existente entre industrias de Puerto Rico e industrias similares de los Estados Unidos"—véase la exacta reproducción de dicha norma en la Sec. 15(b) de la Ley Núm. 96 de 26 de junio de 1956—debiendo sustituirse por la enmienda propuesta por el Doctor Gilberto Concepción de Gracia, portavoz del Partido independentista de la minoría, en el sentido, que: "Cuando se trate de industrias manufactureras cubiertas por la Ley de Normas Razonables de Trabajo de 1938, según ha sido enmendada, el salario que se fije deberá ser por lo menos igual al que por legislación federal se fije para igual labor, para industria de la misma naturaleza en Estados Unidos", el portavoz del partido de gobierno Lic. Víctor Gutiérrez Franqui, consigue la derrota de la enmienda por substitución, alegando: "Señor Presidente, nos tenemos que oponer a esa enmienda. Esa enmienda destruye toda esta organización de fijación de salario. Lo que habría que hacer es solicitar que se hiciera extensiva a Puerto Rico la Ley Federal. Ese es el resultado, cada vez que se reuniera un comité tendría que fijarle el peso a toda industria que estuviera en el mercado interestatal. Eso es lo mismo que hacer aplicable desde ahora la Ley Federal a Puerto Rico. No tendríamos que hacer nada de esto. Solicitamos que se derrote la enmienda." (Pág. 1212.)

El extenso papel de trabajo que hemos preparado ha sido con el propósito de destacar el sereno y mesurado patriotismo junto a la escrupulosa lealtad desplegados en todo momento para mantener en su mejor posición de razonabilidad, justicia y reciprocidad nuestro contrato de trabajo, tanto en aquellos aspectos que sólo afectan nuestra "pequeña economía" como en aquéllos que puedan afectar nuestro "mercado libre" con los Estados Unidos. Gracias a este patriotismo

y esta lealtad hasta ahora hemos podido evitar en nuestro sistema obrero-patronal, la incertidumbre en cuanto a salarios impuestos desde afuera, sin correspondencia con nuestra realidad económica y sin seguridad en cuanto a la reducción de los empleos, el cambio continuo de tipos de salarios mínimos obtenidos por una organización gremial operando dentro de una civilización que puede ser más pródiga, por poseer un consumidor de mayor capacidad adquisitiva; hemos podido evitar además cualquier ventaja marginal que pudiera producir una competencia desleal entre los productos manufacturados en Puerto Rico y los manufacturados en los Estados Unidos.

La inclusión extensa que hacemos de la Ley de Normas Razonables de Trabajo de 1938 y la Ley Núm. 96 de 26 de junio de 1956, con su correspondiente tabla de concordancias, es para acabar con el mito que se trata de leyes antitéticas, sin coexistencia posible dentro del mismo espacio legislativo, una de las cuales es más favorable al obrero o al patrono que la otra, con un conflicto irreconciliable que necesita la camisa de fuerza de la preeminencia congresional. Con vista al estudio conjunto de ambos estatutos no es difícil concluir que con nuestra Ley Núm. 96 de 26 de junio de 1956 buscamos y encontramos una correspondencia con el estatuto federal que nos permite la aplicación en su totalidad de nuestra Ley local a cualquier contrato de trabajo celebrado en nuestro país, lo mismo para regir dentro de nuestro propio perímetro como para regir el área más extensa de nuestras operaciones interestatales.

De acuerdo con el Art. 3 de la Ley Núm. 379 de 15 de mayo de 1948 relacionado con la Sec. 1 de nuestra Ley Núm. 289 de 9 de abril de 1946 fijando un día de descanso por cada seis días de trabajo, la "semana de trabajo" provista por nuestra Ley local es de cuarenta y ocho horas compuesta de seis días consecutivos de ocho horas cada uno ($6 \times 8 = 48$), seguido por un día de descanso de veinticuatro horas con-

secutivas que completa la unidad tradicional de siete días de la semana puertorriqueña de todos los tiempos. Tiene que ser un término de seis días porque el tope de ocho horas diarias obliga a una extensión de seis días para llegar a las cuarenta y ocho horas semanales. Tiene que ser un término de veinticuatro horas consecutivas porque la ley habla de un "día de descanso". Las horas en exceso de cuarenta y ocho horas a la semana o de ocho horas durante cualquier día o de cualquier hora dentro del séptimo día de descanso deberán pagarse a razón de doble tiempo del tipo de salario convenido para las horas regulares. Siempre que no pase de ocho horas diarias no importa cuando empieza y cuando termina el período de tiempo cubierto por las ocho horas durante las veinticuatro horas consecutivas que forman el día de trabajo o de descanso. Como cuestión de realidad histórica, el día de trabajo de 8 horas es la hélice que mueve la reforma del contrato de trabajo en Puerto Rico.

La única excepción es la que consagra el disponiéndose del Art. 5 de nuestra Ley Núm. 379 de 15 de mayo de 1948 que adopta para las industrias dedicadas a la producción de objetos del comercio interestatal, la semana federal de cuarenta horas pero conservando el tope de ocho horas diarias. El tope diario de ocho horas impone una extensión de cinco días para llegar a las cuarenta horas de la semana federal. Esto aumenta el período de descanso a cuarenta y ocho horas consecutivas después de la semana de trabajo. Las horas en exceso de cuarenta horas a la semana, o de ocho horas durante cualquier día o cualquier hora dentro del sexto día deberán pagarse a razón de tiempo y medio del tipo de salario convenido para las horas regulares y cualquier hora dentro del séptimo día deberá pagarse a razón de doble tiempo del tipo de salario convenido para las horas regulares. Siempre que no pase de ocho horas diarias no importa cuando empieza y cuando acaba el término de tiempo

cubierto por las ocho horas durante las veinticuatro horas consecutivas que forman el día de trabajo o de descanso.

Se supone que la siguiente gráfica represente el movimiento de la semana de trabajo dentro del límite permitido por el reglamento federal:

| Semana de trabajo: | D | L | M | M | J | V | S | Horas traba- jadas |
|---|---|---|---|---|---|---|---|---|
| (1) | x | x | x | x | x | x | 0 | 48 |
| (2) | 0 | x | x | x | x | x | x | 48 |
| (3) | 0 | 0 | x | x | x | x | x | 40 |
| (4) | x | 0 | 0 | x | x | x | x | 40 |
| (5) | x | x | 0 | 0 | x | x | x | 40 |
| (6) | x | x | x | 0 | 0 | x | x | 40 |
| (7) | x | x | x | x | 0 | 0 | x | 40 |
| (8) | x | x | x | x | x | 0 | 0 | 40 |
| (9) | x | x | x | x | x | x | 0 | 48 |
| (10) | 0 | x | x | x | x | x | x | 48 |

De acuerdo con el movimiento de esta "semana de trabajo" la querellada Caribbean Refining Co. sólo pagaba las 8 horas del sexto día a tiempo y medio cuando el sexto día caía dentro de la semana fija establecida por el patrono, o sea, cuatro veces en un período de diez semanas. En las demás semanas, aunque se trabajaban ocho horas diarias durante seis días consecutivos, el sexto día se compensaba a tiempo sencillo por aparecer los seis días trabajados sucesivamente pero en dos distintas semanas.

No hay nada más que mirar el resultado que arroja esta gráfica, sin dejarse impresionar por la flébil estructura evasiva de las dos semanas, para darnos cuenta, que por encima de lo establecido por el disponiéndose del Art. 5 de nuestra Ley Núm. 379 de 15 de mayo de 1948, en cuanto a la semana de cuarenta horas, compuesta de cinco días, ocho horas cada uno la querellada lo que crea es la semana regular de trabajo

nuestra de cuarenta y ocho horas, seis días corridos de ocho horas cada uno, y sólo está dispuesta a compensar a tiempo y medio las horas trabajadas durante el sexto día cuando los seis días transcurran dentro de la semana fija que se establece. Esto es contrario a las propias disposiciones de la Sec. 788.2 (c) que dispone que la semana de trabajo de un empleado es un período fijo que no es necesario que coincida con la semana de calendario y puede comenzar en cualquier día o en cualquier hora del día y del apartado (d) de la misma sección que prohibe se promedien las horas trabajadas entre dos o más semanas. Puesto en las palabras de la ilustrada Sala sentenciadora de San Juan: La semana establecida por la querellada está de acuerdo en algunos aspectos con la semana de trabajo dispuesta por la Ley Núm. 379 de 15 de mayo de 1948, pero, al combinar el sistema de turnos de seis días consecutivos de trabajo con dos días de descanso, en una semana fija de siete días, de domingo a domingo, el resultado inevitable de tal programa de trabajo es una violación del fin de salud laboral que se propone la Ley Núm. 289 de 9 de abril de 1946 creando un día de descanso. Por otro lado, solamente dos veces cada ocho semanas los seis días consecutivos caen dentro de la semana de trabajo. En su aplicación práctica, y en cuanto a las limitaciones impuestas por la Ley Núm. 379 de 15 de mayo de 1948, la semana de trabajo creada por la querellada recurrente es de seis días de ocho horas (48 horas) y no de cinco días de ocho horas (40 horas) cuya semana de 40 horas es la autorizada por la Ley de Normas Razonables de Trabajo y el disponiéndose del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948. Hasta aquí la correcta interpretación de la ilustrada Sala de San Juan del Tribunal Superior de Puerto Rico.

La proposición de la querellada resulta además contraria a nuestra interpretación en el caso de *Compañía Popular* v. *Unión de Empleados*, 69 D.P.R. 179 (Snyder) (1948) cita precisa a la pág. 196, relacionada con la aplicación de la

Ley Núm. 289 de 9 de abril de 1946, en cuyo caso se resuelve: "Cuando existe solución de continuidad en el trabajo, los restantes días trabajados, a los fines de calcular el trabajo de seis días, se juntarían con parte de la próxima semana de trabajo, con posibles resultados desastrosos para ambas partes. Para evitar la doble paga bajo la Sec. 4, el patrono vendría obligado a conceder y el empleado vendría obligado a aceptar, un día de descanso en medio de la próxima semana normal de trabajo. A tal resultado caótico no debe llegarse a menos que lo exija la Ley. Por otro lado, si la Ley Núm. 289 es interpretada, en el sentido, de que siete días son una semana de trabajo, *separadamente* y como una *unidad* para cada empleado, las partes comprenderán sus respectivos derechos y deberes al final de cada período de siete días y el fin primordial de la Ley—un día de descanso cada siete días—será cumplido. El segregar cada período de siete días en esta forma y determinar los respectivos derechos y responsabilidades de los empleados y patronos en ese momento, constituye un método similar al de calcular a base de años enteros el ingreso para fines contributivos, a pesar del hecho de que frecuentemente no se obtiene el ingreso sobre una base automáticamente anual. . . . Tomando cada siete días como la unidad de medida, es obvio que, empezando con el primer día después que el empleado disfruta de su día regular de descanso, éste debe trabajar seis días consecutivos [cinco días si se trata de una industria interestatal cubierta por el disponiéndose del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948] con el fin de que pueda tener derecho a descansar el séptimo día [sexto y séptimo si se trata de una industria interestal]. Y el dejar de trabajar algún día en medio de la semana no empieza, a los fines de recibir un día de descanso sin paga, un nuevo período de seis días consecutivos de trabajo. Resolverlo así equivaldría a precipitar el caos que nuestra decisión en este caso trata de evitar, viniendo el empleado obligado a des-

cansar un día en que tanto el patrono como él desean que se trabaje. Tiene que haber un día regular y fijo de descanso; [o dos días] y los seis días [o cinco] consecutivos de trabajo se cuentan empezando el día después del de descanso, no importa que otros días de trabajo durante la semana de trabajo no se han trabajado por razones ajenas al requisito del día de descanso. . . . Nuestra conclusión es que la corte de distrito cometió los errores tercero y cuarto al resolver que los seis días de trabajo no tenían que ser consecutivos. Resolvemos que, tomando *la semana de trabajo regular de cada empleado como una unidad separada*, éste debe trabajar seis días consecutivos [o cinco] para tener derecho al séptimo día de descanso [o sexto y séptimo]." (Énfasis nuestro.)

La importancia que tiene la opinión emitida en el caso de *Compañía Popular* v. *Unión de Empleados*, supra, es que presenta un cuadro de hechos bastante similares a este caso, a saber, (1) intento de partir la semana en dos para evadir la aplicabilidad del día de descanso después de seis días consecutivos de trabajo; (2) intento de romper el turno de seis días consecutivos del obrero haciéndolo figurar en distintas semanas; (3) interrupción en el turno de seis días consecutivos estableciendo un día libre de trabajo en medio de la semana. La resolución del caso tiene algunos supuestos similares a las reglas básicas del reglamento federal, a saber, (1) cada semana de trabajo constituye una unidad, totalmente separada de las otras (2) el día de descanso debe concederse en relación al trabajo del empleado y no en relación al plan de la empresa (3) se prohibe el prorrateo de las horas trabajadas entre dos o más semanas (4) el término sucesivo de seis días no podrá romperse aunque no se hayan trabajado otros días durante la semana por razones ajenas al requisito del día de descanso (5) el inicio de la semana de trabajo de un empleado permanecerá fijo irrespectivamente de su programa de trabajo y el día de descanso debe ser uno regular y fijo dentro de la "semana de trabajo".

En cuanto a la adopción de la semana federal de cuarenta horas por el disponiéndose del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948, sólo tendremos que referirnos a la anterior acotación del caso de *Peña* v. *Eastern Sugar Associates* a la pág. 278 de esta opinión.

Siendo, pues, evidente que la aplicación del reglamento federal que hemos examinado es menos beneficioso que los contenidos sobre la semana de trabajo de nuestras leyes—Ley Núm. 379 de 15 de mayo de 1948 y Ley Núm. 289 de 9 de abril de 1946—y la jurisprudencia nuestra anteriormente analizada, debe aplicarse el disponiéndose del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948 y la Sec. 1 de la Ley Núm. 289 de 9 de abril de 1946, según ha sido interpretada por este Tribunal, y no el reglamento federal. La alegación de que dicho reglamento federal rige en Puerto Rico por encima de leyes locales nuestras más beneficiosas al obrero, carece de fundamento.

Antes de terminar queremos hacer algunos comentarios sobre nuestra decisión en el caso de *Porto Rico Coal Co.* v. *Tribunal Superior*, 91 D.P.R. 89 (Belaval) (1964). Este caso no altera en ninguna forma nuestras anteriores decisiones sobre el *disponiéndose* del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948. Basta examinar la primera parte de la opinión, referente al período de 1ro. de enero de 1950 a 26 de junio de 1956, y la forma como se resuelve aplicando el *disponiéndose* del Art. 5 en cuanto al pago de tiempo y medio por cualquier hora extra, para darse cuenta que no ha variado en nada nuestro juicio sobre el particular.

Ahora bien, en cuanto a la segunda parte de la opinión referente al período de 26 de junio de 1956, cuando entra en vigor nuestra Ley Núm. 96 de 26 de junio de 1956, a 31 de agosto de 1961, se produce una situación distinta que presenta una triple especialidad: (1) Se trata de una industria, que en cuanto a horas, nunca ha sido regulada por

la Ley de Normas Razonables de Trabajo federal, (2) Se trata de una industria que en cuanto a salario ya ha sido regulada por la Asamblea Legislativa de Puerto Rico, (3) Se trata de una reclamación, que en cuanto a las otras condiciones de trabajo—horas regulares o extraordinarias, tipo de compensación por hora extra—, no está basada en un convenio colectivo.

(1) Cuando se aprobó la Ley de Normas Razonables de Trabajo de 1938—52 Stat. at Large 1060, cita precisa a la pág. 1067—los marinos estaban exentos de las disposiciones de dicha ley, tanto las referentes al salario mínimo (Sec. 6 29 U.S.C.A. sec. 206) como las referentes a las horas de trabajo y a la compensación por hora (Sec. 7, 29 U.S.C.A. sec. 207). Cuando se aprueban las enmiendas del 1949, el único cambio que hubo fue un cambio en el número dentro de la sección que correspondía a la exención: 63 Stat. at Large 910, cita precisa a la pág. 918. Cuando se aprueban las enmiendas del 1961—Ley Pública Núm. 87–30 de 5 de mayo de 1961; 75 Stat. at Large 65 cita precisa a las págs. 71–73—en virtud de la enmienda de la Sec. 9 (a) (14) de dicha ley a la Sec. 13 de la Ley de Normas Razonables se dispone que estaría exenta de las disposiciones contenidas en las Secs. 6 (Salarios) y 7 (horas y compensación extra) de la Ley de Normas Razonables de Trabajo de 1938, cualquier persona empleada como marino en un barco que no fuera un barco americano y en virtud de la enmienda de la Sec. 9 (b) (6) de la Ley Pública Núm. 87–30 a la misma Sec. 13 de la Ley de Normas Razonables de Trabajo se establece que las disposiciones de la Sec. 7 (horas y compensación extra) no se aplicarán a ninguna persona empleada como marino, sin hacer distinción en cuanto a unos barcos u otros. La disposición ordenando pagarle salario mínimo a las personas empleadas como marinos en un barco americano, está incluida en la Sec. 5 (b) (2) de la misma Ley Pública Núm. 87–30 como una enmienda por adición al apartado b de la

Sec. 6 de la Ley de Normas Razonables de Trabajo (cita precisa a la pág. 67 del 75 Stat. at Large). Como se puede apreciar por esta sencilla acotación incidental de la historia legislativa, antes del 1961, todos los marinos estaban exentos por la Ley de Normas Razonables de Trabajo de 1938, tanto de las disposiciones de horas como de salarios de dicha ley. Después del 1961, los marinos en barcos extranjeros seguían exentos en su totalidad de las disposiciones de horas y salarios federales pero los marinos en barcos americanos seguían exentos de las disposiciones federales sobre horas máximas de trabajo y compensación extra. La razón detrás de esta exclusión federal es obvia: en ausencia de un contrato marítimo típico, como lo era en el caso, el contrato de trabajo de mar ordinario hay que considerarlo como un contrato sin horas fijas, y en ausencia de prueba en contrario, es razonable suponer que las distancias que median en el cumplimiento laboral no permiten la periodicidad de la tarea. No habiéndose probado ningún pacto expreso sobre el particular, en el caso bajo estudio había un vacío, a llenarse con lo que resultará ser el mejor derecho aplicable a una tarea discontinua.

(2–3) En cuanto a la aplicabilidad total del *disponiéndose* del Art. 5 de la Ley Núm. 379, ya sabemos que cuando existe un decreto mandatorio o un convenio colectivo fijando otra norma de trabajo (horas) o de compensación (salario) o de ambas (horas y salarios), el propio *disponiéndose* del Art. 5 de la Ley Núm. 379, establece su propia inaplicabilidad. En cuanto a dicha aplicabilidad en su totalidad del *disponiéndose* del Art. 5, no nos decidimos a aplicar nuestra jurisprudencia sobre exenciones, en el sentido, que cuando se trata de tareas específicas, empleados especiales o destrezas expresamente exemptuadas por la Ley de Normas Razonables de Trabajo federal, se aplica el *disponiéndose* del Art. 5 de nuestra Ley Núm. 379 de 15 de mayo de 1948, porque según hemos visto, en virtud de la Sec. 9 (b) y su corres-

pondiente apartado 9(b) (6) de la Ley Pública Núm. 87–30 de 5 de mayo de 1961, enmendando la Sec. 13 de la Ley de Normas Razonables de Trabajo federal, referente a las exenciones, se saca de dichas exenciones todo lo relacionado con la Sec. 7 federal (horas y compensación por horas extras) "a los marinos empleados en buques americanos". Es conveniente, además, añadir que las únicas disposiciones sobre compensación para los marinos en tal forma empleados se hace como una inclusión en un apartado especial a tal fin establecido dentro de la Sec. 5(b) (2) de la misma Ley Pública Núm. 87–30 enmendando el apartado (b) de la Sec. 6 de la Ley de Normas Razonables de Trabajo cita precisa a la pág. 67 de 75 U.S. Stat. at Large referente a salarios— véase como aparece en su forma actual en la Sec. 6(b) (2) en 29 U.S.C.A. sec. 206 (edición de 1965); véase además *"Changes in Exemptions"* 2 U.S. Code Cong. & Ad. News— 87th Congress First Session (1961) págs. 1651–1652.

Como es sabido, tanto el decreto mandatorio como el convenio colectivo de que habla el *disponiéndose* del Art. 5 pueden adoptar, como reglamentación gubernativa en vigor o como pacto de patronos y empleados independientes, las mismas normas en cuanto a semana de trabajo de cuarenta horas, ocho horas diarias y compensación a tiempo y medio en exceso de las cuarenta horas a la semana y de ocho horas diarias que establece el *disponiéndose* del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948, para las industrias cubiertas por la Ley de Normas Razonables de Trabajo de 25 de junio de 1938, según enmendada, o pueden decretar o convenir otras normas que resulten más ventajosas para el obrero. Las normas que están permanentemente incorporadas a nuestro contrato de trabajo como requisitos legales básicos son las contenidas en el *disponiéndose* del Art. 5 de la Ley Núm. 379 de 15 de mayo de 1948 y forman parte de cualquier contrato de trabajo para industrias o negocios cubiertos por la Ley de Normas Razonables de Trabajo de 1938 pero dichas normas, se repite, pueden ser mejoradas

en beneficio del obrero, sin que resulten contrarias a ninguna ley nuestra.

En cuanto a la compensación a tipo doble por las horas extras que se hizo en el caso de la *Porto Rico Coal Co.* y la *Porto Rico Lighterage*, la misma se basó en una conclusión de la Sala sentenciadora que se trataba de una industria local, regida por decreto, cosa que después de examinar el cambio de las exenciones en cuanto a horas para los marinos que había sufrido la Sec. 13 de la Ley de Normas Razonables de Trabajo, la clasificación de las tareas en cuanto a la industria marítima que había adoptado nuestra propia Legislatura al establecer un salario mínimo para dicha industria y la falta de un convenio sobre otras condiciones de trabajo, triple especialidad del caso bajo estudio, no resultaba tan desprovista de fundamento como para justificar nuestra revocación de la misma.

Debe confirmarse la sentencia dictada por la Sala de San Juan del Tribunal Superior de Puerto Rico de fecha 18 de octubre, 1963, salvo lo referente a que en el turno Núm. 1 —11:01 P.M. a 7:00 A.M.—los querellantes trabajan durante los siete días calendario y por tanto tienen derecho a que se les compense a doble tiempo las horas trabajadas durante el séptimo día, por ser improcedente como cuestión de hecho y como cuestión de derecho.

Opinión disidente en parte del Juez Asociado Señor Santana Becerra en la cual concurren el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Belaval y Hernández Matos

San Juan, Puerto Rico, 15 de marzo de 1966

La recurrente Caribbean Refining Co. es una empresa en el comercio interestatal. Su producción le exige trabajar los 7 días de la semana y las 24 horas del día. El día lo trabaja en 3 turnos de 8 horas cada uno comenzando el

primero a las 11:00 P.M. hasta las 7:00 A.M., de 7:00 A.M. a 3:00 P.M. el segundo y de 3:00 P.M. a 11:00 P.M. el tercero. Hasta el 11 de enero de 1956 el programa de trabajo de la recurrente era uno de 5 días consecutivos de labor y 2 días consecutivos de descanso. Hasta ahí, nunca hubiera surgido el presente litigio. En 11 de enero de 1956 la recurrente abandonó el anterior programa y estableció uno de 6 días consecutivos de trabajo y 2 días consecutivos descanso. Aquí surgió la razón del litigio por cuanto es fácil ver que dicho programa de trabajo y descanso así integrado cubre un período de 8 días o sea, sobrepasa la semana natural de 7 días en que está dividido el tiempo.

En 18 de marzo de 1957 la recurrente y sus obreros suscribieron un convenio colectivo. En lo aquí pertinente se dispuso en dicho convenio de la siguiente manera: (Art. IV):

"(a) *Semana de Trabajo.*—Para los empleados que regularmente trabajan de día la semana de trabajo consistirá de 168 horas consecutivas comenzando a las 12:01 A.M. el lunes y terminando a los 12:00 M. del domingo siguiente.

"Para aquellos empleados que trabajan en turnos, la semana de trabajo comenzará al principio de aquel turno regularmente fijado que empieza en o antes de las 12:00 M. del domingo y termina el siguiente lunes en la mañana. Dicha semana laborable consistirá de 168 horas consecutivas terminando el domingo siguiente a la fecha de su comienzo.

"(b) *Día de Trabajo.*—El día normal de trabajo consistirá de ocho (8) horas de trabajo durante cualquier período de (24) horas consecutivas.

"(d) *Turnos.*—Por la presente, y hasta nuevo aviso de la Compañía, se observarán los siguientes horarios:

. . . . . . . .

EMPLEADOS DE TURNO

| Turno | | |
|---|---|---|
| Núm. 1 | 11:00 P.M. a | 7:00 A.M. |
| Núm. 2 | 7:00 A.M. a | 3:00 P.M. |
| Núm. 3 | 3:00 P.M. a | 11:00 P.M." |

Se acordó en el referido convenio que se pagaría extra a tiempo y. medio cualquier hora trabajada en exceso de 8 al día y cualquier hora trabajada en exceso de 40 horas en cualquier semana y a tiempo doble toda hora trabajada en el séptimo día consecutivo trabajado.

Ante las consecuencias trascendentales que se le han querido imprimir a este caso, según nuestros autos, particularmente por los *amici curiae* que se han unido a la recurrente en apoyo de que se revoque la sentencia dictada por el Tribunal Superior que sostuvo a los obreros en la reclamación objeto del recurso; ante los temores del alegado efecto adverso y perturbador que en el expediente se le atribuye al fallo que se revisa, de ser sostenido, sobre la industria en Puerto Rico, y pareciéndome que en gran medida la cuestión litigiosa que está aquí envuelta se ha sacado de su propio marco reducido y se ha llevado a proporciones que realmente no tienen en la discusión que el récord ofrece de la misma junto al problema siempre en pie del adecuado acomodo entre la legislación del trabajo de Puerto Rico y la de los Estados Unidos en las controversias de salarios—problema éste que a mi juicio no tiene en realidad mucho que ver en la presente contienda—me parece necesario y apropiado que la controversia quede expuesta en lo que verdaderamente es, y se sepa qué envuelve y qué no envuelve la cuestión litigiosa ante el Tribunal según fue fallada. Veamos:

En 29 de julio de 1958 un grupo de 58 obreros de la recurrente, luego se unieron muchos más, interpuso querella judicial y alegó que la recurrente les había requerido trabajar en turnos rotativos en la forma y manera en que aparecía en un programa de trabajo acompañado a la querella, sobre el cual no hay disputa. Que en innumerables ocasiones, siguiendo dicho programa de trabajo, los querellantes habían sido requeridos a trabajar durante 6 días consecutivos a la semana sin que las horas trabajadas en exceso de 40 se les hubieran compensado a razón de tiempo y medio. Alegaron

352

también que en innumerables ocasiones habían sido requeridos para trabajar el día de descanso sin que las horas así trabajadas les fueran compensadas a doble tiempo. En su contestación la recurrente negó estos hechos aunque admitió la existencia del programa de trabajo unido a la querella. Levantó una serie de defensas afirmativas. La Sala sentenciadora celebró una vista sobre las cuestiones de derecho envueltas en el pleito y recibió prueba en relación con dichas cuestiones de derecho. En 18 de septiembre de 1959 dictó sentencia.

Fue de opinión la Sala sentenciadora, correctamente, [1] que comenzando la semana de trabajo inmediatamente después del día de descanso, la semana en una industria cubierta por la Ley de Normas Razonables de Trabajo federal termina cuando el obrero ha trabajado 40 horas; y si dichas 40 horas fueron trabajadas en períodos de 8 horas cada día, las trabajadas después del 5to. día serían extras y el patrono viene obligado a pagarlas a razón de tiempo y medio de conformidad con el *disponiéndose* del Art. 5 de la Ley Núm. 379 de 1948. Concluyó la Sala, correctamente a la luz de la prueba, que en el plan de trabajo de la recurrente solamente dos veces cada 8 semanas los 6 días consecutivos de labor caían dentro de su semana de trabajo y que en su funcionamiento práctico la semana de trabajo creada por la demandada siempre era de 6 días de 8 horas. En su sentencia la Sala ordenó a la recurrente pagar las cantidades que adeudara computadas a base de compensar las horas trabajadas durante el 6to. día consecutivo de trabajo contados desde el día inmediatamente después del día de descanso, *a razón de tiempo y medio*, y las horas trabajadas por los querellantes en el día de descanso, séptimo día, a tipo doble. Se condenó a la recurrente a satisfacer la cantidad de $35,733.37 por

---

[1] Véanse Reglamento federal de la Ley de Normas Razonables de Trabajo, Sec. 778.2(c), (d); y *Ponce Ramos v. Fajardo Sugar Co.*, 85 D.P.R. 599 (1962), caso éste citado varias veces por la propia recurrente con aprobación.

concepto de la compensación a tiempo y medio por el 6to. día consecutivo de trabajo; $12,962.89 por razón del séptimo día o día de descanso trabajado en relación con el turno Núm. 1, menos $3,578.89 a deducirse por compensación recibida, para un total de $45,117.37, más la penalidad dispuesta por ley y honorarios.

Para no ocuparme más de ello, quiero expresar desde ahora que los querellantes no tienen derecho a la compensación extra de $12,962.89 fijada por la Sala por razón de labor en el séptimo día o día de descanso, y en ese aspecto estoy conforme con la opinión del Tribunal (Parte III). Para reclamar por razón de trabajo en el día de descanso, los querellantes dividieron el primer turno de 11:00 P.M. a 7:00 A.M. en dos días de trabajo distintos, uno cubriendo la hora de 11:00 a 12:00 y otro las 7 horas restantes. Ello es improcedente por cuanto el día de 8 horas de trabajo comenzaba a las 11:00 P.M. y no a las 12:00. Seguiré exponiendo mi criterio sólo en lo referente a la compensación de tiempo y medio por razón del 6to. día consecutivo de trabajo.

He aquí la semana de trabajo y el programa que implantó la recurrente y el cual no está en disputa:

| "Semana de trabajo: | D | L | M | M | J | V | S | Horas trabajadas |
|---|---|---|---|---|---|---|---|---|
| (1) | x | x | x | x | x | x | 0 | 48 |
| (2) | 0 | x | x | x | x | x | x | 48 |
| (3) | 0 | 0 | x | x | x | x | x | 40 |
| (4) | x | 0 | 0 | x | x | x | x | 40 |
| (5) | x | x | 0 | 0 | x | x | x | 40 |
| (6) | x | x | x | 0 | 0 | x | x | 40 |
| (7) | x | x | x | x | 0 | 0 | x | 40 |
| (8) | x | x | x | x | x | 0 | 0 | 40 |
| (9) | x | x | x | x | x | x | 0 | 48" |

(x) días trabajados
(0) días no trabajados

De un estudio de la anterior gráfica que representa la semana de trabajo establecida por la recurrente según lo dicho, comenzando a las 11:00 P.M. del domingo para terminar 168 horas después (7 días de 24 horas) a las 11:00 P.M. del próximo domingo, surgen varias observaciones y se ameritan varias conclusiones:

(1) Distinta a las demás, la 9na. semana vuelve a reproducir una situación idéntica a la de la primera. La situación se desenvuelve por lo tanto, en un ciclo de 8 semanas.

(2) En la 1ra. semana de este ciclo el 6to. día consecutivo de trabajo cae dentro del marco de domingo a domingo y, según la prueba, se concedió paga extra por dicho día.

(3) En la 2da. semana del ciclo el 6to. día consecutivo cae sábado, dentro del marco de domingo a domingo y también se pagó extra por dicho día.

(4) En la 3ra. semana del ciclo el 6to. día consecutivo del período de trabajo se sale del marco de la semana de domingo a domingo y cae en la 4ta. semana que le sigue, y dicho día se funde o identifica con el 1er. día regular de labor de esta última.

(5) En la 4ta. semana del ciclo el 6to. día consecutivo del período de trabajo cae en la 5ta. que le sigue y se funde o identifica con el 2do. día regular de trabajo de esta última.

(6) En la 5ta. semana del ciclo el 6to. día consecutivo del período de trabajo cae en la 6ta. que le sigue y se funde o identifica con el 3er. día regular de trabajo de esta última.

(7) En la 6ta. semana del ciclo el 6to. día consecutivo del período de trabajo cae en la 7ma. que le sigue y se funde o identifica con el 4to. día regular de trabajo de ésta.

(8) En la 7ma. semana del ciclo el 6to. día consecutivo del período de trabajo cae en la 8va. que le sigue o se funde o identifica con el 5to. día regular de trabajo de esta última semana.

Es un hecho indisputable y así lo declaró el Sr. Eugene R. Cays, Vicepresidente de la compañía, que se pagó compensa-

ción extra por el 6to. día en las semanas (1) y (2) y no se pagó en las semanas (3), (4), (5), (6), (7) y (8). (T.E. págs. 87, 88 y sgtes.) Observando la gráfica, aparentemente no creía la Compañía tener obligación de pagar horas a tiempo y medio en el período representativo de dichas 8 semanas, en adición a las horas extras en las primeras dos, ya que aparecen 40 horas semanales. Ahí reside lo artificial de la situación en detrimento del obrero.

Las 40 horas semanales en las semanas 3ra. a 8va. parten del supuesto, incierto en este caso, de que las semanas de trabajo del obrero comenzaban siempre en domingo con la semana calendario, y terminaban con ésta. Los hechos incontestables en el récord demuestran que ésa no era la realidad a partir del 11 de enero de 1956 en que se abandonó el programa inicial de 5 días consecutivos de trabajo y dos días de descanso, 7 días naturales, y se sustituyó por el de 6 días *consecutivos* de trabajo y dos días *consecutivos* de descanso, 8 días naturales consecutivos.

El comienzo de la semana de trabajo lo marca el retorno de nuevo, no importa en qué día, a la labor normal después de transcurrido el período unitario anterior de trabajo y descanso. En este caso la semana de trabajo de los obreros empezaba al volver ellos a la labor normal después de sus seis días corridos de trabajo y sus dos días de descanso corridos. Era inevitable, por lo tanto, si bien cronológicamente muy lógico, que el día del comienzo de la semana se corriera cada vez bajo un programa que cubría 8 días naturales consecutivos de trabajo y descanso en conjunto y no siete. Obsérvese en la gráfica cómo el primer día de trabajo en la segunda semana, después del descanso, no pudo caer otra vez en domingo como en la primera, y sí en lunes, y el de la 3ra. semana no comienza en lunes, si no en martes, y así sucesivamente. En un período de tiempo representativo de 8 semanas cada semana de trabajo comenzaba en un día sucesivo distinto. Los hechos incontestables demuestran que ésa era la realidad

para el obrero, no la posición artificial asumida por la recurrente a los efectos del pago, de que toda semana de trabajo empezaba en un domingo y terminaba en el otro. Esta posición irreal produce el resultado de aparecer semanas de trabajo comenzadas con descanso en vez de labor (2da. y 3ra.), o días de descanso después de sólo un día de labor (4ta.), o de 2, 3 y 4 días (5ta., 6ta. y 7ma.), contrario a la realidad y a su propio programa que establecía una labor consecutiva durante 6 días. Dividiendo así artificialmente la semana de trabajo del obrero a los fines de la nómina para hacerla comenzar de nuevo, sin haber expirado, cada domingo, el 6to. día consecutivo real y efectivamente trabajado en una semana se representaba como un día de trabajo de paga ordinaria de la próxima. En este caso la jornada diaria era no menor de 8 horas (convenio colectivo) y por tanto 5 días consecutivos representaban 40 horas de labor. Siendo así, el 6to. día corrido trabajado por el obrero constituía un exceso de 40 horas.

Partiendo de la primera semana comenzada en domingo, la prueba indisputable en el récord que es la gráfica desmiente cualquier pretensión de la Compañía en el sentido de que los obreros no trabajaran siempre 6 días consecutivos—8 horas en exceso de 40—antes de disfrutar de sus períodos de descanso para comenzar de nuevo la labor de una próxima semana de trabajo. En el transcurso de tiempo representativo de 8 semanas, cada dos meses, la gráfica demuestra como hecho incontestable que se trabajaron siete semanas o períodos de 6 días consecutivos de labor o exceso de 40 horas, y en 5 de dichas semanas el sexto día o exceso de 40 horas no se pagó a tiempo y medio bajo el patrón artificial de semana calendario aplicado por la recurrente.

La Sec. 7(a) de la Ley de Normas Razonables del Congreso,—29 U.S.C.A. sec. 207—dispone que excepto lo provisto en la misma ningún patrono empleará a cualquiera de sus empleados dedicado al comercio o a la producción de bienes para el comercio por una semana de trabajo mayor de 40

horas, a menos que tal empleado reciba compensación por su trabajo en exceso de las horas antes especificadas a un tipo no menor de vez y media del tipo regular al que está empleado. ([2])

El Reglamento federal de esta Ley, Sec. 778.2, dispone en su apartado (c) que la semana de trabajo *del empleado* es un período fijo que se repite regularmente de 168 horas—7 períodos consecutivos de 24 horas. ([3])—"No tiene que coincidir con la semana del calendario, y puede empezar en cualquier día y a cualquier hora del día." (Véase *Ponce Ramos, etc.* antes citado). "Una vez que el tiempo de comenzar la semana de trabajo *del empleado* se ha establecido, el mismo queda fijo, independientemente del horario trabajado por él. El comienzo de la semana puede cambiar si el propósito es que sea permanente el cambio y no está ideado para evadir el requisito de paga extra de la ley."

El apartado (d) del propio Reglamento dispone que cada semana se mantiene por sí sola; que la ley toma una sola semana como norma y *no permite que se promedien horas en dos o más semanas*, y que esto es así independientemente de que el empleado trabaje en un horario normal o en uno oscilante de turnos.

No asumo la posición de sostener que el sistema de turnos rotativos implantado por la recurrente fuera en violación de la ley y la reglamentación federal por ese solo hecho. En el sistema de turnos rotativos no reside el problema. El problema reside en el hecho de que en cada período de 168 horas —7 períodos de 24 horas—que es la medida laboral unitaria de la Ley de Normas Razonables, e independientemente de en

([2]) "Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

([3]) "An employee's workweek is a fixed and regularly recurring period of 168 hours—*seven consecutive 24-hour periods.*" (Énfasis nuestro.)

qué día de la semana comenzaban a transcurrir esas 168 horas hasta quedar extinguidas para repetirse de nuevo, los obreros trabajaban 8 horas—un sexto día—en exceso de 40, sin que, como manda la Sec. 7, se les pagara a tiempo y medio excepto en las dos ocasiones en 8 semanas en que bajo la representación ficticia de la semana calendario, el transcurso de las 168 horas coincidía con el transcurso de la semana natural, coincidencia que el Reglamento expresamente dispone no tiene que existir.

El pago del salario a base de una semana de trabajo ficticia de domingo a domingo logrado mediante el mecanismo de dividirle artificialmente al obrero su jornada real de labor consecutiva de 6 días en semanas calendario distintas era contrario a la ley y la reglamentación federal que no permite tal separación. El Reglamento toma cada semana o período de 168 horas consecutivas por sí mismo, y separadamente, como la base unitaria para determinar la jornada en exceso de 40 horas en cada período trabajado. De otro modo la Sec. 7 de la Ley sería inoperante y su mandato de compensación extra quedaría al capricho de la distribución que en la nómina un patrono quisiera hacer de la jornada trabajada, logrando que desaparezca artificialmente, como en este caso, cualquier exceso de 40 horas en un período básico de 168 ó semana de trabajo.

Aparte de que los obreros pidieran o no los turnos rotativos, (⁴) en los cuales ya expresé que no reside el problema, nada en los autos demuestra que bajo el sistema de 6 días de trabajo en lugar del anterior de 5, ellos convinieran o aceptaran la forma ya descrita para calcular su salario semanal. Cualquier renuncia expresa o implícita a la compensación adicional que dispone la Sec. 7 sobre el exceso de 40 horas sería contraria al interés público e inoficiosa. En el convenio colectivo acordaron, por el contrario, que toda hora en exceso de 40 se pagaría a tiempo y medio.

---

(⁴) Véase T.E. también a las págs. 90 y sgtes.

Se observa por el Tribunal que bajo el sistema anterior hasta enero de 1956 la recurrente no venía obligada a pagar horas extras y en el nuevo sistema, "cuando menos", tenía que pagar 16 horas extras cada 8 semanas, como si el cambio redundara en beneficio del obrero. Eso era correcto al principio por la razón obvia que el obrero trabajaba sólo 5 días en cada período de 168 horas, no más de 40 horas. Bajo el sistema posterior la recurrente implantó una semana de 6 días consecutivos de 8 horas diarias de labor, claramente en exceso de 40 horas. En el transcurso de 8 semanas venía ella obligada a pagar tiempo y medio en siete períodos trabajados o por 56 horas en total y no por 16 horas solamente. La gráfica retrata objetivamente esa realidad, así como el hecho de que los obreros siempre trabajaron seis días corridos antes de disfrutar del período de descanso y comenzar de nuevo la labor.

Estimo que no debería revocarse en este aspecto el fallo de la Sala sentenciadora dado a la luz de un enjuiciamiento realista de esos hechos en el récord. Las reclamaciones del salario obrero como todas aquellas otras controversias que surgen al amparo de una política pública con propósitos definidos, requieren enfoques y resultados fundamentalmente prácticos por sobre el refinamiento técnico, así como la individuación de cada caso a la luz de sus hechos y circunstancias propias, para hacer valer mejor la política pública envuelta.

En nuestra presente economía que para el interés puertorriqueño es una primordialmente de salario y consumo, el salario del trabajador es de la mayor importancia. Constituye el flujo vital de esa economía. Debe ser preferible aquella interpretación o aplicación del derecho que en sus efectos prácticos conceda al salario el máximo de la protección que le dan las leyes aplicables del Congreso y las del Estado Libre Asociado de Puerto Rico por cuanto, aparte consideraciones de orden humano, el obrero nuestro consume para su diaria

subsistencia de un país donde el salario del trabajador algo más que duplica el suyo, teniendo que absorber como consumidor la carga de ese mayor salario en el costo del producto que consume, aumentada además por el costo de fletes de la marina que también mejor paga a sus obreros. (⁵)

Por razón de ciertas constancias del expediente de este Tribunal en revisión, creo oportuno dejar clarificado, según mencioné al principio, que ésa ha sido la cuestión litigiosa dentro de sus verdaderos lindes y no más allá de su propio ámbito. No pasa de ser una acción para hacer valer el derecho de unos obreros del comercio interestatal a recibir su paga extra de tiempo y medio que les conceda la Sec. 7(a) de la Ley de Normas federal por cada exceso de 40 horas a la semana o 6to. día consecutivo que trabajaron, derecho que les negó la recurrente bajo su particular manera de liquidarles la semana de labor.

En el fallo de la Sala sentenciadora no está envuelto problema otro alguno de mayor trascendencia o complejidad en la esfera obrero-patronal. No se reclamó ni se concedió paga extra a tipo mayor que el tiempo y medio de la Sec. 7(a) de la Ley federal. No hay cuestión de salario mínimo presente, ni de decreto mandatorio o convenio colectivo en relación al salario mínimo; ni hay controversia a resolver en cuanto a si, expuesto en las palabras de un *amicus curiae*, "¿basta que exista un convenio colectivo o un decreto que fije los salarios que deben pagarse en una fábrica o industria cubierta por la Ley Federal de Horas y Salarios para que resulte inaplicable el 'disponiéndose' del referido Artículo 5 de la Ley 379?", cuestión ésta que se dice afecta grandemente la industrialización; ni la controversia envuelve problema alguno en cuanto al Art. 5 de la Ley Núm. 379 de 1948 y su "disponiéndose" en

---

(⁵) En declaración ante un sub-comité de Trabajo del Senado de Estados Unidos el Sr. David Dubinsky expresó el 14 de agosto pasado que en febrero de 1965, un año, el salario promedio en la industria manufacturera en Puerto Rico era de $1.23, comparado con $2.59 en Estados Unidos, una diferencia por hora de $1.36.—El Imparcial, 6 de septiembre de 1965.

su relación con las industrias bajo la Ley de Normas federal por cuanto el derecho de estos obreros a paga de tiempo y medio surge de la referida Sec. 7 federal y no de ley nuestra; ni nada hay en el fallo del tribunal de instancia, de ser confirmado, ante la verdadera controversia, como tampoco lo hubo en el de *Porto Rico Coal Co.* v. *Tribunal Superior*, 91 D.P.R. 89 (1964), que amenace el programa de industrialización de Puerto Rico, temor éste que con alguna frecuencia se aduce como un quinto argumento en relación con los pleitos de salarios y que sin la necesaria base en los hechos y sin sentido de selección, podría redundar en un argumento de clase en la serena disposición judicial de estas controversias. Básico como es para nuestro pueblo el programa de industrialización, no toda controversia de salario ni todo fallo sosteniendo una reclamación de salario como el de este caso ha de afectar necesariamente dicho programa. ([6])

Este caso tal vez deba advertir a los obreros del comercio interestatal en la mesa de contratación colectiva de los efectos, en cuanto a la compensación extra de la Sec. 7 de la Ley de Normas Razonables del Trabajo federal, de un plan de trabajo de seis días consecutivos de labor y dos días consecutivos de descanso dentro del marco de la semana calendario, como el aquí puesto en práctica por la recurrente.

En mi opinión la sentencia recurrida debería ser confirmada en este aspecto.

---

([6]) En el caso de *Porto Rico Coal* sólo estaba envuelta la compensación extra en exceso de 8 horas en un día. No había problema de paga por la semana de trabajo, federal o nuestra. Como marinos, aquellos obreros estaban expresamente excluidos por la propia Ley de Normas Razonables de Trabajo de toda protección en cuanto a paga extra. Ante situación así en que los obreros quedaban fuera del radio de acción federal estábamos en libertad de darles la protección máxima que dispone la legislación nuestra y les compensamos a doble tiempo el trabajo en exceso de 8 horas al día.